74 Cal.Rptr.2d 121 (1998)
954 P.2d 384
The PEOPLE, Plaintiff and Respondent,
v.
Lee Max BARNETT, Defendant and Appellant.
No. S008113.
Supreme Court of California.
May 4, 1998.
Rehearing Denied July 8, 1998.
*136 Michael A. Willemsen, Palo Alto, and Ron Parravano, Monterey, under appointments by the Supreme Court, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.
BAXTER, Justice.
Defendant Lee Max Barnett was convicted by a jury of one count of murder (Pen.Code, § 187),[1] two counts of robbery (§ 211), one count of assault with a firearm (§ 245, subd. (a)(2)), and four counts of kidnapping (§ 207). The jury found true the special circumstances that the murder was committed while defendant was engaged in the crime of robbery (§ 190.2, former subd. (a)(17)(i)), that the murder was committed while defendant was engaged in the crime of kidnapping (§ 190.2, former subd. (a)(17)(ii)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). It also found true allegations that defendant personally used a firearm in the commission of the robberies and kidnappings (§ 12022.5). After the jury returned a verdict of death, the trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)).[2] Appeal to this court is automatic. (§ 1239, subd. (b).)
We find no prejudicial error at the guilt or penalty phase of defendant's trial. We therefore affirm the judgment in its entirety.

I. FACTS

A. The Guilt Phase
The instant crimes occurred when two groups of people unexpectedly confronted each other on July 6, 1986, at a remote campsite in the Forest Ranch area of Butte County. The evidence at trial included testimony from those involved in the confrontation, including defendant, and from others who had contact with defendant the summer before the confrontation and immediately afterward.

1. The Prosecution Case
In 1985, defendant and Richard Eggett stayed at the remote campsite and dredged for gold together. In the summer of 1985, Christine Racowski was at the camp with the two men for a week.[3]
Tension developed when Racowski complained about defendant's belligerent language and accused him of stealing her wallet. Toward the end of the week, defendant called Racowski a "fucking bitch" and accused her of trying to sabotage the gold dredge. When Racowski denied the accusation, defendant punched her in the face. Eggett said, "That's it, I'm pulling out." Defendant grabbed his .22-caliber rifle and pointed it at Racowski, saying, "I just might as well pump some lead in her right now." Eggett intervened and the gun fired while pointed in the air. According to Racowski, Eggett was upset with defendant's aggressive behavior, and the gold dredging partnership between Eggett and defendant ended at that time.
Late in the summer of 1985, Dave McGee went to the camp at Eggett's request to help him remove a dredge. While at the dredge site, McGee observed tension between Eggett and defendant, who was also at the camp. Defendant left after Eggett said he did not need defendant's services anymore.[4] When McGee and Eggett later returned to *137 the campsite, Eggett's Jeep would not start and they had to hike out. McGee subsequently saw that the Jeep's engine had been destroyed by a screw.
A week or two later, defendant went to McGee's apartment and talked to Eggett (who had been staying with McGee) through the screen door. McGee heard defendant accuse Eggett of stealing gold from him. Eggett denied it. Defendant tore through the screen door, striking at Eggett. After Eggett chased defendant back out and off the porch, McGee saw defendant pull out a hunting knife and shake it at Eggett. Defendant fled as the police arrived, saying he would be back to kill Eggett and the others.
The following summer, in June of 1986, defendant approached Greg Kersting in Chico about the possibility of gold mining. Defendant told Kersting, who had a dredge, that he knew of a place with "lots of gold" in the Forest Ranch area. Defendant claimed that he and a partner had mined up there the year before and that the partner had "ripped him off' for "pounds of gold." After several conversations, Kersting and defendant agreed to dredge for gold together.
On the evening of July 5, 1986, defendant drove to the campsite with Kersting and his wife, Margarets Haynes, their three young children, and defendant's friend, Tom Burgess.[5] On the way to the campsite defendant told Haynes he was going to kill "Rich" (later identified as Richard Eggett). Defendant said: "I'm going to kill that fucker. I'm going to kill that sucker dog lips." Defendant later mentioned to Haynes that Eggett had stolen some gold from him.
When the group finally arrived at the campsite, a small tent and a motorcycle were there. Defendant stepped out of his truck, tied a red bandana around his head, got his gun and checked to see if anyone was there. Kersting heard defendant tell Burgess to get ready for possible trouble. Finding no one there, defendant drove his truck right through the camp, knocking over tables.[6] Haynes heard defendant call out: "Hey Rich, are you here, hey." Later, just before Haynes went to bed and also the next morning, she again heard defendant say he was going to kill that "sucker dog lips."
Prior to retiring for the night, defendant tried to turn his truck around and it got stuck in a hole. Defendant had the idea to tie some wood or logs on the truck's wheel with rope in order to get it out and turned around.
The following morning, on July 6, 1986, defendant began cutting trees to build a bridge across the creek. (See ante, fn. 6.) Defendant did not intend to stay at the campsite; he wanted to camp closer to the part of the creek where the dredging would be done. Kersting did not think the bridge was a good idea, so he walked between one and two miles, checking out the road for alternatives. Kersting returned about an hour or an hour and a half later. Soon after, he and the others heard a vehicle approach the campsite.
Defendant told Burgess to get his gun because it might be the people defendant had spoken of earlier, coming back to rob him. Defendant grabbed his .22-caliber rifle and ran up the side of a hill. Burgess stood with his loaded shotgun, waiting to see who was coming.
The approaching vehicle was Eggett's Jeep. Eggett was driving, joined by his mentally slow brother, Billy Eggett (Billy), Lloyd Curtis Hampton, and Bill Cantwell.[7] Eggett, Billy, and Hampton had initially arrived at the campsite around June 8, 1986, to dredge for gold, but had gone into town for the Fourth of July weekend and had spent the night at Cantwell's trailer. Cantwell decided to accompany them back to the campsite that morning. As they drove into the camp, they *138 saw two unfamiliar vehicles. Someone ran toward them and then up the side of the hill. Believing someone might be "ripping [them] off," Hampton and Cantwell armed themselves and went into the camp on foot.
There was a tense confrontation when Eggett's group came upon defendant's group. Eggett, Hampton and Cantwell wanted to know who was in their camp and what they were doing. Kersting and Burgess tried to explain they had gotten stuck the night before and were trying to move out. Kersting showed them his family and said they had planned to camp for the weekend and do some mining. He was told they were in the wrong place, and they had to get out of there. At one point, Kersting heard Eggett and Burgess scuffling behind him, apparently over Burgess's shotgun.
Meanwhile, defendant had run to the top of the hill. After revealing his presence, defendant shouted statements to the effect of "Rich, I'm back. I've come to get you" and "Eggett, you SOB, it's taken me a year but I've got you now." Defendant pointed his rifle and told Cantwell to drop his pistol or die.[8] He directed Eggett's group to drop their weapons and get out of there. Cantwell and Hampton put down their guns after defendant fired a warning shot and "bluffed" them by pretending others were up on the hill with him. Defendant told them to put their hands on their heads.
Eggett recognized defendant, and they started arguing about the previous year. Defendant cursed Eggett for robbing him. He also accused Eggett of having "a 300 pound nigger beat the shit out of [him] and kill [his] dog" the year before. Eggett denied everything.
After Hampton and Cantwell put their weapons down, defendant came down the hill. Eggett and defendant continued to argue, with defendant yelling that Eggett was a liar, a thief and a robber. Defendant got angry as Eggett repeatedly denied his accusations. At one point defendant told Eggett: "Hold it right there. I'm going to blow your God damn head off."
As defendant approached Eggett's group, he told Burgess to shoot if anyone moved. Defendant instructed Eggett's group to "empty [their] pockets" and place everything on the hood of Eggett's Jeep. Hampton put his gun, his knife and his wallet on the hood. Cantwell placed his pistol there,[9] along with $1,100 from a payroll check he had just cashed. A vial of gold belonging to Eggett and Hampton, worth between $700 and $1,000, was placed on the hood by Eggett. After surrendering their belongings, Eggett, Cantwell and Hampton were forced at gunpoint to place their hands behind their heads. Eggett's brother Billy stayed off to the side.
Defendant stuck Cantwell's pistol in his belt. He took Cantwell's money, saying that it would just about pay him back for what Eggett had stolen and that now Eggett owed the money to Cantwell. He also took the gold vial and Hampton's knife. When he took the gold, he told Eggett: "I got part of it that you owed me now." Defendant gave the money and gold to Burgess to hold.
Defendant then rummaged through the Jeep, warning that all the gold and ammunition should be given up or someone would be shot. When defendant found two boxes of shotgun shells in the Jeep, he became very upset and kicked Eggett. Defendant also took some pawn slips for gold from the Jeep. He indicated he was taking the items as payment or payback for what Eggett owed him.
Then in front of everyone, defendant pointed Cantwell's .38-caliber pistol toward Eggett's feet and clicked the trigger three times. The third time, the pistol fired and "snake shot" hit Eggett in the feet. Eggett, who had been wearing only thongs on his feet, cried out in pain and fell down. Although defendant initially appeared to express surprise that the pistol actually fired, he began to taunt Eggett, asking him how it *139 felt to have the shoe on the other foot and remarking that it was about time he felt some pain. He told Eggett to get up or the next shot would be in his head. Eggett got up, but complained he needed to go to the hospital. Defendant told him to quit sniveling.[10]
After the shooting, defendant seemed more "hyper" while Eggett became subdued. Defendant grew even more verbally and physically abusive toward Eggett, kicking him and hitting him in the head, face and ribs with the butt of the gun. He beat him in the head with a frying pan and threw a small stereo speaker at his head. As defendant beat Eggett, he warned Eggett to be quiet or he would "torment the hell out of you, beat the shit out of you and kill you." He also kept calling Eggett a snitch, referring to the previous year when Eggett had called the police on him for assaulting "a girl" at the camp and for putting "machine screws" into the carburetor of Eggett's Jeep. At various times defendant said he should kill Eggett and put him "through pain." At one point, Hampton and Cantwell saw defendant snag Eggett in the back with a treble fish hook and yank on it.
At defendant's direction, Eggett, Hampton and Cantwell all had their hands tied behind them and their feet bound.[11] They were put in Eggett's Jeep along with Billy. Defendant, accompanied by Burgess, drove the Jeep some distance away from the campsite while Kersting and his family remained behind.
About an hour later, defendant stopped the Jeep and pulled Eggett out. Defendant apparently started to rip Eggett's clothes off, then instructed Billy to use a knife to cut the rest off.[12] The others heard defendant say he was going to tie Eggett to a tree and leave him there a couple of days for the mosquitoes to eat.[13] After defendant walked Eggett away from Burgess and the others, Cantwell and Hampton heard Eggett yelling and screaming in pain as if being beaten. When defendant returned to the Jeep by himself, some 10 to 30 minutes later, the screaming had stopped.
When defendant returned, Hampton and Cantwell heard him tell Burgess that he had tied fishing line around Eggett's genitals "real tight" and that Eggett "won't be able to screw any other chick again." Defendant then untied Hampton's and Cantwell's hands, but not their feet. At that point, defendant said he would let Hampton and Cantwell go, but that he would find them and kill them if they said anything. He also told them to leave Eggett where he was for two or three days.
Defendant then drove Burgess, Hampton, Cantwell and Billy back to the campsite. According to Haynes and Kersting, they had been away from the camp for about one .and a half to two hours. When they returned, defendant allowed Hampton and Cantwell to untie their feet. Kersting was surprised that everyone seemed to be smiling and happy. When defendant said he was going to leave Eggett tied up to "suffer" a little more, Hampton and Cantwell nodded in apparent agreement and said, "Yes it's true." They also agreed with defendant that Eggett was "not that great of a guy." Hampton and Cantwell were scared and had decided to go along with whatever defendant said in order to save themselves.
Thereafter defendant produced some methamphetamine and offered it around. Kersting, Haynes and Burgess did not take any. Cantwell was nervous about refusing defendant, so he snorted some of the methamphetamine. Hampton injected some of it because he wanted to make defendant feel more comfortable. Defendant injected some as well.
*140 Defendant eventually returned some of the property taken from Hampton and Cantwell, including their weapons, ammunition, and about $800 of Cantwell's money.[14] The gold vial, which defendant had given to Burgess, was not returned. Burgess still had it when he was arrested.
As everyone was getting ready to leave, defendant told Kersting that he was going to park Eggett's Jeep up in the bushes, and that he would be back. He told Cantwell he was going to stash the Jeep in the woods somewhere and leave a note describing its location for Cantwell at the "slab" near Cantwell's trailer. Cantwell believed defendant said at one point that the Jeep was for Cantwell to keep.
Defendant was the first to leave the camp. While Kersting and one of his children stayed behind for defendant to return, Burgess left with Haynes and the other two children in Kersting's truck. When Kersting's truck got stuck backing out of the steep slide, defendant tried to push it with the Jeep. The truck ran into a rut, tearing off the lower radiator hose and bending the tie rod. When Haynes came back to camp to get water and a tool for the truck, Kersting decided his entire family should leave with Burgess.
Hampton and Cantwell left together on their motorcycles with Billy. Near the area where Richard Eggett had been left, they let Billy off Cantwell's motorcycle and told him to wait while they tried to find Eggett. Although defendant had warned them to leave Eggett for a few days, they thought defendant had already left.
When they got to the place where they thought the Jeep had been parked, Hampton honked his horn and Cantwell yelled for Eggett. They got off their motorcycles and started to walk, but immediately heard the motor of a Jeep start up. Figuring that Eggett would not have been able to get in the Jeep to drive it, Hampton and Cantwell believed that defendant or possibly someone else was there.
Fearing defendant and his warning to leave Eggett, Hampton and Cantwell got back on their motorcycles and went in the other direction. When their motorcycles got stuck, they abandoned them and headed to Cantwell's trailer in the dark. As Hampton and Cantwell went through the hills, trying to make sure they got away from defendant, the methamphetamine they had taken from defendant was making them hallucinate and paranoid that someone was following them.
Hampton and Cantwell eventually arrived at Cantwell's trailer around 9:00 a.m. the next morning (July 7).[15] They then drove Cantwell's Blazer back to the camp area to look for Eggett. They saw Eggett's dog and followed it to Eggett's Jeep, which was a short distance downhill from where they had heard Eggett screaming. Eggett's body was in the Jeep under clothes and sleeping bags. He had been stabbed to death.
After picking up Cantwell's wife and child, Cantwell and Hampton went to the Forest Ranch ranger station and called the police. They led the police back to the Jeep. Tied logs found on the wheels of Eggett's abandoned Jeep appeared similar to the tied logs defendant had fashioned and used on one of the vehicles the night before the confrontation with Eggett's group.
Burgess, meanwhile, had driven Kersting and his family home in Kersting's truck. They reached the Kersting home at midnight. Burgess and Kersting talked for several hours thereafter.
At approximately 10:00 a.m. the following morning (July 7), Burgess left Kersting to go to the home of Phil Enoingt and Delinda Olson. Defendant arrived at the home within 20 minutes of Burgess. Defendant said he wanted to get his hair dyed because the police were looking for him and asked Delinda if she knew how to do it. Defendant changed his clothes and shaved off his beard. Burgess, who was trying to avoid defendant, *141 observed blood on defendant's thighs when defendant changed his clothes.
That same day, defendant came by the Kersting house for his dog. Kersting noticed that defendant looked different; his beard had been shaven and his hair was slicked back. That was the last Kersting saw of defendant until the trial.
On July 17,1986, the police took defendant into custody after receiving an anonymous tip that he would be driving down from Cohassett in a pickup truck with another individual. When defendant was arrested, he identified himself as Daniel D. Osburn and had a fishing license in that name.
Forensic pathologist Dr. Gwen Hall performed an autopsy on Eggett's body on July 8,1986. She testified that Eggett had multiple stab wounds to the trunk: six in the back and two in the front. Death was caused by multiple stab wounds to the chest and abdomen. There were two life-threatening wounds: One went through the back of the rib cage and pierced the right lung; the other went through the chest wall and pierced the left lung.
Dr. Hall also found numerous injuries to Eggett's left hip and thigh, which she described as nicks and cuts caused by a sharp object puncturing the skin. There were no attendant scrapes or smaller scratches to suggest that those injuries were sustained by a fall or hitting against something. The shallow puncture wounds, as well as the eight stab wounds, appeared to be premortem as there was some bleeding into the wounds.
Dr. Hall additionally found other injuries and wounds, including a bump and a scrape on Eggett's forehead caused by a blunt object and wounds compatible with snake shot in Eggett's feet and lower legs. The shot was to tiny to be extracted. Other injuries included a number of scratches on many parts of the body, many of which were consistent with being caused by indigenous brush. Scratches on the right side underneath the arm had no bleeding and were post-mortem. Dr. Hall checked Eggett's genitals for injuries that could have resulted from fishing line. Although she did not see any, the absence of marks or injuries did not exclude the possibility that fishing line had been tied around the genitals.
Dr. Hall could not determine whether Eggett died before being placed in the Jeep. The time of death was between 40 and 48 hours prior to the autopsy, but with several hours' leeway on either side. If Eggett was alive when the non-life-threatening stab wounds were inflicted, they would have been painful. The lethal wound that fractured a rib and punctured the right lung also would have caused severe pain. In Dr. Hall's opinion, the numerous nicks and cuts caused by the sharp object puncturing the skin in the left hip and thigh area suggested that Eggett had been tortured by being poked or stabbed.

2. The Defense Case
In addition to attacking the credibility of the prosecution witnesses, defendant took the stand and testified in part as follows.
Defendant denied Christine Racowski's testimony that he punched her at the campsite in 1985 and denied that he and Eggett ended their partnership as she had described. Although defendant fired his rifle two or three times in the air to scare Racowski, Eggett did not seem too upset and did not grab the gun.
Defendant also disputed Dave McGee's version of the 1985 incident at McGee's apartment. According to defendant, he was beaten and kicked by McGee, Eggett and Cantwell when he went unarmed to the door to retrieve his share of some gold that he and Eggett had mined together. Defendant denied he had a knife. He also denied having sabotaged Eggett's Jeep.
With regard to the events of July 5 and 6, 1986, defendant denied he ever mentioned Eggett or a former partner to Haynes on the drive up to the camp. He may have mentioned the matter previously to Kersting, but did not tell him about his anger toward Eggett because he did not expect to see Eggett at the camp.
On the morning of July 6, defendant ingested two capsules of methamphetamine, which he thought were vitamins. Defendant admitted he confronted Eggett regarding a *142 "250 pound nigger" who had beaten him up, but denied he said anything about it being Eggett's turn now. Defendant also confirmed he yelled for "Sam and John" to keep the others covered when he bluffed Eggett's group into putting their weapons down. According to defendant, Sam and John were real people that he had briefly spotted in the area when he was down by the bridge, but they were not actually on the hill when he yelled their names.
Defendant claimed his shooting of Eggett was accidental. He had wanted to make sure all the weapons were empty, so he "dry fired" them. Cantwell had said that the gun was empty, so defendant was very surprised when it discharged.
Defendant admitted he took the money and gold that had been placed on the Jeep by the members of Eggett's group and gave them to Burgess. He claimed, however, there was only $863.23 in cash, not $1,100 as Cantwell had testified. Defendant took the money and gold because he felt Eggett owed him over four pounds worth of gold from the previous year. Once defendant learned the money belonged to Cantwell, he returned the money to him.
Defendant testified he had Eggett, Cantwell and Hampton tied up because he thought he was in a dangerous situation and believed that freeing the men would place him and his own group in jeopardy. Defendant claimed he previously had several violent encounters with Cantwell, fueled by Cantwell's anger that defendant had stolen 25 gallons of methamphetamine oil from his van.[16] Defendant was also wary because Cantwell and the others had lied earlier when they said the gun was not loaded and denied the existence of more ammunition. Defendant claimed his original plan was to take Eggett and his group to the top of the mountain and leave them there on a side road. He later decided to leave Eggett and take Hampton and Cantwell back to the camp. He thought they would return speedily to release Eggett if they thought Eggett was being left as mosquito bait.
Defendant denied he ever placed a fishing lure on Eggett's back or hit Eggett with his closed fist and a frying pan. He also denied striking Eggett with a rifle, but admitted slapping Eggett and throwing a small, empty tobacco can at his shoulder. He also admitted telling Cantwell and Hampton that he had tied fishing line around Eggett's genitals, but denied that he actually did so. Defendant also claimed he struck Hampton in the face with his fist after Hampton stabbed defendant twice in the leg with a folding knife.
After defendant drove back to the campsite with everyone but Eggett, he made sure that all the property was returned, including the weapons. Defendant shared some methamphetamine with Cantwell and Hampton and everyone talked about manufacturing the drug. Defendant led Cantwell to believe that he would return the 25 gallons of stolen methamphetamine oil. They agreed to cook up the methamphetamine right there in the camp; Cantwell agreed to give defendant several pounds of the finished product.
At Cantwell's request, defendant drove Eggett's Jeep to the area called the incline so that it would be available when Cantwell and Hampton went to get Eggett. When defendant returned to camp, his truck was the only vehicle there. He found that one of its tires had been stabbed and was flat. Defendant became afraid and hid for a while until he could no longer hear the sound of any engines. He then drove his truck to Highway 32, where he changed the tire. Defendant *143 admitted that he was at Phil Enoingt's and Delinda Olson's house on July 7 and that Burgess may have seen him change his pants.
Defendant admitted he identified himself as Daniel Osburn when stopped by the police, but said he did so only because the man who was with him at the time knew him by that name. He denied using the false name to confuse police. Defendant also admitted he had dyed his hair just after the confrontation with Eggett's group, but claimed he did so to avoid being recognized by Cantwell.
Crucially, defendant denied stabbing Eggett at any time. He also denied having a knife on his person on July 6 or 7, 1986, though he did carry a crevicing and dredging tool that he had obtained from Sam and John (two reclusive miners) the previous year.
Defense witnesses Jyll Bond and Kenny Clumpus testified they heard Cantwell speak of methamphetamine oil that had been stolen by defendant. According to their testimony, it was Cantwell who arranged to have Eggett killed and defendant framed for the murder.
Jeffrey Gray claimed he was with defendant on Sunday, July 6, 1986, from midafternoon to midnight and that defendant did not seem excited, scared or apprehensive.
Pathologist Bill Maduros gave his expert opinion that Eggett's wounds were homicidal, rather than torture, wounds. He also testified that if fishing line had been tied around Eggett's genitals, a residual mark would have been left, depending upon how tightly it was tied.
Licensed psychotherapist Joyce Quaytman testified generally that ingestion of methamphetamine can result in symptoms of grandiosity, hypervigilence, psychomotor agitation, delusions and hallucinations. She had no idea of the purity of the methamphetamine ingested by defendant on July 6,1986.

B. The Penalty Phase

1. The Prosecution Case
In addition to relying on the circumstances of the instant crimes, the prosecution presented evidence of defendant's prior felony convictions and evidence of his prior violent criminal activity, as follows:
In 1965, defendant was being pursued in a vehicle when he injured a state trooper in New York by running him off the road. Defendant was convicted of second degree assault, transportation of a stolen vehicle across state lines, and felony attempted prisoner escape.
In March of 1969, defendant robbed the clerk of a liquor store in New York at knife point. Prior to taking the money, defendant had proposed to the clerk that they split the proceeds. A week later, defendant robbed him again, this time claiming to have a gun in his coat. After his arrest, while the clerk was sitting near him in court, defendant repeatedly warned the clerk in a low voice to say he did not remember anything.
In September of 1970, defendant was arrested for a series of robberies in the Calgary area. At the time of his arrest, defendant was a passenger in a truck and raised a loaded handgun up off the seat with his left hand. A second officer stopped defendant from using the gun. He was convicted of five counts of armed robbery.
In December of 1971, defendant tried to rob the owner of a North Miami Beach restaurant at gunpoint. He was thwarted when the owner slammed the cash register drawer on his hand as he tried to grab the money. He fled and police pursued. During the pursuit, defendant backed his vehicle into a police officer, hitting him in the right leg. He also sideswiped a police car and ran into a fence. Defendant eventually was shot in the left leg after he pointed a gun at an officer.
April of 1972, defendant robbed the attendant of a Phoenix gas station at gunpoint. Prior to committing the robbery, defendant had tried unsuccessfully to get the attendant to set up a robbery and share the proceeds.
In September of 1973, defendant, while in custody at a medical facility, resisted being transported back to jail. He broke away from officers and started smashing at the glass door of a fire extinguisher compartment. *144 He had to be Maced before he could be handcuffed.
On October 26, 1977, defendant raped 17-year-old Mae G. when they went for a drive in his car. Defendant took her to an isolated location where he raped her, sodomized her, and forced her at knife point to perform oral sex.
In November of 1979, defendant was convicted of assault on David Sinopoli and sentenced to prison in Massachusetts.
In November of 1982, defendant met Helen T. in a bar in Albany, New York, and got her in his car on the pretext of sharing some marijuana. He took her to an isolated area and raped her.
On January 10, 1987, defendant, while incarcerated in jail, used a razor blade to slash the arm of Arthur Jordan, an inmate in the next cell, as Jordan was leaning on the bars watching television. Defendant had accused the victim of having his buddy, the former resident of the cell, moved.
On May 13, 1987, defendant caused a disturbance in the jail yard by refusing to wear his jumpsuit as required by jail rules. As he was being led back to his cell, he threw his fist towards the head of one of the officers. The fist did not connect because another officer grabbed defendant's arm with both hands.
On May 24, 1988, defendant spit at three correctional officers, hitting two in the face, as he resisted being loaded into a transportation van. Once in the van, defendant kicked out one of the windows.
On July 22, 1988, defendant tried to kick out the windows of the patrol car he was riding in. When an officer tried to grab him, he spit in his face.

2. The Defense Case
The defense attempted, through cross-examination, to cast doubt on the above events.
In addition, defendant's mother and brother testified with regard to defendant's harsh childhood in New York. The family lived on a farm in an old, uninsulated chicken coop that had no water or electricity. His father was stern and sometimes physically abusive toward defendant and his brother. The father usually hit the children with a two-by-four or a belt, but had hit defendant once with a hammer and had beaten him another time with a chain. Defendant and his brother had to work hard at tasks not normally required of young boys. The boys were mocked at school because they smelled like goats as a result of their limited washing facilities and livestock-feeding responsibilities before school.
Defendant's mother also testified that defendant worked hard for local farmers to earn money for a horse. He protected his older brother. He participated in 4-H projects and won many prizes for his vegetables and livestock. One year he worked hard to pay his way to Bible camp. Defendant was a good artist who sold a lot of pictures. Defendant was always good to his mother and she loved him very much.
William Culhane testified he had worked with defendant in defendant's logging business after meeting him at a Bible study group in the early 1980's. Defendant was a hard worker and volunteered to help Culhane dig out his septic system. Culhane did not see defendant drink or use drugs.
Linda Lorenz testified she met defendant in 1984 when he trimmed some trees at her house. Defendant helped her and her family around the house and yard. He brought them food items that he had scrounged from dumpsters. Defendant introduced them to his church.

II. DISCUSSION

A. Motions to Substitute Counsel or Allow Self-representation and Related Matters
Defendant began complaining about the performance of his appointed counsel at a very early stage, and continued to do so even after substitution of his initial counsel and throughout the trial proceedings. He makes a number of interrelated contentions with regard to the court's denials of his numerous motions to substitute counsel (People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Marsden)) and motions to *145 represent himself (Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (Faretta)).

1. Motions Involving Attorney Schroder

(a) Facts
On July 18, 1986, counsel was appointed and defendant was arraigned in the Oroville Justice Court. Public Defender John Schroder made his first appearance on behalf of defendant on July 21, 1986. The preliminary hearing was scheduled for July 31, 1986.
At the outset of proceedings on July 31, defendant asked the magistrate to replace Schroder and the public defender's office with other counsel on the grounds that: (1) there was some connection between Schroder and a person named Melvin Schroeder who knew the murder victim; (2) Schroder was not interested in hearing defendant's side of the story; (3) Schroder did not set aside sufficient time to prepare questions for the preliminary hearing and did not bother to read the questions prepared by defendant; and (4) the public defender could not and would not fairly and diligently pursue his case.
The magistrate promised to inquire into defendant's request after addressing other pending matters first. Apparently upset that Schroder was permitted to continue representation for such matters, defendant said: "I would make a motion to proceed pro se, then. I feel I'm adequate to handle my own case, rather than railroaded off by these gentlemen." The magistrate proceeded to deal first with the other matters, and thereafter indicated he would hear from defendant on his objections to counsel after a recess.
After the recess, Schroder confirmed in response to the magistrate's questioning that he had conversed with defendant, received all the discovery, and was prepared for the preliminary hearing. The magistrate then allowed defendant to "address the Court on your motion to have counsel relieved and appoint other counsel or represent yourself in this matter."
Both defendant and Schroder were permitted to speak at length on the matter. After reiterating his beliefs that counsel was not prepared and that counsel perhaps was connected to Melvin Schroeder, defendant specifically asked for appointment of substitute counsel. In response, Schroder indicated he had never heard of Melvin Schroeder and was not related to him. Schroder also described meeting with defendant on July 20, 1986, and going over the preliminary hearing procedure with him. Schroder explained he had witness statements and would cross-examine the witnesses on discrepancies, but would not put on a defense. Defendant questioned Schroder's motives and accused him of lying to the court and being unprepared for the preliminary hearing.
When asked if he would be willing to listen to defendant during a recess, Schroder answered no, because "[w]hat he wants to talk about are things that happened a year ago, that are not relevant at all." . After further questioning, Schroder disclaimed any feelings against defendant that would interfere with his representation and said he would be willing to listen to defendant before the preliminary hearing "[a]s long as he stays to the point, but that's the problem I have." Defendant, meanwhile, insisted he could not deal with Schroder because of a conflict of personality and a conflict of interest. He again asked that substitute counsel be appointed, and said he would not communicate further with Schroder.
After announcing he had "made an inquiry under People versus Marsden," the magistrate denied the motion to relieve Schroder and the public defender's office. When the magistrate then inquired whether there were any other motions at the time, defendant said only that he wanted the record to reflect his exception to that ruling.
Less than two weeks later, at his first superior court appearance before the Honorable Roger Gilbert on August 12, 1986, defendant again moved to remove Schroder (and his law partner Robert Mueller), complaining that Schroder failed to meaningfully represent him at the preliminary hearing. Defendant accused Schroder of selling him out and said he would never again talk to Schroder. In light of its heavy criminal calendar that day, the court continued defendant's motion to August 15.
*146 On August 15, the court held an extended in camera hearing on defendant's motion. Among other things, defendant reported a "complete breakdown in communications" with Schroder, spoke repeatedly of a conspiracy against him and confirmed he would no longer speak to Schroder or any counsel associated with him. Defendant, however, indicated he did not wish to represent himself.[17] Subsequently, the court concluded that the attorney-client relationship had "irretrievably broken down" and directed that another attorney within the public defender's office be assigned to the case. Defendant noted his exception to the court's ruling but raised no other issue.
Defendant then petitioned in propria persona for writ of habeas corpus, seeking appointment of an attorney not connected with Schroder or the public defender's office. Meanwhile, Schroder's law partner, Robert Mueller, requested to be relieved as counsel because he had represented prosecution witness Bill Cantwell on at least nine different occasions and three other potential witnesses as well. On September 16, 1986, the court granted Mueller's request and appointed Jerry Kenkel, who was not from the public defender's office, to represent defendant as secondary counsel. Approximately 10 days later, Kenkel was appointed chief counsel for defendant.
On December 4, 1986, the defense moved to dismiss the action pursuant to section 995, arguing that the magistrate erroneously failed to grant defendant's Marsden motion before the preliminary hearing. On December 29,1986, a related common law motion to dismiss was filed, incorporating by reference the section 995 points and authorities and relying also on information from the superior court Marsden hearings and Mueller's request to be relieved. The Honorable William R. Patrick ultimately denied both motions on March 20,1987.

(b) Analysis
Defendant first contends the magistrate erred in denying his Marsden motion to replace Schroder before the preliminary hearing. He next contends the superior court erred when it denied his motion for a dismissal based on the magistrate's failure to replace Schroder. The crux of his argument is this: On August 15, 1986, the superior court relieved Schroder upon finding that the attorney-client relationship had "irretrievably broken down." Because the conditions which led the superior court to find an irretrievable breakdown were no different when the preliminary hearing occurred two weeks before, the magistrate should have granted the Marsden motion at that time.
Marsden motions are subject to the following well-established rules. "'"When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]." [Citations.]'" (People v. Memro (1995) 11 Cal.4th 786, 857, 47 Cal.Rptr.2d 219, 905 P.2d 1305.) Denials of Marsden motions are reviewed under an abuse of discretion standard. (People v. Berryman (1993) 6 Cal.4th 1048, 1070, 25 Cal.Rptr.2d 867, 864 P.2d 40.) Denial "is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would `substantially impair' the defendant's right to assistance of counsel. [Citations.]" (People v. Webster (1991) 54 Cal.3d 411, 435, 285 Cal.Rptr. 31, 814 P.2d 1273.)
Here, the magistrate gave both defendant and Schroder ample opportunity to be heard on the Marsden motion. Schroder confirmed he had met with defendant, received all the discovery and witness statements, *147 and was prepared to proceed with the preliminary hearing. Although the record clearly discloses strategy disagreements between defendant and Schroder, it demonstrates no failure by Schroder to provide adequate representation.[18]
Moreover, "[a] trial court is not required to conclude that an irreconcilable conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (People v. Crandell (1988) 46 Cal.3d 833, 860, 251 Cal.Rptr. 227, 760 P.2d 423.) Since defendant had rejected Schroder's assistance a mere 13 days after his appointment, at an early stage of the proceedings, the magistrate could reasonably conclude that defendant had not made sufficient efforts to resolve his differences with Schroder or given Schroder sufficient time to demonstrate he was worthy of defendant's trust. (Ibid.)[19] No abuse of discretion appears.
The fact that the superior court relieved Schroder two weeks after the magistrate refused to do so is not significant. The superior court did not make its determination of an irreconcilable conflict based upon the same Marsden morion and arguments that were presented to the magistrate. A separate Marsden motion was at issue, and accordingly, the superior court held a separate hearing to review defendant's complaints. That the superior court made a different determination under such circumstances did not render the magistrate's earlier decision erroneous. (See People v. Berryman, supra, 6 Cal.4th at p. 1070, 25 Cal.Rptr.2d 867, 864 P.2d 40 [a reviewing court focuses only on the challenged ruling and the record on which it was made].) Even though the superior court considered many of the same objections heard by the magistrate, the court did not in any way suggest that the magistrate erred in denying the earlier motion.
Defendant next argues the magistrate committed reversible error in denying his Faretta motion for self-representation before the preliminary hearing. Likewise, he contends, the superior court committed reversible error in denying his motion to dismiss based on its review of the magistrate's decision.
To invoke the constitutional right to self-representation, a criminal defendant must make an unequivocal assertion of that right in a timely manner. (People v. Hines (1997) 15 Cal.4th 997, 1028, 64 Cal.Rptr.2d 594, 938 P.2d 388.) "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (People v. Marshall (1997) 15 Cal.4th 1, 23, 61 Cal.Rptr.2d 84, 931 P.2d 262.) A reviewing court, in determining whether a *148 motion for self-representation is unequivocal, is not bound by the trial court's apparent understanding that the defendant was making a motion for self-representation. (People v. Marshall, supra, 15 Cal.4th at pp. 23-25, 61 Cal.Rptr.2d 84, 931 P.2d 262.)
In this case, the record reflects that an unequivocal assertion was never made. Defendant said he "would make a motion to proceed pro se, then" when the magistrate would not immediately discuss his Marsden request at the outset of proceedings on July 31,1986. But when subsequently told by the magistrate "you may at this time address the Court on your motion to have counsel relieved and appoint other counsel or represent yourself in this matter," defendant launched into his complaints and suspicions regarding Schroder and asked repeatedly for appointment of another counsel, but expressed no desire for self-representation in the alternative. When the magistrate denied the motion to relieve Schroder after stating he had conducted a Marsden inquiry and asked if there were any other motions, defendant announced his objection to that ruling but made no mention of wanting to represent himself. Under these circumstances, defendant's single reference to "mak[ing] a motion to proceed pro se" is properly viewed as an "impulsive response" to the magistrate's refusal to immediately consider his Marsden request. As such, it did not constitute an unequivocal assertion of the right to self-representation. (Jackson v. Ylst (9th Cir.1990) 921 F.2d 882, 888 [self-representation request deemed an equivocal, emotional reaction to the trial court's denial of a motion for substitute counsel]; accord, Reese v. Nix (8th Cir.1991) 942 F.2d 1276, 1281 [defendant's statement  `"Well, I don't want no counsel then'"  deemed a mere expression of frustration in response to the trial court's denial of a request for substitute counsel]; Hodge v. Henderson (S.D.N.Y.1990) 761 F.Supp. 993, 1001-1002, affd. per curiam (2d Cir.1991) 929 F.2d 61.)[20]

2. Pretrial Motions Involving Attorneys Kenkel and Stapleton

(a) Facts
On September 11, 1987, defendant filed a "declaration" claiming his case had been prejudiced by Schroder's failure to promptly investigate the underlying facts and events. Defendant also asserted that Kenkel, his current counsel, had ignored his repeated requests to contact various witnesses "believed vital to the defense" and asked that Kenkel be directed to make every effort to locate the witnesses. In the alternative, defendant demanded dismissal of the charges against him.
The trial court treated defendant's declaration as a Marsden motion and conducted an in camera hearing. Defense investigator Robert Eastham testified and submitted his notes outlining his efforts to locate certain witnesses and evidence. The court observed that while the investigation was not yet complete, substantial efforts had been made on defendant's behalf. After noting that defendant was not asking for counsel to be relieved, the court offered to reopen the matter in six weeks if defendant wanted to do so.
On January 21, 1988, defendant filed a habeas corpus petition in propria persona, alleging the incompetence of Kenkel. Defendant purported to refuse all further contact with Kenkel and sought appointment of another attorney. The court treated the petition as a request for a Marsden hearing, and after several continuances, conducted an extensive in camera hearing on March 7, 1988, in which defendant was allowed more than an hour to air his grievances.[21] Defendant faulted Kenkel for not calling him to the stand to testify about the prejudice he suffered as a result of Schroder's representation. *149 Defendant also accused Kenkel of dereliction in tracking down witnesses, including two gold miners named "Sam" and "John" (last names unknown), who supposedly witnessed the events of July 6, 1986, and could attest to defendant's innocence. Defendant additionally complained of Kenkel's refusal to meet with him in jail on May 8, 1987, Kenkel's refusals to seek bail and move for a change of venue, and his failure to devote sufficient time to defendant's case due to his outside workload.
In response, Kenkel testified under oath regarding his considerable professional qualifications. He answered each of defendant's complaints point by point, describing, among other things, the defense team's efforts to locate witnesses and the reasons why he rejected defendant's proposed strategies.[22] After hearing defendant's responses to Kenkel's testimony at a subsequent hearing on March 11, 1988, the court declined to relieve counsel.
On March 31 and April 4, 1988, the court held hearings on defendant's petition for writ of habeas corpus requesting his release from custody. These hearings took place in open court after defendant was advised by counsel and the court that the proceedings were not confidential and that the prosecutor was entitled to be present. Defendant repeated his earlier claims that there were many witnesses to corroborate his version of the relevant events  most importantly, Sam and John  and emphasized he knew them only by first name or appearance and had no addresses for them. Defendant therefore wanted Kenkel to seek his release from custody so that he could help find them before the trial. Kenkel's failure to do so, defendant claimed, was depriving him of his rights to effective representation, compulsory process and a fair trial.[23]
In considering the release issue, the court heard testimony from defense investigator Douglas Nisson. Nisson explained his efforts to locate Sam and John, whom defendant had described as nomadic gold miners with no known address. Nisson had attempted to locate permits or intentions to mine but such documents did not exist. He had spoken with a fire marshal who patrolled the area, but the marshal had not heard of Sam or John. Nisson also intended to locate two other miners described by the fire marshal and to physically search the area using a map drawn by defendant. The court denied the writ, finding no basis upon which to release defendant and no substantiation for the assertions of counsel's incompetence.
Trial was scheduled to begin on May 9, 1988. On May 2, 1988, the defense requested a 30- to 60-day continuance to investigate matters recently added to the prosecution's list of aggravating evidence for the penalty phase and to follow up on recently obtained information regarding the whereabouts of Sam and John. The court denied the request, stating that jury selection would last at least 30 days and that defense investigators could continue their work during that time.
Meanwhile, on May 9,1988, defendant filed a new Marsden motion. Prior to the start of trial proceedings, the court held a hearing and directed defendant to confine his showing to new matters arising since the previous Marsden hearing. After clarifying that his motion was directed toward both Kenkel and associate counsel Stapleton (see ante, fn. 21), defendant described several pretrial motions he believed counsel should have filed and additional points he thought should have been raised.[24] Defendant also complained *150 counsel had not discussed defense strategy or the selection of trial witnesses with him and had failed to address the issues raised by defendant in some 45 letters to counsel. In response, Kenkel said the defense team had been preparing diligently for trial and was ready to proceed. He saw no basis for any of defendant's proposed motions and had tried to comply with every reasonable request made by defendant. Kenkel told the court he was reluctant to disclose defense strategies and evidence for fear that, by analogy to section 987.9,[25] the court would be forced to disqualify itself from presiding over the trial. The court denied the Marsden motion, observing that counsel had been properly representing defendant and would continue to do so.[26]

(b) Analysis
Defendant first contends the trial court erroneously denied his January 1988 request to remove Kenkel from the case. In particular, he claims the court accepted counsel's explanations and assurances without adequate inquiry. Defendant also faults the court for focusing entirely on the adequacy of counsel's work without considering whether an irreconcilable conflict between counsel and defendant had developed. Defendant appears to contend that while each of the claimed failings of counsel "might be individually excusable," their combined effect on the attorney-client relationship required counsel's removal.
Defendant cites only one decision, People v. Hill (1983) 148 Cal.App.3d 744, 196 Cal. Rptr. 382, to support his claim that the inquiry into counsel's performance was deficient. Consistent with established case law, that decision recognized that a court may not deny substitution of an attorney based solely on its own courtroom observations of the attorney's previous demonstrations of courtroom skill without permitting the defendant to relate alleged instances of incompetence. (People v. Hill, supra, 148 Cal.App.3d at p. 753, 196 Cal.Rptr. 382, citing Marsden, supra, 2 Cal.3d at pp. 123-124, 84 Cal.Rptr. 156, 465 P.2d 44 and other cases.) It further concluded that a court may not conduct an off-the-record investigation into the allegations of incompetence but must make its inquiry in open court in the presence of the defendant. (People v. Hill, supra, 148 Cal. App.3d at pp. 753-755, 196 Cal.Rptr. 382.)
That is exactly what happened here. Treating defendant's January 1988 habeas corpus petition as a Marsden request, the court allowed defendant to fully state his complaints. As part of the court's careful inquiry into the matter, Kenkel was sworn in and, in defendant's presence, asked to summarize *151 his experience in criminal law[27] and then to address each of defendant's complaints. The court then permitted defendant to respond. We perceive no deficiency in the court's inquiry.
Likewise, the trial court did not abuse its discretion in denying the Marsden request. Although defendant's frustration with counsel was clearly evident, the record reflects substantial investigative efforts by Kenkel and his anticipated readiness to proceed on the scheduled trial date. The claim of inadequate representation is not well founded.
Additionally, the record does not indicate that defendant and counsel had become embroiled in such an irreconcilable conflict that ineffective representation was "likely to result." (People v. Crandell, supra, 46 Cal.3d at p. 854, 251 Cal.Rptr. 227, 760 P.2d 423.) Notably, while defendant made clear he was "disillusioned" with Kenkel's representation, he also described Kenkel as "a great guy" and made no reference to an irreconcilable conflict. Kenkel did not join in the motion for substitution or otherwise suggest that such a conflict existed. (See People v. Young (1981) 118 Cal.App.3d 959, 967-968, 173 Cal. Rptr. 700.) That Kenkel refused to accede to defendant's demands on various tactical matters (such as whether to expose defendant to pretrial cross-examination by the prosecutor on the issue of prejudice resulting from Schroder's representation and whether to advance certain pretrial motions), standing alone, did not constitute sufficient cause for substitution of counsel. (People v. Williams (1970) 2 Cal.3d 894, 905, 88 Cal.Rptr. 208, 471 P.2d 1008.)
Defendant next contends the court erroneously denied his related habeas corpus petition seeking release from custody "because without the presence of [defendant] it would be extremely difficult for the defense to locate and identify Sam and John, two critical witnesses. If the court's order denying the petition was based on Investigator Nisson's assurances, then the court should have reconsidered its order when it later appeared that Nisson did not have any further leads on locating Sam and John and did not attempt to locate their operation." Defendant addresses this matter amid the Marsden issues because it involves his "dissatisfaction with counsel" and "forms the backdrop" to his subsequent Marsden motions.
In advancing these claims, defendant presents no legal analysis whatsoever regarding his eligibility for bail (See § 1270.5 [a defendant charged with a capital offense cannot be admitted to bail when the proof of guilt is evident or the presumption thereof great].) At most, defendant refers to Kinney v. Lenon (9th Cir.1970) 425 F.2d 209 as containing "strong language" regarding the right of an incarcerated prisoner to be released to help locate crucial witnesses where the circumstances make it difficult or impossible for persons other than the defendant to find, or gain the cooperation of, witnesses.
In Kinney v. Lenon, supra, 425 F.2d 209, the appellant was a juvenile detained in a detention home pending trial on charges arising out of a schoolyard fight. The juvenile was Black and his attorneys were White. Although there were many witnesses to the fight, they, too, were Black and it was claimed that, because the juvenile could not identify them by name but only by sight, his attorneys would have great practical difficulty in interviewing and lining up the witnesses. In directing that the juvenile be released for the purpose of aiding the preparation of his defense, the appellate court remarked: "It would require blindness to *152 social reality not to understand that these difficulties [in overcoming the apathy and reluctance of potential witnesses to testify] may be exacerbated by the barriers of age and race. Yet the alternative to some sort of release for appellant is to cast the entire burden of assembling witnesses onto his attorneys, with almost certain prejudice to appellant's case." (425 F.2d at p. 210.)
Assuming arguendo the soundness of Kinney v. Lenon, supra, 425 F.2d 209, and setting aside for the moment section 1270.5 and other issues that might warrant consideration in the proposed release of a defendant facing capital charges, we find the circumstances presented to the trial court here undeserving of parallel treatment. Unlike the situation in Kinney v. Lenon, defendant here was able to provide first names and descriptions of Sam and John, the two miners who supposedly could attest to his innocence. Moreover, defendant claimed that Sam and John would not be apathetic or reluctant witnesses once they were located; rather, in defendant's own words, they "would be only to [sic] happy to verify that I had done nothing wrong." Defendant also drew a map purporting to show the general location of Sam's and John's campsite and mining activities to aid the defense investigation. Investigator Nisson, using the information provided by defendant, had spoken to various persons in the area and had obtained several leads on miners who fit the descriptions. However, he had not finished pursuing those leads by the time of the hearing on defendant's habeas corpus petition and indicated he intended to search the area once the weather permitted. Since defendant's release under these circumstances did not appear necessary to preserve his right to a fair trial (see Kinney v. Lenon, supra, 425 F.2d at p. 210), no abuse of discretion has been shown.
Defendant cites no authority to support his related claim that the court was required to undertake a sua sponte reconsideration of the release matter when it later appeared that Nisson had exhausted his leads for locating Sam and John and did not attempt a physical search for their camp. The claim is rejected. To the extent changed circumstances might have supported his release, it was incumbent upon defendant to make another release request based upon that new information.
Defendant next contends that his specially appointed counsel, Rick Ortner (see ante, fn. 23), was ineffective for failing to request an in camera hearing on the release request and that the court erroneously failed to exclude the prosecutor on its own initiative. According to defendant, his federal constitutional privilege against self-incrimination and his right to effective assistance of counsel were violated because the prosecutor was able to cross-examine defense investigator Nisson and gain access to defendant's declarations detailing his defense.
We reject these contentions. As courts have recognized, Marsden hearings are held outside the presence of the prosecutor because such matters may often entail the disclosure of defense strategy or evidence to which a prosecutor might not otherwise be privy. (E.g., People v. Dennis (1986) 177 Cal.App.3d 863, 871, 223 Cal.Rptr. 236.) Moreover, the People generally have no interest in having the defendant represented by a particular attorney. (Ibid.) The People, however, have a substantial interest in the determination whether and under what circumstances a capital defendant is granted a pretrial release from custody. Accordingly, any request for such a release must be heard in a fully adversarial proceeding in which the prosecutor has notice of the grounds for the request and an opportunity to present evidence and argument. (See People v. Smith (1993) 6 Cal.4th 684, 694, fn. 2, 25 Cal. Rptr.2d 122, 863 P.2d 192 [any motion to withdraw the plea or for a new trial must be part of a fully adversarial proceeding, even if based upon the alleged ineffectiveness of counsel]; People v. Pinholster (1992) 1 Cal.4th 865, 930, 4 Cal.Rptr.2d 765, 824 P.2d 571 [motion to dismiss]; People v. Dennis, supra, 177 Cal.App.3d at pp. 872-873, 223 Cal.Rptr. 236 [motion for new trial].)
Relying upon People v. Grace (1971) 18 Cal.App.3d 292, 95 Cal.Rptr. 688, defendant also contends the court conducted an insufficient inquiry and erroneously denied *153 his Marsden motion to relieve Kenkel and Stapleton just before the start of trial on May 9, 1988. In particular, defendant asserts it was not refuted that Kenkel had never discussed with him the evidence he had planned to present or the strategy he would employ and that Kenkel had not responded to many of the points raised in defendant's numerous letters. Moreover, defendant argues, the court wrongly denied him the opportunity to present preliminary hearing transcripts and police reports to rebut Kenkel's conclusions that defendant's proposed strategies had no merit. At the very least, defendant urges, his complaints disclosed a serious breakdown in the attorney-client relationship.
Defendant's reliance upon People v. Groce, supra, 18 Cal.App.3d 292, 95 Cal.Rptr. 688, is misplaced. In that case, the Court of Appeal reversed a conviction where the trial court had made absolutely no effort to inquire into defense counsel's alleged inadequacy after the defendant complained that counsel should have produced hospital records that might support defendant's innocence. In doing so, the appellate court observed: "It is recognized that the objection is frequently made to the inadequacy of counsel. This objection seldom has merit because the decision of the attorney is normally made after due consideration on the trial tactics to pursue in the interest of his client. The court's inquiry, of course, is not to ascertain defense counsel's reasons for his decision for not following procedure requested by the defendant. The inquiry should be limited to whether the attorney made a knowledgeable election on the subject." (18 Cal.App.3d at p. 296, 95 Cal.Rptr. 688.) In other words, the court must ascertain whether counsel's action or inaction "was a matter of discretion or neglect." (Ibid.)
We observe that at least one court has criticized the duty of inquiry articulated in People v. Groce, supra, 18 Cal.App.3d 292, 95 Cal.Rptr. 688, in the context of a Marsden hearing held in the presence of a prosecutor. (See People v. Huffman (1977) 71 Cal.App.3d 63, 80-81, 139 Cal.Rptr. 264.) But even assuming such an obligation exists where, as here, the trial court conducted the hearing in camera, no deficiency appears. After allowing defendant to speak at length regarding the instances of alleged inadequacy, the court ascertained from Kenkel that both he and Stapleton had reviewed the record and evidence in depth and that they had found no meritorious basis upon which to seek dismissal, suppression, discovery, a venue change, a gag order or any of the other actions requested by defendant. (See ante, fn. 24.) Moreover, the court received Kenkel's assurances that he and Stapleton were aware of each of the disputed subject areas raised by defendant and had tried to comply with his requests to the extent possible. Having determined that counsel's decision to reject defendant's proposed strategies was a matter of informed discretion and not neglect, the court was under no obligation to review the preliminary hearing transcripts and police reports that, according to defendant, would rebut Kenkel's evaluation of his strategies.[28]
Finally, defendant is correct in suggesting that a disagreement over trial tactics could signal such a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. (People v. Williams, supra, 2 Cal.3d at p. 905, 88 Cal. Rptr. 208, 471 P.2d 1008.) However, the trial court in this case was not faced with a record evidencing such a breakdown. Counsel affirmed at the hearing that the defense team had worked many hours, investigating and researching the case and was ready to proceed to trial.[29] Counsel gave no *154 indication that the relationship with defendant had in any way hampered defense preparations. More importantly, there was substantial evidence of cooperative efforts in that counsel in fact investigated the possibility of pursuing defendant's suggested strategies but declined to do so only after determining they would not be successful. On this record, denial of substitution was not an abuse of discretion.
In reaching this conclusion, we have not overlooked defendant's assertion that Kenkel never specifically refuted the claim that he had never discussed defense strategy with defendant. Although the court did not ask Kenkel to respond to that particular point, it knew from the previous hearings that defendant was in fact aware of counsel's strategies and areas of investigation.[30] It was also obvious that defendant simply had no interest in defense strategies that varied from his own and that his sole aim was to have the defense conducted his way, regardless whether current or substitute counsel was involved. Since defendant had no right to an attorney who would accede to all of his whims, denial of the Marsden motion did not constitute an abuse of discretion.

3. Midtrial and Posttrial Motions

(a) Facts
On June 29, 1988, after five weeks of jury selection and six days of testimony, defendant told the court: "I wish to make a Faretta motion. I wish to self-represent." The next day the court held a hearing, the first part of which was conducted in camera in light of defendant's assertion that explaining his dissatisfaction with counsel would require disclosure of what defendant perceived to be major portions of his defense. During the closed session, defendant was permitted to speak for well over two hours (approximately one hundred pages of transcript) regarding his criticisms of counsel and his reasons for wanting self-representation. In particular, defendant faulted counsel for failing to properly cross-examine various prosecution witnesses, failing to obtain discovery from the prosecution regarding inmates who were given "deals" to testify against him or bribes to not testify on his behalf, arid failing to properly respond to the prosecutor's unethical and prejudicial conduct. Defendant was also allowed to file two exhibits consisting of witness questions he had prepared for trial. One exhibit listed 324 questions for Bill Cantwell and the other contained 355 questions for Lloyd Curtis Hampton.
The court then heard from counsel. Kenkel explained why he had cross-examined certain witnesses as he did and indicated he had incorporated the questions and points raised by defendant where he thought it was appropriate. Kenkel assured the court that he had reviewed all the discovery provided, that he was working long hours on the trial, and that he had seen defendant every weekend since the trial started. He also made the observation that defendant had a very disjointed view of how the trial should proceed and a poor understanding of the rules of evidence. It was Kenkel's opinion that he could not provide effective representation by acceding to defendant's demands for an "all or nothing" approach seeking a complete acquittal.
After hearing these complaints and responses, the court reconvened in open court for further consideration of the Faretta motion. The court ultimately denied the motion after finding that: (1) defendant's statement of reasons involved merely tactical disputes; (2) the quality of counsel's representation had been of a very high caliber; (3) the trial was well underway; (4) although a continuance would not be required, granting the motion would cause at least some disruption; and (5) there had been a number of requests for substitution of counsel. (See People v. Windham (1977) 19 Cal.3d 121, 128, 137 Cal. Rptr. 8, 560 P.2d 1187 (Windham) [listing guidelines for considering midtrial Faretta motions].)
*155 On July 5, 1988, defendant filed a motion in propria persona for cocounsel status, repeating many of the same complaints he made to support his previous Faretta motion. The motion was denied.
On July 25, 1988, defendant told the court he wanted another lawyer because Kenkel was not asking the questions or putting on the defense as defendant desired. In an in camera hearing, defendant complained that Kenkel had made no further attempts to find witnesses Sam and John despite assurances he would do so, that Kenkel failed to request the standard and special jury instructions drafted by defendant, and that he failed to question witnesses about matters raised by defendant. He also claimed Kenkel refused to introduce evidence of specific prior acts of violence by Eggett which, according to defendant, would show the reasonableness of his state of mind when he had Eggett tied up. Defendant was also permitted to file as exhibits the list of jury instructions he wanted, as well as eight separate lists of questions he had prepared for the following witnesses: (1) a three-page list of questions for Tom Handy; (2) a five-page list for Tom Burgess; (3) another six-page list for Burgess; (4) an eight-page list for Greg Kersting; (5) a seventeen-page list for Cantwell; (6) a nineteen-page list for Hampton; (7) a two-page list for Jyll Bond; and (8) a three-page list for Linda Lorenz. After taking a break and reviewing defendant's lists, the court announced it would not substitute counsel.
Later in the in camera hearing, defendant continued to object to Kenkel's representation, as if a motion were still pending. By that time, defendant had decided to testify in his own defense and it appeared he soon would be called to the stand. Defendant complained he did not know if he wanted counsel questioning him because counsel was not asking his proposed questions. Defendant also expressed shock that the court would find Kenkel competent without reviewing every single one of the nearly 1,300 questions prepared by defendant, and asked the court to spend several hours on such a review so that it could exercise "proper discretion" in evaluating the questions. The court refused, explaining it had looked at many of the questions and had determined they related to trial strategy and tactics. The court also refused defendant's request for permission to question witnesses subject to his counsel's objections and advisement.
At the end of the day on July 25, 1988, the court held another in camera hearing, at Kenkel's request, pertaining to defendant's decision to testify. Kenkel said he would be calling defendant as a witness the next day, even though he had advised defendant against it because he would be subject to rigorous cross-examination and impeachment with prior felony convictions. Kenkel also informed the court he had decided, despite defendant's objections, not to make further efforts to pin down the time of death more specifically than had prosecution witness Dr. Gwen Hall or to have Eggett's body exhumed in order to impeach Dr. Hall. Additionally, Kenkel spoke of his refusal to call or recall certain witnesses.
After Kenkel, defendant was given an opportunity to speak. He stated why he believed his actions on the date of the murder would justify a jury instruction regarding lawful resistance to a public offense. He also explained his reasons for wanting certain witnesses called or recalled, his theory supporting Eggett's exhumation, and his belief that the prosecutor was attempting to "blackmail" him into not testifying by threatening impeachment with supposedly remote or constitutionally infirm prior convictions. Defendant complained he had heard no response from counsel regarding his desire to consult experts regarding the effects of methamphetamine in high dosages (in order to impeach Cantwell's and Hampton's versions of the events and to support a diminished capacity defense).
On the morning of August 2, 1988, Kenkel told the court he had just visited defendant at the jail and that defendant had yelled at him and had been "totally out of line and unreasonable." Among other things, defendant accused counsel of reneging on promises to spend at least 45 minutes with him every morning to prepare for the trial, and he again complained of counsel's refusal to impeach prosecution witnesses with their prior inconsistent statements. Believing that *156 counsel did not want to bring out the truth, defendant said he could not deal with Kenkel anymore and asked that "another counsel be appointed; preferably from out of [the] area here."
Based on defendant's erratic behavior, Kenkel expressed his doubt as to defendant's competency. According to Kenkel, he and defendant had a "very agreeable, very productive meeting" the previous night (August 1, 1988). That morning, however, defendant inexplicably "wigged out" and became "virtually uncontrollable in his anger and antipathy" toward Kenkel in the holding cell. Over the prosecutor's objection, the court appointed a doctor to examine defendant that afternoon and to advise whether there should be a full hearing on the issue of his competency to proceed with the trial. (§ 1368.) The court also appointed separate counsel for defendant on the competency issue.
The following morning, based upon the report of Dr. William Lorack, the court determined there was no objective, substantial evidence upon which to justify the finding of a doubt regarding defendant's competency. Accordingly, the court denied Kenkel's request for a full competency hearing.
Having resolved that issue, the court next permitted defendant to elaborate in camera on his Faretta motion, pending from the day before. Among other things, defendant said counsel was "railroading" him by failing to present evidence of the violent character of the victim and various witnesses including Bill Cantwell, by failing to impeach Cantwell with a prior inconsistent statement regarding whether defendant snorted or injected methamphetamine at the campsite, by bringing up defendant's prior convictions in the direct examination of defendant before the court had ruled on their admissibility, and by failing to object to or otherwise counter prosecutorial questioning on prejudicial and irrelevant matters. Kenkel specifically refuted many of the charges, pointing out that defendant's proposed strategies would have been either inconsequential or even counterproductive to the defense. After examining the Windham factors (see 19 Cal.3d at p. 128, 137 Cal.Rptr. 8, 560 P.2d 1187), the court denied defendant's "motion to relieve counsel and substitute other counsel or substitute himself in pro per." The court concluded in effect that defendant and his counsel simply differed over tactics and strategy, which were "within the province of counsel."
On August 8, 1988, after the defense had rested in the guilt phase, defendant filed a 12-page, single-spaced document entitled "Defendant's Objection to Counsel Resting the Defense. Specific Objections Noted. And Faretta Motion to Defend Self."[31] The next day, the court held an in camera hearing, summarizing some 24 issues in the document as "highlights." Several of the identified issues had already been touched upon in previous motions (e.g., defendant's desire to call certain witnesses and to impeach others, and counsel's failure to locate various witnesses including the two reclusive miners known to defendant as Sam and John[32]), while others involved additional asserted inconsistencies *157 in witness testimony and surrebuttal evidence that defendant wanted brought out at trial. In addition, defendant faulted counsel for calling a single drug counselor to support his defense instead of experts in pharmacology, toxicology, physiology, psychology and psychiatry.
Defendant also complained about Kenkel's handling of defense investigator Eastham's concession at trial on rebuttal that he had been unable to find the supposedly stolen methamphetamine oil buried in any of the locations defendant had described. The prosecutor had used that concession to cast doubt on the defense's evidence that the theft of Cantwell's methamphetamine oil led Cantwell to frame defendant for Eggett's murder. Kenkel should have brought out the fact that defendant had previously revealed some of the locations to Burgess, who was not in custody and could have removed the oil before Eastham looked for it. After asserting deficiencies in Eastham's efforts to find the oil, defendant repeated his earlier requests to be taken to the locations himself, under appropriate security, to retrieve the oil and prove it really existed.
Although Kenkel did not respond to all of defendant's objections and claims, he explained that defendant's proposed strategy for various witnesses might be damaging to the defense and disclosed that the investigation of other leads provided by defendant proved fruitless. Kenkel also reported that methamphetamine oil had been located that Sunday in Durham at a location defendant had not disclosed until Thursday afternoon.[33] Prior to that, defendant had described only three locations, one of which was on private property. After Investigator Eastham failed to find methamphetamine oil at the two public locations, Kenkel sent Investigator Nisson to retrace Eastham's steps. Nisson was likewise unsuccessful. On Sunday night, Nisson went with prosecution investigator Tony Koester to the private property previously unsearched and found a whiskey bottle there.[34]
Finally, Kenkel indicated the defense had not physically searched the general area described as Sam's and John's campsite and had not looked for the two miners since the start of trial. Kenkel noted, however, that prior to trial the defense team had looked for Sam and John all over Butte County. The defense had advertised in the newspaper and had attempted to obtain leads in pawnshops and other places where miners would trade. In Kenkel's words, "they've all been dead ends."
In denying the Faretta motion, the court again considered the quality of counsel's representation, the length and stage of the trial, and defendant's prior proclivity to request substitution of counsel or self-representation. The court also noted that all of defendant's complaints related to trial tactics, strategy and investigation and that defendant had hampered his own defense by not supplying counsel with the location of necessary physical evidence until after the defense rested. Finally, the court found that Kenkel and Stapleton had properly represented defendant and would continue to do so, and that at no time during the trial had there been a breakdown in the attorney-client relationship that interfered with counsel's representation.
On August 10, 1988, after closing arguments, defendant announced he was firing counsel. The next day, just before the jury was instructed, defendant told the court he had a conflict of interest with counsel and was suing him. After the jury was instructed, the court directed defendant to put his reasons for wanting self-representation in writing. Defendant objected to the court's requirement for a written motion and to counsel's taking any other actions on his behalf.
On August 15, 1988, while the jury was deliberating in the guilt phase, defendant submitted a document entitled "Defendant's Objections to Having Attorney Jerry Kenkel Forced Upon Him, (and Mark Stapleton Forced Upon Him). Defendant's Objections to Certain Actions of His Attornies (sic) in Failing to do Certain Things, and in Doing *158 Other Things that He Should Not Have Done." This time defendant accused counsel of conflicts of interest pertaining to Stapleton's previous representation of Cantwell and James Lee Halstead and Kenkel's current representation of Dan Zurcher and relationship to Jim Skidmore. His numerous other complaints included counsel's failures to object to certain questions, evidence, and arguments; to introduce evidence regarding the amount of gold found by other miners in the campsite area, defendant's back injuries, a dollar bill from Cantwell reflecting a phone number, the lack of medical attention at the jail in 1986, and evidence regarding air conditioning venting in Cantwell's van; to present rebuttal evidence or attack inconsistencies with reference to the testimony of Hampton, Cantwell, Kersting and Sergeant Handy; to move for exhumation of Eggett's body; and to rehabilitate Jyll Bond regarding Eggett's death. Defendant also objected to the fact that Burgess was given limited immunity and to the fact that the prosecution read half the jury instructions to the jury.
Treating defendant's objections as a request for a Faretta hearing, the court held an in camera hearing on August 16, 1988, after the jury had returned a guilty verdict on all charges. Both Kenkel and Stapleton testified under oath that they had reviewed and investigated the claimed conflicts previously and had concluded there was no potential conflict or connection between their representation of the named individuals and defendant's case. Defendant disputed counsel's representations and exclaimed: "[M]y counsel has lied to the Court, my counsel lied to me, quite frankly I don't want this human piece of excrement anywhere near me and that's really the way I feel about it. Mr. Stapleton is lying here, these guys knew that I was going to be convicted cause they had it all arranged for me to be convicted." Defendant then expressed his anger at Kenkel for having suggested in his closing argument that if defendant did kill Eggett, it was in response to hostile statements by Eggett which caused defendant to become enraged in his drug-induced paranoia. Despite defendant's insistence that he wanted no further contact with counsel, the court denied his request for a Faretta hearing.
On August 22, 1988, the first day of penalty phase testimony, defendant filed a document entitled "Motion for Marsden Hearing. Defendant's Objection to Further Representation by Counsel with whom Defendant has a Conflict of Interest. Defendant Further Objects to Inaction of his Counsel which Constitutes Ineffectiveness of Counsel." In that document, defendant served "notice" he was suing Kenkel and Stapleton for malpractice based upon their alleged ineffectiveness and incompetence. Attached as exhibits were a document listing mitigating evidence for counsel to investigate, a motion to strike portions of the aggravating evidence for lack of notice, a motion for a jury trial on an unadjudicated assault, and a motion relating to the presentation of chemical evidence.
At the hearing on this matter, the court noted that defendant's objections were repetitive of previous ones dealing with trial strategy and tactics. Furthermore, it viewed defendant's notice of lawsuits as a "ploy" to obtain removal of counsel. As for defendant's list of mitigating evidence, counsel confirmed he had investigated the evidence but decided against presenting witnesses who could "end up backfiring." In light of the above, the court denied the request for a Marsden/Faretta hearing.[35]
On August 23, 1988, defendant filed another Marsden request based upon counsel's asserted deficiencies at the penalty phase. In particular, defendant complained that counsel failed to properly question and object when police and victim witnesses were on the stand, that counsel failed to locate and subpoena hospital employees to testify that in 1971 defendant was not identified by an alleged victim, and that counsel failed to challenge the constitutionality of his 1965 assault conviction. The court denied the motion after counsel briefly explained his investigation and strategies on the identified matters.
*159 On September 7, 1988, while penalty phase witnesses were still being called, defendant indicated he wanted appointment of new counsel through whom he could file a new trial motion based largely on the ground of counsel's ineffectiveness. Since the trial had not yet concluded, the court denied the requested appointment and denied the motion for a new trial without prejudice on the ground it was premature.
On September 12, 1988, defendant requested another Marsden hearing. In view of the many previous Marsden hearings, the court stated it would exercise its discretion to keep the case moving but said it would allow defendant to make a record in an in camera session after closing arguments that day. With the court's permission, defendant called his mother, Bertha Walther, to the stand. Walther testified she had informed counsel of potential mitigating evidence, including various acts of heroism and kindness by defendant.[36] Kenkel testified next, explaining his reasons for not introducing the evidence described by Walther and other matters raised by defendant. This hearing was interrupted when the jury returned with its death verdict.
At the continued hearing held on November 4, 1988, both Kenkel and Investigator Nisson testified regarding the subject of Sam and John and again described their efforts to locate the two miners. Although other claimed deficiencies were also discussed at the hearing, defendant identified the failure to conduct a physical search for Sam and John as the main gist of his ineffectiveness claim. At the end of the hearing, defendant submitted a motion for a new trial (over 130 pages in length) that he himself had prepared. The court annexed that document to Kenkel's motion for a new trial and agreed to consider the ineffectiveness claims therein as part of the Marsden motion.
On November 18, 1988, the court denied Kenkel's new trial motion. That same day, the court requested Kenkel to file a written response to the ineffectiveness arguments raised in defendant's new trial motion. Kenkel did so.
On November 30, 1988, the court denied defendant's September 12, 1988, Marsden motion as both untimely and without merit. It also denied defendant's request for another attorney to assist in presenting his motion for a new trial because defendant had not demonstrated a colorable claim of ineffectiveness of counsel. The court then denied the motion for a new trial, finding no merit to any of the grounds asserted.

(b) Analysis
Once the trial against a defendant has commenced, a Faretta motion for self-representation "is addressed to the sound discretion of the trial court, which should consider such factors as the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow the granting of such a motion." (People v. Marshall (1996) 13 Cal.4th 799, 827, 55 Cal.Rptr.2d 347, 919 P.2d 1280, relying on Windham, supra, 19 Cal.3d at p. 128, 137 Cal.Rptr. 8, 560 P.2d 1187; People v. Clark (1992) 3 Cal.4th 41, 98-99, 10 Cal.Rptr.2d 554, 833 P.2d 561.)
Here, when the trial court was ready to entertain defendant's Faretta motion of June 29, 1988, defendant specifically asked to address the quality of counsel's representation in camera since he would have to reveal a "good portion of the defense" in doing so. The court granted his request, later explaining that "when you get into a Faretta motion after the trial has been started, the first part of Faretta motion is in the nature of a Marsden *160 hearing and, therefore, I'm treating the first prong as a Marsden motion, and that is why the Court has closed the courtroom to the public and the District Attorney." (Italics added.) Defendant now contends the trial court agreed to treat defendant's Faretta motion additionally as a Marsden motion, and in doing so, erroneously denied it. We disagree.
A fair reading of the record discloses that, at all times, both sides and the court assumed that only a Faretta motion was presented. It is clear from the entire proceeding that when the court said it would treat the first prong of the Faretta motion as a Marsden motion, it simply meant it would hear arguments on the first Windham factor (the quality of counsel's representation) as it would in a Marsden motion, that is, outside the presence of the prosecutor so that defendant could fully address counsel's alleged deficiencies without prejudice to his case. As there was no Marsden motion before the court, the claim of error is without merit.
Defendant next contends the June 29, 1988, Faretta motion was erroneously denied. First he asserts that the request was "timely" because he could not know before the trial started that Kenkel would refuse to ask certain questions and commit other mistakes at trial that would prejudice him. Moreover, defendant argues, all of the Windham factors pointed in his favor. Defendant is wrong on both contentions.
Because the motion was made in the midst of trial, it was not timely for purposes of invoking an absolute right of self-representation under Faretta, supra, 422 U.S. 806, 95 S.Ct. 2525. (People v. Hamilton (1985) 41 Cal.3d 408, 421, 221 Cal.Rptr. 902, 710 P.2d 981 [motion made after jury selection but before opening statements held untimely], cited with approval in People v. Hamilton (1988) 45 Cal.3d 351, 369, 247 Cal. Rptr. 31, 753 P.2d 1109.) It therefore was within the court's discretion to grant or deny the request. (People v. Marshall, supra, 13 Cal.4th at p. 827, 55 Cal.Rptr.2d 347, 919 P.2d 1280; People v. Clark, supra, 3 Cal.4th at p. 98, 10 Cal.Rptr.2d 554, 833 P.2d 561.) On review we cannot say the trial court abused its discretion in assessing the Windham factors. The court could reasonably conclude that counsel's representation at trial had been of a very high caliber notwithstanding defendant's constant complaints. The court could also reasonably find that the length and stage of the proceedings, as well as the potential for disruption and defendant's prior proclivity to seek counsel's removal, favored denial of the motion for self-representation. That defendant did not seek a continuance is not determinative. (People v. Hamilton, supra, 41 Cal.3d at p. 421, 221 Cal.Rptr. 902, 710 P.2d 981.) No error appears.
Defendant also argues the trial court erred in denying his July 5, 1988, request for cocounsel status. In conclusory fashion, he contends the request should have been granted for all the same reasons that his Faretta request of June 29, 1988, should have been granted and notes that appointed counsel's continuing involvement in the case would have resulted in even less disruption. This argument is rejected. A criminal defendant has no right both to be represented by counsel and to participate in the presentation of his own case. (People v. Clark, supra, 3 Cal.4th at p. 97, 10 Cal.Rptr.2d 554, 833 P.2d 561.) As such an arrangement is generally undesirable, a court may authorize it "only upon a `substantial' showing that it will promote justice and judicial efficiency in the particular case." (People v. Frierson (1991) 53 Cal.3d 730, 741, 280 Cal.Rptr. 440, 808 P.2d 1197; see also People v. Kirkpatrick (1994) 7 Cal.4th 988, 1004, 30 Cal.Rptr.2d 818, 874 P.2d 248; People v. Clark, supra, 3 Cal.4th at p. 97, 10 Cal.Rptr.2d 554, 833 P.2d 561.) No such showing was made here.
Defendant next asserts the trial court erroneously denied the Marsden motion of July 25, 1988. He faults the court for failing to inquire whether the differences over strategy and tactics revealed a breakdown in the attorney-client relationship that justified appointment of a new attorney. We perceive no error.
As the People point out, the record reveals that despite defendant's complaints, he and his counsel communicated and cooperated in presenting the defense. For example, defendant *161 had given Kenkel lists of witness questions he had prepared. Kenkel in fact used some of these questions, although he skipped some and asked others out of sequence. Additionally, if defendant's claim to the trial court is to be believed, counsel submitted various jury instructions at defendant's insistence. Thus, while defendant and counsel had ongoing disagreements over strategy, their relationship had not suffered an irretrievable breakdown.[37]
As his next claim of error, defendant notes that, even though the trial court had denied the July 25, 1988, Marsden motion, it continued to permit him to speak as if a motion were still pending. At one point, defendant asked that he be allowed to question witnesses and that counsel be permitted to object or advise. Defendant now claims the court erred when it answered: "The Court has previously ruled on your request of him and his co-counsel. I find after start of trial all of these requests are not timely made and that vests in the Court the total discretion whether or not the motion will be granted. In exercising my discretion I'm denying all such motions." In defendant's view, that response showed a complete misunderstanding of the law in that: (1) the rule of midtrial untimeliness applies only to Faretta motions, not to Marsden motions; and (2) in neither case does the court have total discretion.
A fair reading of the record does not disclose any misunderstanding by the court. First of all, the court appeared to have made its remarks in direct response to defendant's request for what amounted to cocounsel status in the examination of witnesses. Second, whether or not the court was also referring to Marsden motions, its mention of having "total discretion" did not suggest that such motions or others were or would be denied arbitrarily or without any exercise of discretion.
Additionally, defendant contends the issues raised at the separate in camera hearing at the end of the day on July 25, 1988, obligated the court to appoint substitute counsel. We disagree. In reviewing the record, we observe that Kenkel had requested the subject hearing to register the fact that he had advised defendant against testifying at trial. Kenkel also informed the court that, contrary to defendant's wishes, he would not be pursuing certain matters at trial because he perceived them to be unhelpful or detrimental to the defense. Defendant then explained his reasons for wanting the particular matters explored and his frustration with counsel for not doing so. Even assuming a new Marsden request may be gleaned from these discussions, defendant was permitted to speak at length concerning his complaints of counsel. Nothing new, however, had happened since the Marsden hearing earlier that day that would have compelled a substitution.[38]
Defendant next challenges the trial court's denial of the Marsden motion made a week later on August 2, 1988. As mentioned above, that motion was made the same day Kenkel moved for a competency hearing based upon his observations that defendant had become inexplicably and uncontrollably angry at him even though they had had a "very agreeable, very productive meeting" *162 the previous night. According to defendant, the combination of Kenkel's observations, his belief that defendant was mentally incompetent, and defendant's statements to the court that he had been unable to sleep or "think straight" as a result of Kenkel's performance, "removed any possible doubt about the fact that the attorney-client relationship had completely disintegrated." Not only does defendant contend the court erred in failing to recognize the breakdown of the relationship, he also asserts counsel's failure to inform the court of such a breakdown constituted ineffective assistance and placed counsel and defendant in a conflict of interest.
Contrary to defendant's contentions, the record does not reflect that the attorney-client relationship had deteriorated to the point that defendant's right to effective assistance of counsel was jeopardized. (People v. Williams, supra, 2 Cal.3d at p. 905, 88 Cal. Rptr. 208, 471 P.2d 1008; see People v. Crandell, supra, 46 Cal.3d at p. 854, 251 Cal.Rptr. 227, 760 P.2d 423.) Even though counsel and defendant constantly disagreed over which defense strategies were best under the circumstances, they continued to communicate productively with each other and each appeared to be putting his best efforts into trying the case. While defendant never ceased to express his frustration with counsel's choice of strategy and tactics, that alone did not warrant counsel's substitution. (People v. Williams, supra, 2 Cal.3d at p. 905, 88 Cal.Rptr. 208, 471 P.2d 1008.)
We do not subscribe to defendant's view that counsel somehow misstepped in failing to report an irretrievable breakdown to the court. The fact that defendant was cooperative with counsel the night before his sudden outburst (and previously, as well) was indicative of a functioning relationship. The outburst itself did not signal a breakdown of the attorney-client relationship such as to require counsel's removal. Rather, as noted in Dr. Lorack's report to the court, defendant acknowledged having to "find some way to release tension and anger he had since he refrained in [sic] doing this in the Courtroom." That counsel sought a competency hearing after the unexpected episode suggests only that counsel was concerned about his client and wanted to ascertain whether he was capable of proceeding with the trial.[39]
Defendant next claims the trial court erred in denying the two separate Faretta motions filed on August 8 and 15, 1988. He contends the court should have done more to resolve supposed contradictions between the claims of defendant and counsel over the soundness of their conflicting defense strategies (raised in both motions) and should have inquired further into the alleged conflicts of interest pertaining to Stapleton's previous representation of Cantwell and Kenkel's then current representation of Dan Zurcher (raised in the August 15 motion). Once again we find no error. For each motion, the trial court allowed defendant to explain his dissatisfaction. On both occasions, the court acted well within its discretion to deny self-representation based upon the quality of counsel's representation, the late stage of the proceedings, the potential for disruption and defendant's demonstrated proclivity to seek substitution of counsel.[40] (Windham, supra, 19 Cal.3d at p. 128, 137 Cal.Rptr. 8, 560 P.2d 1187.)
We also reject defendant's related contention that the trial court erred in denying his Marsden request of August 15, 1988. In its inquiry into the matter, the court heard counsel's detailed responses on the alleged conflicts of interests and other points, as well as counsel's representation that they had investigated thoroughly all matters raised by defendant during the course of the case. *163 Based on the record, we see no abuse of discretion in the court's failure to substitute counsel. (People v. Webster, supra, 54 Cal.3d at p. 435, 285 Cal.Rptr. 31, 814 P.2d 1273.)
Likewise, we reject defendant's claim that the court erred in denying his subsequent Faretta and Marsden motion of August 22, 1988. For one thing, the record does not reflect an unequivocal assertion of the right of self-representation.[41] (People v. Marshall, supra, 15 Cal.4th at p. 23, 61 Cal.Rptr.2d 84, 931 P.2d 262.) Even assuming it did, some of the factors supporting denial of self-representation were even stronger than before. (See Windham, supra, 19 Cal.3d at p. 128, 137 Cal.Rptr. 8, 560 P.2d 1187 [stage of the proceedings, defendant's prior proclivity to substitute counsel].) In addition, the record once again fails to demonstrate any breakdown in the attorney-client relationship jeopardizing defendant's right to effective assistance of counsel. (People v. Williams, supra, 2 Cal.3d at p. 905, 88 Cal.Rptr. 208, 471 P.2d 1008.) That this time defendant purported to serve notice of a malpractice action does not compel a different result. Given the circumstances, the court could properly reject defendant's notice of intent to sue as a ploy to create a conflict of interest. (See People v. Horton (1995) 11 Cal.4th 1068, 1106, 47 Cal.Rptr.2d 516, 906 P.2d 478 [defendant's filing of malpractice action against appointed counsel did not create any actual conflict of interest necessitating counsel's withdrawal]; People v. Smith, supra, 6 Cal.4th at p. 696, 25 Cal.Rptr.2d 122, 863 P.2d 192 ["a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict"].)
We also conclude the trial court did not err in denying defendant's Marsden motion of August 23, 1988. As the record demonstrates, nothing of significance had happened to affect the attorney-client relationship since the previous Marsden motion.
With regard to his last Marsden request of September 12, 1988, defendant claims the court should have removed counsel in light of his showing that counsel abdicated their duty in conducting the defense and did not investigate or present mitigating evidence related by his mother and himself.
Viewed as a whole, the record fails to demonstrate any abuse of discretion by the court. Kenkel testified that investigators were sent to New York, San Diego and Arizona to track down the leads provided by defendant.[42] Based upon these efforts, Kenkel and Stapleton developed all penalty phase materials they felt were appropriate and would not open "any doors on cross examination that would introduce adverse evidence." To explain why certain witnesses were not called, Kenkel identified the potentially harmful consequences of eliciting testimony from them.[43] Kenkel also explained his tactical decisions to not introduce *164 evidence of defendant's 27 Bible diplomas because of their potential to inflame the jury and to not present business records from defendant's short-lived logging business because of their limited usefulness. In addition, Kenkel stated that other of defendant's claims could not be verified even after investigation, such as his claim of charity toward 40 unnamed families in transient hotels during 1983 and 1984, his claim that Sergeant Handy had lied during the guilt phase about a certain distance, and his claim that a knife assault at the jail could not have happened as the prosecutor described. Finally, in answer to defendant's complaint that no physical search for Sam and John had been undertaken as promised, counsel explained his conclusion that a physical search would not have been fruitful in view of his unsuccessful endeavors to find the miners through other avenues.
In sum, the record did not demonstrate that counsel incompetently investigated or handled the matters raised by defendant. While it is true, as defendant argues, that counsel did not attempt to locate every single potential witness identified by defendant and his mother, "[w]e have never required counsel to investigate all prospective witnesses...." (People v. Jackson (1980) 28 Cal.3d 264, 289, 168 Cal.Rptr. 603, 618 P.2d 149.) Furthermore, the record amply refuted defendant's suggestion that the penalty phase investigation was left to the investigators without counsel's meaningful involvement.[44]
Defendant next claims he was entitled to appointment of separate counsel to assist in presenting the "ineffectiveness assistance aspects of his new trial motion." He is wrong. Although a defendant may seek and obtain (upon a proper showing) substitute counsel at any stage of the proceeding in trial court (People v. Smith, supra, 6 Cal.4th at pp. 695-696, 25 Cal.Rptr.2d 122, 863 P.2d 192), a defendant is not entitled to simultaneous representation by two attorneys, one of whom is challenging the other's competence (People v. Hines, supra, 15 Cal.4th at p. 1024, 64 Cal.Rptr.2d 594, 938 P.2d 388). The court did not err in refusing appointment of separate counsel for that limited purpose.
Defendant also appears to assert he was entitled to substitution of counsel in view of People v. Stewart (1985) 171 Cal.App.3d 388, 217 Cal.Rptr. 306, which suggested that new counsel must be provided at the post-conviction stage when a defendant seeks a new trial based upon counsel's incompetence and has made a "colorable claim" involving counsel's conduct outside the courtroom. (171 Cal. App.3d at pp. 396-397, 217 Cal.Rptr. 306.) Defendant emphasizes language in that opinion concluding that a "colorable claim" is shown when the defendant "credibly establishes the possibility that his trial counsel failed to perform with reasonable competence and that, as a result, a determination more favorable to the defendant might have resulted in the absence of counsel's failings." (People v. Stewart, supra, 171 Cal.App.3d at p. 396, 217 Cal.Rptr. 306.)
In People v. Smith, supra, 6 Cal.4th 684, 25 Cal.Rptr.2d 122, 863 P.2d 192, we concluded that the burden for obtaining appointment of substitute counsel, as expressed in Marsden and its progeny (e.g., People v. Webster, supra, 54 Cal.3d at p. 435, 285 Cal.Rptr. 31, 814 P.2d 1273; People v. Crandell, supra, 46 Cal.3d at p. 854, 251 Cal.Rptr. 227, 760 P.2d 423), applies equally preconviction and postconviction. In so concluding, we examined People v. Stewart, supra, 171 Cal. App.3d 388, 217 Cal.Rptr.2d 306, and rejected the notion that its "colorable claim" language supports either a greater right to substitute counsel or a reduced burden of proof *165 at the postconviction stage than at any earlier point. (People v. Smith, supra, 6 Cal.4th at pp. 693-694, 696, 25 Cal.Rptr.2d 122, 863 P.2d 192; see also People v. Memro, supra, 11 Cal.4th at p. 859, 47 Cal.Rptr.2d 219, 905 P.2d 1305.)[45]
In applying the Marsden standard, we conclude the court did not err in denying any separate request for substitute counsel. To the extent such a request incorporated claims made in connection with his last Marsden request of September 12, 1988, the denial was proper for all of the reasons stated above. To the extent the request also incorporated the ineffectiveness claims contained in defendant's new trial motion, those claims simply renewed previous ineffectiveness claims which the court had already inquired into and rejected. In addition, the court requested and received counsel's written responses to other allegations supposedly contained in the new trial motion. Based upon this record, we find no error in the court's refusal to appoint substitute counsel at the postconviction stage. Contrary to defendant's assertions otherwise, the court was fully capable of evaluating defendant's renewed claims and assessing counsel's competence in light of the extensive inquiries previously undertaken and its observations of the entire trial and counsel's performance throughout. No abuse of discretion appears.[46]

B. Jury Selection and Juror Misconduct Issues

1. Denial of Defense's Challenges for Cause
Defendant contends the trial court improperly denied his challenges for cause to prospective jurors Stanton Allison, Ron Costa, Everett Wilson and Melinda Caven, who he claims were prejudicially disposed in favor of the death penalty. He claims his federal constitutional right to an impartial jury was violated by the court's failure to follow the proper standard as articulated in Wainwright v. Witt (1985) 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841.
The point need not detain us long, for defendant cannot demonstrate prejudice even assuming the court erred as to all four prospective jurors. Since none of those potential jurors actually sat on the ultimate jury, none could have tainted the panel with his or her alleged bias.[47] (People v. Gordon (1990) 50 Cal.3d 1223, 1247, 270 Cal.Rptr. 451, 792 P.2d 251; see also People v. Clark, supra, 3 Cal.4th at p. 155, 10 Cal.Rptr.2d 554, 833 P.2d 561.) Moreover, when the jury was accepted and sworn in this case, the defense had 10 remaining peremptory challenges.[48] Our decisions make clear that the failure to exhaust peremptory challenges bars a defendant from attacking the trial court's decisions on appeal. (People v. Ramos (1997) 15 Cal.4th 1133, 1158-1159, 64 Cal.Rptr.2d 892, 938 P.2d 950; People v. Raley (1992) 2 Cal.4th 870, 904-905, 8 Cal. Rptr.2d 678, 830 P.2d 712; People v. Morris (1991) 53 Cal.3d 152, 185, 279 Cal.Rptr. 720, 807 P.2d 949.) We decline defendant's invitation to reconsider those decisions here.

2. Granting of Prosecution's Challenges for Cause
Defendant contends the trial court erred and violated his federal constitutional *166 rights in dismissing prospective jurors Colette Hill and Carol Thatcher for cause. He emphasizes that even though Hill expressed doubt whether she could vote to impose the death penalty, she affirmed repeatedly that she would follow the court's instructions and consider the death penalty. Likewise, defendant asserts that Thatcher's stated willingness to consider the death penalty only in a "really, really awful" case did not signify an unwillingness to follow the law or the court's instructions.
"In a capital case, a prospective juror may be excluded if the juror's views on capital punishment would `prevent or substantially impair' the performance of the juror's duties." (People v. Price (1991) 1 Cal.4th 324, 402, 3 Cal.Rptr.2d 106, 821 P.2d 610, citing Wainwright v. Witt, supra, 469 U.S. at p. 424, 105 S.Ct. at p. 852.) "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (People v. Rodrigues (1994) 8 Cal.4th 1060, 1146, 36 Cal.Rptr.2d 235, 885 P.2d 1.) "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (People v. Mayfield (1997) 14 Cal.4th 668, 727, 60 Cal.Rptr.2d 1, 928 P.2d 485; People v. Wash (1993) 6 Cal.4th 215, 254, 24 Cal. Rptr.2d 421, 861 P.2d 1107.)
The voir dire of prospective jurors Hill and Thatcher amply supports the trial court's decision to dismiss them. Although some of Hill's responses to questioning reflected a willingness to follow the law and the court's instructions, others furnished substantial evidence of her inability to conscientiously consider a death verdict.[49] Thatcher's responses also raised sufficient doubts as to whether she could impose the death penalty in light of her admittedly "strong bias against putting someone to death."[50] Given this record, we reject defendant's claims of state and federal constitutional error.
Defendant requests us to reconsider our adherence to Wainwright v. Witt, supra, 469 U.S. 412, 105 S.Ct. 844, because the standard it articulates is vague and readily manipulated. Defendant asserts that application of the Witt standard in California has never resulted in a reversal, and that here in particular, the court applied that standard in a discriminatory manner to produce a jury biased toward death in violation of his due process and equal protection rights. On this last point, defendant asserts that Hill and Thatcher were the exact counterparts of Allison, Costa, Wilson and Caven. He reasons that if the court refused to dismiss the latter four for cause, then it should also have refused to dismiss Hill and Thatcher.
We see no basis for rejecting the constitutional standard set by the United States Supreme Court. While there were some similarities in particular phrases used by the dismissed and the retained jurors in expressing their views toward one penalty or the other, they were not overwhelming. In addition, the court properly considered each juror's *167 particular demeanor in deciding whether to dismiss.[51] (Wainwright v. Witt, supra, 469 U.S. at p. 428, 105 S.Ct. at p. 854 [noting that the question of a juror's bias may turn upon determinations of demeanor and credibility that are peculiarly within a trial judge's province].)

3. Inquiry Concerning Juror Larry Field
On July 18, 1988, before the start of the defense case at the guilt phase, defense counsel alerted the court that Juror Larry Field had been at the jail visiting Ann Baxmeyer, who was incarcerated with defense witness Jyll Bond. Counsel reported that Bond said she had told Baxmeyer all about her potential testimony and that she may have told Baxmeyer that people she thought were friends of Cantwell's had threatened to kill her if she were to testify. When questioned outside the presence of the other jurors, Field said that Baxmeyer, a close friend of his, had not mentioned Jyll Bond or anything concerning defendant's case. Field agreed to not visit Baxmeyer at the jail until the trial was over.
Ten days later, Field informed the court he had received a distressing letter from Baxmeyer and requested permission to talk with her by telephone. After hearing Field's assurances that he would immediately leave or cut off the conversation if Baxmeyer started to talk about the trial, both defense counsel and the prosecutor concurred in the court's decision to permit Field to have contact with Baxmeyer.
On August 18, 1988, Field told the court he had married Baxmeyer, who was still in jail. When asked if anyone had tried to discuss the case with him, Field acknowledged he once had to "drop" a conversation when someone started to mention a letter received from defendant several years before. He also mentioned that Baxmeyer was concerned because of things said to her, and that his refusal to discuss the case was causing "some stress and conflict" between them. Field confirmed, however, that no one had told him anything about the facts of the case and that he was trying to the best of his ability not to hear or see anything about the case.[52] The court permitted Field to remain on the jury, but admonished him that he could not discuss the case with his wife or anybody else, and that he would have to be "more on guard" in light of his visits to the jail. Neither the defense nor the prosecution requested a further inquiry or moved to replace Field with an alternate juror.
Defendant now contends the court's August 18 inquiry was inadequate and violated due process because Field was not asked to relate the specific questions and responses in his conversations with Baxmeyer. In particular, he argues that Field's statement  "things have been said to [Baxmeyer] and she's been questioning me about them and I tell her I can't fully explain what's going on because of which it has to do with what I'm doing here"  established that Field had in fact received information about the case from Baxmeyer. Defendant also contends that defense counsel's failure to demand a further inquiry constituted ineffective assistance.
A trial court must conduct a sufficient inquiry when put on notice that good cause to discharge a juror may exist. (People v. Davis (1995) 10 Cal.4th 463, 547, 41 Cal.Rptr.2d 826, 896 P.2d 119; see People v. Burgener (1986) 41 Cal.3d 505, 520, 224 Cal. Rptr. 112, 714 P.2d 1251.) In this case, the court fulfilled its duty of inquiry. After ascertaining the general nature of the situation involving Baxmeyer, the court specifically asked for and received Field's assurances that he had not discussed the case with her or anyone else. Unlike defendant, we do not view the quoted statement by Field as necessarily reflecting any receipt of information about the case. Had the tenor of the statement actually been as defendant urges, it is likely that additional questioning would have been requested or undertaken. As it stood, *168 all participants to the inquiry  the court, the prosecutor, and defense counsel  appeared satisfied with Field's responses. The claim of error is rejected.
Defendant's claim of ineffective assistance is likewise rejected. Since the court conducted a reasonable inquiry, defense counsel did not render ineffective assistance by failing to demand more. We also observe that, during jury voir dire, Field had expressed certain attitudes and knowledge about the effects of drug use that might benefit the defense during trial. Thus we cannot rule out the possibility that counsel made a tactical choice to avoid a strategy that may have led to Field's dismissal. (See People v. Burgener, supra, 41 Cal.3d at p. 521, 224 Cal.Rptr. 112, 714 P.2d 1251.)

C. Guilt Phase Issues

1. Assault on Christine Racowski
Christine Racowski testified that in the summer of 1985, she stayed for a week at the mining camp with Eggett and defendant. When defendant accused Racowski of trying to sabotage a gold dredge and punched her in the face, Eggett said, "That's it, I'm pulling out." In response, defendant threatened to "pump some lead" into Racowski and grabbed his .22-caliber rifle and pointed it at her. Eggett stepped between them and struggled with defendant for the gun, which fired while pointed in the air. Eggett was upset with defendant's aggressive behavior toward Racowski, and the gold dredging partnership between Eggett and defendant ended at that time.
In permitting the foregoing testimony, the court concluded that evidence concerning "the break-up of the partnership" offered proof of defendant's motive'. On appeal, defendant contends the court erred in rejecting arguments that evidence of that prior act of violence was irrelevant and unduly prejudicial (Evid.Code, § 352), and that it was inadmissible evidence of character (id., § 1101).
When a trial court overrules a defendant's objections that evidence is irrelevant, unduly prejudicial and inadmissible character evidence, we review the rulings for abuse of discretion. (People v. Alvarez (1996) 14 Cal.4th 155, 214-215, 58 Cal.Rptr.2d 385, 926 P.2d 365.)
We first consider whether the trial court abused its discretion regarding the relevance of Racowski's testimony. We think not. According to the evidence at trial, on the day of the July 6, 1986, confrontation, defendant expressed a desire to "get" Eggett for things that happened in the preceding year: At least two prosecution witnesses (Hampton and Cantwell) and one defense witness (Burgess) testified that defendant, apparently upon recognizing Eggett as part of the group entering the camp, shouted statements to the effect of "Rich, I'm back. I've come to get you" and "Eggett, you SOB, it's taken me a year but I've got you now." Although there was evidence that defendant had additional and. perhaps more significant reasons for wanting to get Eggett, Cantwell heard defendant refer to Eggett as a snitch repeatedly and complain that Eggett had "turned him in" the year before for, among other things, assaulting "a girl" that had been in camp. Burgess also recalled that defendant yelled at Eggett regarding a woman that came to the camp the year before. Consistent with that testimony, Racowski testified that, at Eggett's request, she had filled out a report for the sheriff explaining the events at the camp the previous summer. Racowski's testimony was therefore relevant for purposes of shedding light on the roots of defendant's hostility toward Eggett and demonstrating a motive for the torture and killing of Eggett.
We next examine whether the trial court abused its discretion in determining that the probative value of the evidence outweighed its potential for undue prejudice. (Evid.Code, § 352.) Again we find no error. As indicated above, evidence of defendant's assault on Racowski was probative on the issue of motive because the misconduct precipitated the breakdown of defendant's relationship with Eggett and, additionally, was known by defendant to have been reported to the sheriff. Thus, the testimony offered considerable support for the prosecution's theory that defendant tortured and killed Eggett for revenge. Conversely, the evidence was not unduly prejudicial within the meaning of Evidence Code section 352 because it did not *169 amount to "`"evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."(People v. Padilla (1995) 11 Cal.4th 891, 925, 47 Cal. Rptr.2d 426, 906 P.2d 388; People v. Gionis (1995) 9 Cal.4th 1196, 1214, 40 Cal.Rptr.2d 456, 892 P.2d 1199; People v. Garceau (1993) 6 Cal.4th 140, 178, 24 Cal.Rptr.2d 664, 862 P.2d 664.)
We now turn to defendant's third contention, that evidence of his assault on Racowski was inadmissible to prove he had the propensity or disposition to commit the crime charged. (Evid.Code, § 1101, subd. (a); People v. Guerrero (1976) 16 Cal.3d 719, 724, 129 Cal.Rptr. 166, 548 P.2d 366.) Because Racowski's testimony was offered as proof of motive, the trial court correctly determined that its admission would not violate the statutory restriction on the introduction of such evidence. (Evid.Code, § 1101, subd. (b); see People v. Cummings (1993) 4 Cal.4th 1233, 1289, 18 Cal.Rptr.2d 796, 850 P.2d 1.) Moreover, the court's instructions minimized any danger that the jury might rely upon Racowski's testimony for an improper purpose.[53] (See People v. Garceau, supra, 6 Cal.4th at p. 178, 24 Cal.Rptr.2d 664, 862 P.2d 664.) Defendant's claim of prejudicial error fails.[54]

2. Sabotage of Eggett's Jeep
During cross-examination, defense counsel asked Racowski when she gave her statement to the sheriff concerning defendant's assault. She responded: "I believe it was after [Richard Eggett's] Jeep had been sabotaged." On redirect, Racowski indicated that defendant had been suspected of vandalizing Eggett's Jeep and that Eggett had asked her to write the statement "as part of other statements about the vandalism and Mr. Barnett." Defense counsel did not object to the testimony.
Thereafter, the prosecutor called Dave McGee to testify about the vandalism. At defense counsel's request, McGee was directed to not state and conclusions as to who may have vandalized the Jeep unless based upon personal knowledge. McGee testified that late in the summer of 1985, he went to the camp at Eggett's request to help remove a dredge. While there, McGee observed tension between Eggett and defendant, who also was present. Defendant left without saying anything after Eggett said he did not need defendant's services anymore. (See ante, fn. 4.) McGee and Eggett later discovered that Eggett's Jeep would not start. McGee subsequently saw the Jeep engine had been vandalized and destroyed by a screw. Eggett and McGee reported the incident to the sheriff, and it was this written report to which Racowski's statement of the assault was appended.
While testifying on direct examination, McGee blurted out at one point that defendant "sabotaged the vehicle." The court sustained defense counsel's objection on the ground that the testimony was non-responsive to the prosecutor's question.
Defendant argues McGee should not have been permitted to describe the sabotage of the Jeep because there was no "competent" *170 proof of defendant's involvement in the incident. Without such proof, defendant contends, the sabotage evidence was irrelevant and served only to impeach his character in violation of Evidence Code section 1101. We disagree.
Whether or not defendant's involvement in the sabotage was adequately established, the relevance of McGee's testimony lay in the fact that he and Eggett attributed the sabotage to defendant in their report to the sheriff. According to Cantwell, defendant angrily complained on the day of the murder that Eggett had "turned him in" for "putting machine screws down the carburetor" of Eggett's Jeep. Thus McGee's testimony, like that of Racowski concerning the assault, supported the prosecution's theory that defendant tortured and killed Eggett for revenge.
Because McGee's testimony was relevant to the issue of motive, its admission did not violate the statutory restriction contained in Evidence Code section 1101, subdivision (b). And again, the trial court's limiting instructions minimized any danger that the jury would rely upon the evidence for an improper purpose. (See ante, fn. 53; see People v. Garceau, supra, 6 Cal.4th at p. 178, 24 Cal. Rptr.2d 664, 862 P.2d 664.)[55]
Defendant also argues the trial court erred in admitting Racowski's reference to the Jeep's sabotage because it was speculative and based upon hearsay. However, defense counsel's failure to make such objections bars defendant from pursuing this issue on appeal. (Evid.Code, § 353.) But even assuming counsel was ineffective on this point, defendant cannot establish prejudice. Inasmuch as McGee's more detailed testimony concerning the alleged sabotage was properly admitted, it is not reasonably probable that a determination more favorable to defendant would have resulted in the absence of Racowski's brief reference to the subject. Again we find no cause to reverse. (People v. Roolrigues, supra, 8 Cal.4th at p. 1126, 36 Cal.Rptr.2d 235, 885 P.2d 1; People v. Zapien (1993) 4 Cal.4th 929, 981, 17 Cal. Rptr.2d 122, 846 P.2d 704.)

3. Evidence Regarding Tire Tracks
Bill Cantwell and Lloyd Curtis Hampton both testified that after leaving the camp, they drove their motorcycles to the intersection between an access road and the dead-end road where Richard Eggett had been left, and went down the dead-end road to look for Eggett. Upon hearing the sound of a Jeep, they decided to leave. As they attempted to do so, however, their motorcycles got stuck so they fled on foot to Cantwell's trailer. Conversely, Burgess, who left the camp after Cantwell and Hampton, testified he saw "two motorcycle tracks going in and two motorcycle coming out" where the dead-end and access roads intersected. Burgess followed the tracks until the road crossed a creek on a cement slab. At that point he turned left (toward Highway 32) and the tracks continued to the right (toward Cantwell's trailer).
The People called Sergeant Handy to rebut Burgess's testimony. Handy testified he had been at the subject intersection twice: once in July of 1986 and once in July of 1988. He described the intersection as appearing substantially the same both times, with pine needles covering the surface area. Handy said he went to the intersection in 1988 to test whether Cantwell's motorcycle would leave tire impressions on the road. According to Handy, the pine needles prevented any impressions. Handy viewed and identified a series of photographs illustrating that fact. On cross-examination, Handy testified that Cantwell was present at the July 1988 visit to the intersection, that Cantwell's motorcycle was not operational at that time, and that no tire tracks were made when Cantwell sat on the motorcycle and pushed it along.
Defense counsel did not object to Handy's testimony concerning the 1988 visit *171 to the intersection or to his explanation of the photographs. Subsequently, however, counsel objected "as to relevancy 1988 photos" when the prosecutor asked that the photographs be received in evidence. The trial court deferred a ruling until the end of the prosecution's case, at which time it admitted the photographs "for the limited purpose of illustrating the officers testimony to the extent that they do."
Defendant now contends the trial court erred in admitting evidence of Handy's 1988 "experiment" with motorcycle tire tracks. Although defendant acknowledges the event took place at the same time of year and with the same motorcycle as the original occurrence, he claims the conditions were not substantially identical or similar because the motorcycle was pushed, not driven, in 1988. Requesting that we take judicial notice of certain scientifically based conclusions not advanced at trial, defendant seeks to show that the difference in the conditions rendered evidence of the experiment irrelevant and inadmissible.[56]
As an initial matter, we observe counsel's subsequent objection to admission of the photographs into evidence was inadequate to preserve for review the issues of admissibility concerning Handy's preceding testimony and explanation of the photographs and so-called experiment. (See People v. Zapien, supra, 4 Cal.4th at pp. 979-980, 17 Cal. Rptr.2d 122, 846 P.2d 704; People v. Coleman (1988) 46 Cal.3d 749, 777-778, 251 Cal. Rptr. 83, 759 P.2d 1260.) Not only was the objection untimely, but counsel made no reference to any claimed dissimilarity of conditions, other than the time factor, or to any perceived improper experiment.
Even if we assume the issues had been preserved for review (or assume counsel was ineffective in failing to properly object), defendant cannot establish either that the evidence was improperly admitted or that it resulted in any prejudice. Significantly, defendant's appellate contentions rest upon the validity of scientific conclusions not supported by any evidence in the record. (See ante, fn. 56.) Because such conclusions are reasonably subject to dispute, they are not proper matters for judicial notice (cf. Evid. Code, § 452, subd. (h)) and we decline to consider them. The claims are rejected.

k. Location of the Allegedly Stolen Methamphetamine Oil
Defendant testified on direct examination that in 1985 he stole 25 gallons of methamphetamine oil from Cantwell's van. Defendant took the oil, which he had found stored in the van in five large bucket-type containers, to Butte Creek Canyon. On cross-examination, defendant testified he hid the oil in the canyon and offered to take the prosecutor "to get some of it" in exchange for immunity on possession charges.
The prosecutor did not respond to the offer, but asked if defendant had told investigators where the methamphetamine oil was located. Defense counsel did not object. Defendant ultimately disclosed he had given defense investigator Eastham very accurate directions and had drawn a detailed map for him, but that Eastham was unable to locate the oil. Defendant also blurted out that Eastham must have been blind to have not found the oil. Defendant then identified the four locations where he claimed to have hidden the oil: "There was ... one spot right near Okie Dam; one spot down in the end of Helltown Road and one spot up near Sunflower Ranch, and then one up near that on the hillside further."
The prosecutor subsequently sought to call Eastham as a witness to ask whether he had searched the locations described by defendant. Defense counsel objected on attorney work-product and privilege grounds. Finding that defendant's testimony had waived any attorney-client privilege for communications between defendant and Eastham as to the whereabouts of the oil, the court permitted *172 inquiries into the limited area whether or not Eastham was given a map, whether he followed the directions in the map and whether he found anything, but ruled out questioning concerning the contents of the map and the locations searched. On the stand, Eastham testified he went to two of the three locations on defendant's map but avoided the third because it was on private property. He dug at the two locations but found nothing.
Defendant then requested through counsel "that he be suitably secured and the Butte County Sheriffs office directed to drive him to Chico and environs in an attempt to locate the remaining [methamphetamine] oil." After the prosecutor objected on security grounds, the court denied the request.
Several days later (and after both sides had rested), defense investigators followed a new map from defendant and found a whiskey bottle containing liquid behind a wall of a structure in one location and two more bottles with liquid buried in another location. Dave Kemp, a criminalist with the Department of Justice, tested the contents of the whiskey bottle and determined it contained a trace amount of methamphetamine but had no ephedrine or P-2-P, the two principal agents in making methamphetamine. The defense requested a one-week continuance to conduct further testing to impeach Kemp's findings. The request was denied and none of the evidence was put before the jury.
Defendant first argues that Investigator Eastham's observations in looking for the hidden methamphetamine oil were protected by Evidence Code section 912, subdivision (c), since they were made as a consequence of protected communications. (See People v. Meredith (1981) 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46.) Defendant contends the trial court erred in finding a waiver of the privilege, and that counsel was ineffective for failing to protect against disclosure of his communications to Eastham and Eastham's observations.
The People do not dispute that the foregoing communications and observations were initially protected by the attorney-client privilege. The People argue, however, that a waiver was properly found and that counsel was not ineffective in failing to object to defendant's testimony which resulted in the waiver. We agree.
Subject to statutory exceptions not implicated here, the right of any person to claim the attorney-client privilege is waived with respect to a communication protected by that privilege "if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone." (Evid. Code, § 912, subd. (a).) In this case, defendant did not claim the attorney-client privilege before giving testimony regarding the map and directions he gave to Eastham and Eastham's failure to find the allegedly hidden methamphetamine oil. Because defendant voluntarily disclosed such information without asserting the privilege, the trial court properly allowed the United questioning of Eastham with respect to whether he was given a map, whether he followed the directions in the map and whether he found anything.
To prevail on the ineffectiveness claim, defendant must demonstrate that counsel's performance was objectively unreasonable and that, but for counsel's errors, the result of the proceeding would have been different. (People v. Ledesma (1987) 43 Cal.3d 171, 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) However, "a claim of ineffective assistance of counsel will not be reviewed on appeal absent a record from which it may be ascertained that there is no reasonable tactical explanation for an attorney's alleged failure to perform in a manner to be expected of a reasonably competent attorney." (People v. Milner (1988) 45 Cal.3d 227, 241, 246 Cal.Rptr. 713, 753 P.2d 669; see People v. Zapien, supra, 4 Cal.4th at p. 980, 17 Cal. Rptr.2d 122, 846 P.2d 704; People v. Ledesma, supra, 43 Cal.3d at p. 218, 233 Cal.Rptr. 404, 729 P.2d 839.)
Here the appellate record suggests no reason for counsel's failure to object to defendant's testimony, nor was counsel asked to give a reason. As defendant acknowledges, the claimed theft of valuable methamphetamine oil from Cantwell was central to the credibility of both defendant *173 and Cantwell. The record shows that defendant was eager to testify regarding his alleged theft of the oil and Cantwell's alleged anger toward defendant (and Eggett) over the theft. Since the existence of the oil was important to defendant's version of the facts, counsel may reasonably have determined that the jury wanted to hear an explanation for its whereabouts. Furthermore, counsel may reasonably have expected defendant to testify he had buried the oil in several remote places that were too difficult for defense investigators to pinpoint without defendant's presence at the locations. Such testimony would have helped the defense. Since the record sheds no light on the reasons for counsel's conduct, we must reject the claim of ineffective assistance.[57] (People v. Zapien, supra, 4 Cal.4th at p. 980, 17 Cal. Rptr.2d 122, 846 P.2d 704; People v. Milner, supra, 45 Cal.3d at p. 241, 246 Cal.Rptr. 713, 753 P.2d 669; People v. Ledesma, supra, 43 Cal.3d at p. 218, 233 Cal.Rptr. 404, 729 P.2d 839.)
Defendant next contends the trial court erroneously refused to release him from custody so that he could guide the police to the supposedly hidden methamphetamine oil. We disagree. The record reflects that defendant was involved in at least two attempts to escape from custody. One involved his disappearance from the county hospital in Chico in 1985. The other was reflected in his 1965 conviction for felony attempted prisoner escape in New York. In light of defendant's background, the security concerns cited by the prosecutor were sufficient to justify the court's decision in this capital case.[58]
Finally, defendant argues the court erroneously denied the defense a one-week continuance to retest the substances found after both sides had rested. He also asserts counsel was constitutionally ineffective for failing to present evidence that chemicals were in fact found at locations revealed by defendant. On the latter point, defendant claims such evidence would have countered Eastham's testimony that he had searched the locations on defendant's map and found nothing. These claims are properly rejected.
"`The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'" (People v. Zapien, supra, 4 Cal.4th at p. 972, 17 Cal.Rptr.2d 122, 846 P.2d 704, quoting People v. Laursen (1972) 8 Cal.3d 192, 204, 104 Cal.Rptr. 425, 501 P.2d 1145.) In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction. (Ibid.)
Defendant has not demonstrated any abuse of discretion. As the record shows, the trial court did grant a brief continuance to allow the criminalist from the Department of Justice to conduct testing on the newly discovered evidence. However, once the criminalist confirmed that no methamphetamine oil had been found, the court properly determined that a continuance was unnecessary.
*174 Likewise, defendant has not established any prejudice. Although the trial court directed that the evidence be preserved to allow for further testing, defendant has not cited any portion of the record showing that subsequent testing disclosed any methamphetamine oil. We have no basis for concluding, therefore, that the defense's proposed testing would have produced relevant evidence.
Because the record is devoid of any evidence that the belatedly discovered bottles contained methamphetamine oil, and because there was no probative value to the fact that other chemicals were found at the locations described by defendant, counsel cannot be faulted for making no attempt to reopen the case.

5. Impeachment of Kenny Clumpus
Defense witness Kenny Clumpus testified that in 1987, Bill Cantwell said he had gone to Butte Creek in July of 1986 to get methamphetamine oil that had been stolen by defendant and possibly Eggett. According to defendant, this testimony corroborated the claim that Cantwell wanted to revenge the theft of the oil and showed that Cantwell had a motive for killing Eggett. Over the defense's objection, the trial court permitted Clumpus to be impeached by proof of two felony convictions under section 4532 for nonviolent escape.
Defendant contends the prior convictions were inadmissible for impeachment purposes because the least adjudicated elements of a violation of section 4532 do not necessarily involve moral turpitude, that is, the readiness to do evil. (People v. Castro (1985) 38 Cal.3d 301, 314, 211 Cal.Rptr. 719, 696 P.2d 111.)
In People v. Lang (1989) 49 Cal.3d 991, 264 Cal.Rptr. 386, 782 P.2d 627, we rejected an identical argument. There we concluded: "[E]scape without force or violence necessarily involves either deceit, breach of trust, or stealth to effectuate the escape and a willingness to incur the serious risk of violent injury to law enforcement officers and bystanders typically involved in the process of recapturing an escaped prisoner." (Id. at p. 1010, 264 Cal.Rptr. 386, 782 P.2d 627 [violation of Oregon escape statute], relying upon People v. Waldecker (1987) 195 Cal.App.3d 1152, 1158, 241 Cal.Rptr. 650 [violation of § 4532].) We decline to reconsider the issue here.

6. Excluded Evidence of Alleged Threat by Cantwell
Defense witness Jyll Bond testified regarding three encounters she had with Bill Cantwell after Eggett's murder. The substance of her testimony was as follows. In January of 1987, Cantwell told Bond that defendant did not murder Eggett and that Cantwell knew who did. Cantwell also stated to the effect that it "served [defendant] right for stealing [liquid methamphetamine] from him, that he should be framed for it." Approximately a week later, Cantwell told Bond he had killed Eggett, showed her the "shotgun" or "rifle" he used, and said he was going to take the weapon "out of state and get rid of it." The third encounter occurred in July of 1988, less than two weeks prior to the time Bond took the stand. At that time, Bond had seen Cantwell unexpectedly while she was absent without leave from the Shasta County jail. Cantwell told Bond it was good she had left the jail because he knew she would not be on the stand.
The defense had sought to introduce Bond's testimony that while she was at the Shasta County jail, Frank Muretto, acting on behalf of Cantwell, had threatened Bond's life and the life of her daughter to discourage Bond from testifying. The court excluded the evidence on hearsay grounds.
Defendant contends the evidence of Muretto's threat was not hearsay because it had not been offered to establish that Muretto was in fact acting on behalf of Cantwell in threatening Bond. In defendant's view, the evidence was admissible for the nonhearsay purpose of rehabilitating Bond after the prosecutor attempted to impeach her credibility by showing she was an "escapee" from jail at the time of the third encounter with Cantwell.[59] In addition to claiming trial *175 court error, defendant asserts ineffectiveness of counsel in the failure to secure admission of the evidence.[60]
The People dispute the contention that the alleged escape was used for impeachment purposes. The People also point out that the prosecutor had vigorously sought to have any and all evidence concerning the escape excluded as irrelevant and that it was the defense that elicited the evidence from Bond.
We need not resolve whether the court erred or whether counsel misstepped: There could have been no prejudice with respect to Bond's credibility. While testimony regarding the threat, if believed by the jury, may have rehabilitated Bond with reference to her escapee status, her credibility was, in any event, properly impeached with a felony conviction for welfare fraud. Moreover, the reliability of her testimony incriminating Cantwell was put into serious question by her claim that Cantwell showed her the "shotgun" or "rifle" used to kill Eggett. As the jury was well aware, Eggett had been stabbed to death.

7. Defendant's Escape From the County Hospital
As just discussed, defense witnesses Clumpus and Bond gave testimony to support defendant's claim that he had stolen millions of dollars' worth of methamphetamine oil from Cantwell and that Cantwell arranged to have Eggett killed and defendant framed for the murder. Consistent with that testimony, defendant relied on his supposed fear of Cantwell to explain a number of his actions, including his use of aliases and disguises and his departures from Chico both in 1985 and again after the killing.
As relevant to the instant claim, defendant testified on direct examination that Cantwell had been after him for the theft of the methamphetamine oil and that defendant fled from Chico to San Diego in mid-September 1985 after Cantwell shot defendant in his hand and in his leg. On cross-examination, defendant stated he had been staying with Cheryl Lake, but had left Chico around mid-September and had been hiding from Cantwell.
To rebut the above testimony, the prosecutor sought to show that defendant had fled Chico to escape from the police. Initially the prosecutor tried to introduce a police report reflecting defendant's arrest or detention on September 2, 1985, and his subsequent "escape" or. "walk-away" from the Chico Community Memorial Hospital while still in police custody. The trial court overruled the defense's relevancy objection but held the report inadmissible because its disclosure was untimely under the court's discovery order. Later, however, the court allowed the prosecutor to question defendant regarding what he had told Cheryl Lake about his leaving Chico, but precluded inquiry into the hospital matter.
The prosecutor then asked defendant: "You didn't tell [Lake] that you had escaped from the police; had to get out of town?" Defendant replied: "No. I had a misdemeanor failure to identify, and that was about a week before I left town...." Defendant said he had told Lake "at one point that I had a misdemeanor failure to appear; that I had walked away from the County Hospital or where I was being treated for a medical problem.... No  to my understanding I was not arrested, but I did understand that  they probably would have like to have talked to me." Defendant denied that he had left town to avoid the police, and reiterated that he had departed to avoid Cantwell.
After defendant volunteered testimony concerning his walking away from the hospital, the court permitted the prosecutor to ask whether defendant had been arrested on September 2, 1985, and whether he had walked away from the hospital while in police custody. Defendant testified police approached him while he was unloading a van in a parking lot. He gave the name of Lee Kenneth Barrette and a false birthdate. The officer asked for documentary identification and arrested defendant when he failed to *176 provide it. Defendant claimed that after he was placed in the holding cell, he was beaten up by officers and then taken to the hospital. Defendant denied any recollection of being told at the hospital that he was cleared to return to the jail. There were no police at the hospital and defendant "finally just left" after staying for more than an hour.
The prosecutor then called Officer James Carter as a rebuttal witness. Carter testified he saw a van with an expired registration stop in a parking lot. The driver identified himself as Lee Kenneth Barrette but had no identification. After finding no match for Barrette in the California driver's license system, Carter arrested defendant and transported him to the police station.
Upon hearing this testimony, defense counsel objected that the arrest had been made under section 647, subdivision (e) and was therefore unconstitutional under Kolender v. Lawson (1983) 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903.[61] The prosecutor responded that the arrest was under Vehicle Code section 40302, subdivision (a), a fact confirmed by Carter. Undeterred, defense counsel argued that the Vehicle Code provision was unconstitutional on the same grounds as section 647, subdivision (e) and moved to suppress the balance of the testimony regarding defendant's postarrest custody.
The trial court permitted Carter to testify, finding he had probable cause to arrest defendant for driving without a license. Carter testified that defendant, while at the police station, seemed to have a seizure and was taken to the hospital. No one had beaten defendant. Defendant left the hospital at some point although he was still in custody.
Finally, the doctor who examined defendant testified he had cleared defendant's return to jail after diagnosing him as not having had a true seizure. Defendant did not say anything about being beaten, and a small hematoma on his forehead could have been caused by falling and hitting his head. Before the police arrived, defendant was permitted to go to the bathroom and subsequently disappeared.
Defendant makes several contentions with respect to the evidence of his escape from the county hospital. None has any merit.
Defendant first argues the evidence should have been excluded under Evidence Code section 352.' As he concedes, however, counsel objected only on relevancy grounds and made no objection to the perceived prejudicial effect of the evidence. Consequently, that issue has not been preserved for review. (People v. Kirkpatrick, supra, 7 Cal.4th at pp. 1014-1015, 30 Cal.Rptr.2d 818, 874 P.2d 248.)
Defendant next argues counsel's failure to object on Evidence Code section 352 grounds constituted ineffective assistance. We disagree. As discussed above, the defense had presented testimony from defendant and others to show that Cantwell was angry and violent toward defendant for stealing his highly valuable methamphetamine oil, that defendant fled Chico twice to avoid Cantwell, and that Cantwell killed Eggett and framed defendant to revenge the theft. Consequently, evidence showing that defendant had reasons other than the avoidance of Cantwell for leaving town was relevant to disprove the defense. Because such evidence was neither inflammatory nor misleading with respect to any other issue,[62] defendant *177 fails to demonstrate that an objection on section 352 grounds would have been successful. (See People v. Neely (1993) 6 Cal.4th 877, 896-897, 26 Cal.Rptr.2d 189, 864 P.2d 460.)
Defendant also contends the evidence should have been excluded in its entirety because the police report concerning his 1985 arrest was not made available to the defense until late in the trial. Defendant concedes the normal remedy for noncompliance with a discovery order is not suppression of evidence, but a continuance (People v. Robbins (1988) 45 Cal.3d 867, 884, 248 Cal. Rptr. 172, 755 P.2d 355; People v. Reyes (1974) 12 Cal.3d 486, 502, 116 Cal.Rptr. 217, 526 P.2d 225), but argues he would not have testified as to his reason for leaving town had he known at the outset of the police report's existence. We refuse to speculate as to what evidence may or may not have been introduced had the report been timely produced. Defendant had the opportunity to seek a continuance in order to develop a response. He was entitled to no more.
Finally, defendant argues the evidence of his arrest and walk-away from the hospital should have been excluded because his arrest pursuant to Vehicle Code section 40302, subdivision (a), Was unlawful. The People disagree that the arrest was unlawful, and assert that, in any event, its legality is not at issue here. We agree the validity of the 1985 arrest was and is of no significance to any issue in this case. Whether or not the arrest was legal, the circumstances of the arrest and subsequent walk-away from custody were relevant to rebut defendant's testimony that he fled Chico to avoid Cantwell. Defendant provides no authority suggesting that the validity of the arrest should determine the admissibility of such evidence.

8. Alleged Prosecutorial Misconduct

(a) References to Defendant's Past Aliases
The information as filed contained 19 aliases for defendant. The court ruled, however, that only the names "Eric Walther" (defendant's birth name) and "Lee Barnett" would be read during the jury voir dire. Prior to the trial, the court directed the prosecutor to advise all witnesses to make "absolutely no reference or any inference to anything concerning the Defendant's past" without first advising the court.
On cross-examination, the prosecutor asked defendant whether he used the names "Daniel Osborn" (or Osburn), "Lee Barrett" and "Edmond Wanke." Defendant indicated he had used the first two names for cashing checks from his tree trimming service and for tax evasion purposes. The third name he had used in Calgary, Canada in 1970. When asked about the names "Charles Bradley" and "Johnson," defendant responded he had probably used some 15 or 16 different names over the years. The prosecutor then inquired: "Sure it isn't about 23 names, sir." When defense counsel objected to the line of questioning as irrelevant and beyond the scope of direct examination, the prosecutor defended the interrogation by asserting, incorrectly, that defendant had attempted to imply that he had only changed his name recently. The court ruled it would "permit the question thus far."
The prosecutor then asked whether defendant had used the name "Bradley C. Bubb." After defendant denied doing so, counsel again objected, arguing in a bench session that the prosecutor's questioning implied a number of felony convictions and was unduly prejudicial. Although the prosecutor had made no actual references to prior convictions, the court sustained the objection. With the court's permission, however, the prosecutor inquired into defendant's reasons for having changed his name so many times. Defendant replied he wanted to make it difficult for the Internal Revenue Service to track him down, and to keep people"IRS, police, or anyone else"from finding him.
At the end of defendant's testimony, defense counsel moved for a mistrial based in part upon the prosecutor's questioning regarding the 23 or so aliases. The motion was denied.[63]
*178 Defendant contends on appeal that the prosecutor committed prejudicial misconduct by violating the court's pretrial order and eliciting testimony from defendant about his use of numerous aliases to evade taxes and police contact. According to defendant, the improper inferences arising from the prosecutor's tactics and the evidence of aliases undermined his state and federal rights to due process, a fair trial, and a reliable guilt and penalty determination.
In general, a prosecutor commits misconduct by using deceptive or reprehensible methods of persuasion. (People v. Alvarez, supra, 14 Cal.4th at p. 213, 58 Cal. Rptr.2d 385, 926 P.2d 365; People v. Price, supra, 1 Cal.4th at p. 447, 3 Cal.Rptr.2d 106, 821 P.2d 610.) It is generally not necessary for the defendant to show the prosecutor acted in bad faith because the prosecutor's conduct is evaluated in accordance with an objective standard. (People v. Alvarez, supra, 14 Cal.4th at p. 213, 58 Cal.Rptr.2d 385, 926 P.2d 365.) "`To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.'" (People v. Bradford (1997) 15 Cal.4th 1229, 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259 and cases cited therein; see also People v. Rowland (1992) 4 Cal.4th 238, 274, 14 Cal.Rptr.2d 377, 841 P.2d 897; People v. Baines (1981) 30 Cal.3d 143, 149, 177 Cal. Rptr. 861, 635 P.2d 455 [applying waiver principles to misconduct claim involving prosecutor's reference to defendant's alleged use of false name].)
To the extent defendant bases his misconduct claim upon the prosecutor's questioning of defendant and other witnesses regarding the names "Daniel Osburn" or "Lee Barrett," it clearly is without merit. The trial court had specifically determined that the Osburn alias was relevant to the case because defendant had identified himself by that name to officers at the time of his arrest for Eggett's murder. That determination was proper. As for the Barrett alias, many of those who testified at the trial, including the victims, had known defendant by that name. Defendant has not shown how the prosecutor's clarification of that fact served to persuade the jury in a deceptive or reprehensible way.
As for the balance of the claim, the People do not appear to dispute that timely objections were made or that the prosecutor's questions regarding defendant's many other aliases over the years constituted misconduct, although it is claimed the prosecutor acted out of a misunderstanding of defendant's testimony and not in bad faith. Nor do the People appear to contest defendant's claim that the elicited evidence was lacking in relevance. Rather, it is the People's position that a reversal is unwarranted because defendant cannot demonstrate any prejudice from the perceived misconduct.
Even assuming for purposes of argument that the prosecutor's actions constituted misconduct, we may not reverse the judgment if it is not reasonably probable that a result more favorable to the defendant would have been reached in its absence. (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) Applying this standard, we agree no reversal is warranted.
Considered in combination with defendant's prior convictions for transportation of a stolen vehicle in 1966 and theft in 1970 (introduced for impeachment purposes), defendant's testimony that he had used a number of aliases since 1966 to evade taxes, the IRS, the police and others may have given the impression that defendant had a long history of theft offenses and related attempts to avoid law enforcement and theft victims. But since defendant's credibility hinged on convincing the jury that he had stolen methamphetamine oil worth between $2 and $4 million from Cantwell and had sought to avoid Cantwell, allusions to a possible background of theft offenses involving the use of aliases could not have affected the defense case adversely. The prosecutor's questioning did not suggest defendant's possible *179 involvement in violent crimes; neither did the elicited testimony.
In any event, there was overwhelming circumstantial evidence pointing to defendant as Richard Eggett's murderer. In the year preceding the murder, Dave McGee heard defendant threaten to kill Eggett. The night before the murder, Margarete Haynes heard defendant say he was going to kill "Rich." Eyewitnesses testified that when the two groups unexpectedly met each other at the campsite, defendant expressed his desire to "get" Eggett for matters that occurred during the previous year and to make Eggett feel pain. It was undisputed that defendant verbally and physically abused Eggett before transporting Eggett and his group away from the camp to another location. Defendant had the opportunity to torture and kill Eggett after he walked Eggett away from the others at that location. While defendant was alone with Eggett, Cantwell and Hampton heard Eggett screaming in pain. The screaming stopped when defendant returned to the Jeep by himself. Cantwell and Hampton heard defendant brag to Burgess that he had tied fishing line around the victim's genitals "real tight." After returning to the camp, defendant had a second opportunity to torture and kill Eggett when he left the camp by himself that same day. Although defense witnesses at trial suggested it was Cantwell who murdered Eggett, Hampton testified that he and Cantwell were together from the time they left the camp to the time they found Eggett's body the next day. Nothing in Hampton's testimony implicated Cantwell as the killer.
In sum, a reversal is unwarranted because it is not reasonably probable that a different result would have been obtained absent the perceived misconduct.[64] (People v. Watson, supra, 46 Cal.2d at p. 836, 299 P.2d 243.)

(b) Display of the Fishing Lure and Hunting Knife
Both Hampton and Cantwell testified that defendant hooked a fishing lure into Eggett's back. Hampton described the lure as "more or less like a three-pronged lure." Cantwell was more specific in his testimony: He saw defendant pick up a lure from the ground and heard defendant tell Eggett he was going to place a treble hook fishing lure into Eggett's back. Cantwell, who was very familiar with lures, described the lure found by defendant as a "rooster tail" because it had feathers attached to it.
Over a defense objection, the prosecutor showed Hampton a featherless three-pronged fishing lure. Hampton indicated that the displayed lure depicted what he had meant by "a three-pronged lure." When shown the same lure, Cantwell described it as a "treble hook" but not a "rooster tail."
There was also testimony concerning defendant's possession of a knife and the knife wounds suffered by Eggett. Both Hampton and Burgess saw that defendant had a knife at the camp and later heard him instruct Billy to cut the clothes off his brother. Hampton described the knife as "pretty fairly big" and indicated it was at least nine to ten inches long. Forensic Pathologist Gwen Hall testified that Eggett was stabbed eight times with a knife and that the wounds were all approximately one and a quarter inches across.
Prior to closing argument, the prosecutor indicated he intended to use a knife as a demonstration during closing argument. Although defense counsel had no objection to the prosecutor holding the knife and using it for demonstrative purposes, he said he would object if the prosecutor were to engage in "high drama." During closing argument, the prosecutor displayed a knife to the jury and commented: "A knife from the evidence that which [sic ] have of the autopsy surgeon Gwen Hall, pathologist, is that knife would be of approximately an inch and a quarter across, a knife not unlike the knife that we have displayed and are displaying before you now, a Marine Corps K-bar knife. Fairly standard sheath-type, hunting knife. An *180 inch and a quarter across." Defense counsel did not object to the prosecutor's conduct.
Emphasizing that the fishing lure and hunting knife shown at trial had no connection to the crimes and were "vicious looking," defendant now contends that the prosecutor committed misconduct in displaying the instruments and that the trial court erred in allowing him to do so. He claims the viewing of those instruments inflamed the jury and violated his state and federal rights to due process, a fair trial, and a reliable guilt and penalty determination. For the reasons set forth below, we conclude otherwise.
It is entirely proper for a prosecutor to use objects similar to those connected with the commission of a crime for purposes of illustration. (See People v. Brown (1958) 49 Cal.2d 577, 587, 320 P.2d 5; People v. Stone (1963) 213 Cal.App.2d 260, 266, 28 Cal.Rptr. 522.) Here, Cantwell testified that even though the displayed lure had no feathers like the one defendant stuck into Eggett's back, it had the same treble hooks. Because it was useful for illustrative purposes and had no tendency to evoke an emotional bias against the defendant as an individual (People v. Padilla, supra, 11 Cal.4th at p. 925, 47 Cal.Rptr.2d 426, 906 P.2d 388; People v. Gionis, supra, 9 Cal.4th at p. 1214, 40 Cal.Rptr.2d 456, 892 P.2d 1199; People v. Garceau, supra, 6 Cal.4th at p. 178, 24 Cal. Rptr.2d 664, 862 P.2d 664), use of the nonfeathered lure was permissible and did not warrant exclusion under Evidence Code section 352.
Furthermore, the prosecutor did not use deceptive or reprehensible methods of persuasion (People v. Alvarez, supra, 14 Cal.4th at p. 213, 58 Cal.Rptr.2d 385, 926 P.2d 365; People v. Price, supra, 1 Cal.4th at p. 447, 3 Cal.Rptr.2d 106, 821 P.2d 610) in showing the lure to the witnesses and did not try to pass it off as the lure used by the defendant. Commendably, the prosecutor specifically elicited testimony from Cantwell identifying the difference between the two lures. No misleading impression was created.
Defendant's contentions regarding the display of the hunting knife fare no better. First of all, the issues have not been preserved for review because the defense failed to object when the prosecutor displayed the knife and referred to it during closing argument.[65] (People v. Bradford, supra, 15 Cal.4th at p. 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259.) In any event, the testimony given by Burgess, Hampton and Hall  confirming defendant's possession of a large knife at the camp and the approximate size of the knife used to stab Eggett  provided a sufficient basis for the knife's display. (See People v. Brown, supra, 49 Cal.2d at p. 587, 320 P.2d 5; People v. Stone, supra, 213 Cal. App.2d at p. 266, 28 Cal.Rptr. 522.) Again, there was no attempt to mislead the jury into believing the knife was the actual murder weapon. Finally, the record contains no indication that the knife was in fact dissimilar or more vicious in appearance than the knife described by the witnesses, or that display of the knife was so unduly prejudicial as to require exclusion under Evidence Code section 352.

(c) Questioning of Defendant
Defendant next contends the prosecutor committed misconduct during his cross-examination by improperly asking questions that implied without proof that defendant had attempted to bribe witnesses by offering them methamphetamine oil, that he had attempted to dispose of a weapon before his arrest on the current charges, and that he had stolen gold from Eggett.
We do not reach the merits of these contentions. Because the defense failed to make a timely objection and to request an admonition when such an objection and admonishment would have cured any potential harm, the claims of prosecutorial misconduct have been waived for purposes of appeal. (People v. Bradford supra, 15 Cal.4th at p. 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259.) In any case, any harm flowing from the *181 questioning was minimized by the court's instruction that statements by the attorneys were not evidence.

9. Admission of Testimony by Burgess's Attorney
Tom Burgess was at the home of Phil Enoingt and Delinda Olson when defendant arrived the morning after the murder. At some point, Burgess saw defendant change his clothes in the garage. During cross-examination by the prosecutor, Burgess acknowledged that in June of 1987 he told both the prosecutor and his own attorney, David Vasquez, that he had seen both of defendant's legs smeared with blood. On redirect, defense counsel elicited testimony from Burgess to the effect that he had been pressured by Vasquez to make that previous statement. During subsequent questioning by the prosecutor, Burgess maintained he had not told the truth about having seen blood on defendant because of pressure from Vasquez.
When the prosecutor called Vasquez to rebut the foregoing testimony, Vasquez asserted the attorney-client privilege on behalf of Burgess.[66] Defense counsel also objected, arguing that Burgess had not been fully advised regarding the privilege at the time of his testimony and that any waiver was therefore invalid. The trial court ultimately found that Burgess had made a limited waiver of the privilege. Vasquez testified that Burgess had told him shortly before August of 1986 and then again in June of 1987 that he had seen blood on defendant. Vasquez also stated that at no time did he tell or pressure Burgess to lie about the blood.
Defendant contends on appeal that Burgess's supposed waiver of the attorney-client privilege was invalid because he did not receive assistance and advisement of counsel before making disclosures on the disputed topic. We are not persuaded.
As a preliminary matter, we observe that Burgess was the sole holder of the statutory privilege. (Evid.Code, § 953.) Defendant provides no authority supporting his attempt to vicariously assert that privilege on his own behalf for purposes of the claim on appeal. In an analogous context, California courts have held that because the constitutionally based right against self-incrimination is personal, it may not be asserted by another. (See People v. Douglas (1990) 50 Cal.3d 468, 501, 268 Cal.Rptr. 126, 788 P.2d 640 [a defendant lacks standing to object to any perceived violation of another's privilege against self-incrimination]; People v. Wisely (1990) 224 Cal.App.3d 939, 943-944, 274 Cal. Rptr. 291 [citing numerous state and federal authorities holding that a defendant has no standing to argue that the testimony of an immunized witness is the product of improper grants of immunity].) Defendant offers no basis for distinguishing the logic of such cases.
In any event, the claim is without merit. The right of any person to claim the statutory attorney-client privilege "is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication...." (Evid.Code, § 912, subd. (a).) Defendant does not argue that Burgess's disclosure was insignificant for purposes of a waiver. Nor does he contend that Burgess was coerced into relating his account of having been pressured by Vasquez to lie. Indeed, it was defense counsel who elicited the disputed testimony on defendant's behalf in an effort to minimize the incriminating nature of Burgess's prior statement. Since defendant has cited no authority suggesting that assistance and advisement of counsel was necessary to validate Burgess's waiver of the privilege, we agree with the trial court's assessment that a valid, limited waiver had occurred pursuant to Evidence Code section 912, subdivision (a).
Defendant next claims that People v. Perez (1961) 189 Cal.App.2d 526,11 Cal.Rptr. 456 precluded the admission of Vasquez's testimony, since Burgess admitted making the prior inconsistent statement.
*182 The failure to make this particular objection at trial waives the issue on appeal. (Evid.Code, § 353; see People v. Ramos, supra, 15 Cal.4th at p. 1171, 64 Cal.Rptr.2d 892, 938 P.2d 950.) In any event, defendant's reliance upon People v. Perez, supra, 189 Cal.App.2d 526, 11 Cal.Rptr. 456, is misplaced.
In People v. Perez, supra, the defendant was convicted of possession of heroin. As part of the prosecution's case, Joe Ledesma, Jr., was called to testify that he knew the defendant and had bought heroin from him on a prior occasion (unconnected to the charged crime). Ledesma, however, unexpectedly denied knowing the defendant and purchasing heroin from him. (189 Cal.App.2d at p. 534, 11 Cal.Rptr. 456.) Even though Ledesma acknowledged he had previously told another prosecutor, Captain Patton, that he had bought heroin from the defendant, Ledesma claimed he had been told he could go home if he were to make such a statement. Without objection, Captain Patton was then permitted to testify that he never held out any inducement to Ledesma to give information or testify against defendant. The defense, however, subsequently objected when the prosecutor sought to introduce a tape recording of the relevant conversation between Ledesma and Captain Patton, in which Ledesma indicated that he previously had made three purchases of heroin from the defendant's brother and one from the defendant, and that he would testify to those purchases as the truth before the grand jury or in any court. The court overruled the objection and admitted the tape recording "for the limited purpose of whatever weight it might have in the minds of the jurors in resolving the question of whether Ledesma Was stating the truth when he asserted that this claimed bribery took place, and that he made these statements at the request of Capt. Patton in order to secure his release.'" (189 Cal.App.2d at p. 535, 11 Cal. Rptr. 456.)
The Court of Appeal reversed the conviction, concluding that impeachment of Ledesma with his prior inconsistent statement should not have been permitted at all because Ledesma's testimony that he did not know the defendant and had made no purchase from him was not directed to the occasion for which he had been charged and because the testimony did not result in any evidence supporting the defense. (People v. Perez, supra, 189 Cal.App.2d at p. 537, 11 Cal.Rptr. 456.) The Court of Appeal further found that, even if the error was not in permitting the impeachment as such but rather in allowing the jury to hear Ledesma's tape-recorded statements regarding the previous purchases, the danger of its misuse by the jury was great despite the fact that limiting instructions had been given: "It was not evidence that in fact the [defendant] had made a prior sale but its necessary effect was to implant in the minds of the jurors the idea that the [defendant] must have made the sale and thus that it was probable that he was often in possession of heroin and consequently was probably guilty of the crime charged." (Id. at p. 539,11 Cal.Rptr. 456.)
We note that People v. Perez, supra, 189 Cal.App.2d 526, 11 Cal.Rptr.2d 456, preceded the enactment of California's Evidence Code and additionally has been disapproved to the extent it purported to bar the introduction of evidence contradicting a material witness's claim that prior inconsistent statements were made as a result of improper police pressures. (People v. Underwood (1964) 61 Cal.2d 113, 125, 37 Cal.Rptr. 313, 389 P.2d 937.) In any event, its holding does not bar the type of evidence challenged here. Unlike the situation in People v. Perez, the testimony in this case did not pertain to an unrelated offense and was not likely to mislead or otherwise confuse the jury. The prior inconsistent statement at barBurgess's statement that he observed what appeared to have been blood on defendant the morning after Eggett's murderwas evidence pointing to defendant's involvement in the charged murder and special circumstance allegations. (Evid.Code, § 1235; People v. Fierro (1991) 1 Cal.4th 173, 221, 3 Cal. Rptr.2d 426, 821 P.2d 1302 [prior inconsistent statements are admissible both to impeach credibility and to prove the truth of the matter stated].) By eliciting testimony from Burgess that his attorney had pressured him to he, the defense evidently sought *183 to cast doubt on the truthfulness of the prior statement and to neutralize its effect. Under these circumstances, the trial court properly allowed the prosecution to offer Vasquez's testimony to rebut the damaging impression.

10. Burgess's Reference to Supposed Confession by Defendant
As mentioned above, Burgess testified during redirect examination by defense counsel that his attorney, Vasquez, had pressured him to falsely incriminate defendant. Claiming he had been "given the answer to questions and then asked the question," Burgess indicated Vasquez had urged him to state untruthfully that defendant had returned to the campsite the day after the murder. Burgess also indicated, in an answer that was nonresponsive to the question posed, that defendant "had stopped and told somebody that he had done it."[67]
Defendant claims defense counsel was constitutionally ineffective in eliciting the foregoing evidence of a "confession" and in failing to impeach it or have it stricken. We disagree. On the first point, the record offers no basis for concluding that counsel should have anticipated the nonresponsive testimony.
Nor does the record show ineffectiveness on the second point. "The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence.... `"In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel...."'" (People v. Frierson (1979) 25 Cal.3d 142, 158, 158 Cal.Rptr. 281, 599 P.2d 587.) Here, counsel reasonably might have chosen for tactical reasons not to draw attention to the issue because a reasonable interpretation of Burgess's testimony was that it referred to a falsehood purportedly prompted by Vasquez. (See ante, fn. 67.) That inference is supported by the fact that the prosecutor did not ask Burgess any questions about an alleged confession and did not pursue the topic with any other witness. We see no incompetence.
Defendant also claims the prosecutor committed misconduct during closing argument by referring to the supposed confession in explaining one of the instructions on admissions, as follows: "[¶] One of the instructions we talk about is instruction which you must have evidence independent of any admissions the Defendant made outside the Court to find the Defendant guilty. It's called the corpus delecti [sic] rule. A cross [sic: gross (?)] example is if the Defendant had confessed to someone outside of this courtroom said, Yes, I killed Richard Eggett,' but there was absolutely no other evidence that even Richard Eggett was dead, you couldn't come back with a verdict that said, Yes, the Defendant is guilty of the murder of Richard Eggett.' [¶] We have no difficulty with that instruction here because there is plenty of other evidence outside of what the Defendant has said both outside the Court and inside the Court."
No basis for reversal appears. Because the defense remained mute when an objection and admonishment would have cured any potential harm, the claim has been waived for purposes of appeal. (People v. Bradford supra, 15 Cal.4th at p. 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259.)
In any case, it is inconceivable that the jury could have perceived the prosecutor's argument in the damaging manner described by defendant. As the People point *184 out, the prosecutor's reference to a confession was merely a hypothetical example demonstrating a worst case scenario of how one of the instructions would prevent any statement by defendant, no matter how compelling, from resulting in a guilty verdict on one of the charged crimes without other proof. The prosecutor's statement concerning "what the Defendant has said" obviously referred to defendant's various statements throughout the July 6, 1986, confrontation regarding his shooting of Eggett in the feet, his forcible taking of property and his forcible detention and movement of Eggett and his group against their will. At no point did the prosecutor refer to Burgess's brief mention of a supposed confession to murder. There was no misconduct.

11. Claim-of-right Defense
The two robbery charges and the robberymurder special-circumstance allegation centered upon the evidence that defendant robbed Eggett of gold and Cantwell of money during the campsite confrontation. While on the stand, defendant testified: "At this point in time that I took the vile [sic ] of gold and the money, at that point in time, I was going to keep it all because I felt that it was owed to me at that time because Richard Eggett had ripped me off the year before, and I did not know that money was going to turn out to be Billy Cantwell's. After he convinced me of that I gave that back to Billy Cantwell."
The court instructed the jury on the claim-of-right defense but limited its applicability to the robbery count concerning Eggett's gold.[68] Although defense counsel agreed to the instruction as limited, defendant separately advocated application of the defense to the money taken from Cantwell. During closing argument, the prosecutor urged the jury to reject the claim-of-right defense because defendant did not entertain an honest and good faith belief that the gold he took from Eggett in 1986 was the same gold that Eggett supposedly had withheld from defendant in 1985. Conversely, defense counsel told the jury to determine whether or not defendant took the gold from Eggett as "recompense" for the "earlier year's problem between Mr. Eggett and Mr. Barnett." Neither side objected to the argument of the other.
Maintaining that the claim-of-right defense also applied to the taking of Cantwell's money, defendant asserts the instruction as given was error and counsel's agreement thereto constituted ineffective assistance. Defendant also complains the instruction was susceptible to the mistaken interpretation that the defense would apply only if defendant honestly believed that the gold taken from Eggett was the very same gold previously stolen from defendant. Finally, defendant contends the prosecutor improperly argued that erroneous interpretation of the law to the jury.
Defendant's contentions are based principally upon this court's decision in People v. Butler (1967) 65 Cal.2d 569, 573, 55 Cal.Rptr. 511, 421 P.2d 703 (Butler). In that case, the defendant was accused of felony murder based on the underlying crime of robbery. At trial, the defendant testified he had been employed by the victim, who had not paid him for some work. The defendant, armed with a gun, went to the victim's home one evening to collect payment. Although the victim had at one point agreed to pay the defendant, he subsequently changed his mind and approached the defendant with a pistol. During the ensuing scuffle, the defendant shot and killed the victim, and also shot another person present in the victim's home. After quickly searching the home for money and finding none, the defendant grabbed a wallet and ran from the house. In recounting the events, the defendant claimed he did not intend to commit robbery when he went to the house, but intended only to recover the *185 money he was owed. (65 Cal.2d at pp. 571-572, 55 Cal.Rptr. 511, 421 P.2d 703.) Over the defendant's objection, the prosecutor was permitted to argue to the jury that a robbery had been committed even if the defendant honestly believed the victim owed him money. (Id. at p. 572, 55 Cal.Rptr. 511, 421 P.2d 703.) The jury convicted the defendant of first degree felony murder and fixed the penalty at death.
A majority of this court reversed, concluding: "Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]" (Butler, supra, 65 Cal.2d at p. 573, 55 Cal.Rptr. 511, 421 P.2d 703, fn. omitted.)
In his dissent in Butler, Justice Mosk took a dim view of the majority's apparent authorization of armed robbery as a self-help measure. Pointing out that the statutory provision defining robbery (§ 211) raised no issue of ownership of property forcibly taken, but only its possession, Justice Mosk saw no statutory basis for the defense. (Butler, supra, 65 Cal.2d at pp. 576-577, 55 Cal.Rptr. 511, 421 P.2d 703 (dis. opn. of Mosk, J.).) Moreover, noting that the leading cases permitting forcible recapture of property were all decided before the turn of the century, Justice Mosk concluded that a six-shooter was no longer "an acceptable device for do-it-yourself debt collection" and that the "mightmakes-right" doctrine of the previous century was of "dubious adaptability" to modern times. (Id. at p. 577, 55 Cal.Rptr. 511, 421 P.2d 703.)
Since Butter, supra, 65 Cal.2d 569, 55 Cal. Rptr. 511, 421 P.2d 703, was decided, a number of other jurisdictions have rejected the claim-of-right defense for public policy reasons in cases where force, violence, or weapons are used for self-help debt collection. (E.g., State v. Mejia (1995) 141 N.J. 475, 662 A.2d 308; State v. Self (1986) 42 Wash.App. 654, 713 P.2d 142 [rejecting majority's reasoning in Butler]; People v, Hodges (1985) 113 A.D.2d 514, 496 N.Y.S.2d 771 [same]; State v. Winston (1982) 170 W.Va. 555, 295 S.E.2d 46 [defense unavailable where accused takes money or other property, to which he did not have a specific ownership claim, in satisfaction of a debt]; Com. v. Dombrauskas (1980) 274 Pa.Super. 452, 418 A.2d 493 [citing favorably to Justice Mosk's dissent in Butler]; State v. Russell (1975) 217 Kan. 481, 536 P.2d 1392; Cotes v. State (Md.1974) 21 Md.App. 363, 320 A.2d 75 [citing favorably to Justice Mosk's dissent in Butler ]; Crawford v. State (Tex.Crim.App.1974) 509 S.W.2d 582; State v. Martin (1973) 15 Or.App. 498, 516 P.2d 753; Edwards v. State (1970) 49 Wis.2d 105, 181 N.W.2d 383 [defense unavailable if accused cannot trace ownership to specific personal property or money (i.e., bills or coins) taken from the claimed debtor]; People v. Uselding (1969) 107 Ill.App.2d 305, 247 N.E.2d 35; cf. State v. Lewis (App.1978) 121 Ariz. 155, 589 P.2d 29 [defense unavailable where claimed debt was unliquidated].) As several courts have observed, the proposition that a claim of right negates the felonious intent in robbery "`not only is lacking in sound reason and logic, but it is utterly incompatible with and has no place in an ordered and orderly society such as ours, which eschews self-help through violence. Adoption of the proposition would be but one step short of accepting lawless reprisal as an appropriate means of redressing grievances, real or fancied.'" (State v. Mejia, supra, 662 A.2d at p. 319; People v. Hodges, supra, 496 N.Y.S.2d at p. 774; State v. Winston, supra, 295 S.E.2d at p. 51; State v. Martin, supra, 516 P.2d at p. 756.)
In this state, limitations have been imposed on the availability of the defense. For example, the defense is not permitted where the claimed right to the property is rooted in a "notoriously illegal" transaction. *186 (E.g., People v. Hendricks (1988) 44 Cal.3d 635, 642, 244 Cal.Rptr. 181, 749 P.2d 836 [fee collection for prostitution services]; People v. Gates (1987) 43 Cal.3d 1168, 1182, 240 Cal. Rptr. 666, 743 P.2d 301 [distribution of proceeds from a forgery ring].) Moreover, the availability of the defense has been questioned if the claim at issue is unliquidated and therefore subject to dispute. (E.g., People v. Holmes (1970) 5 Cal.App.3d 21, 24, 84 Cal.Rptr. 889 [unliquidated contract claim]; People v. Poindexter (1967) 255 Cal.App.2d 566, 570, 63 Cal.Rptr. 332 [unliquidated tort claim for personal injuries resulting from a barroom brawl].)
In responding to defendant's arguments, the People do not seek reconsideration of Butler. Instead, the People argue the defense is unavailable in the present case because (1) the evidence did not show defendant's good faith belief in a property right to either the vial of gold or the money, and (2) the claim at issue was unliquidated and subject to dispute. To the extent the instruction was given, the People maintain, defense counsel made a reasonable decision to limit the defense to the Eggett robbery. In any event, it is argued, defendant was not prejudiced by the absence of a claim-of-right instruction as to the Cantwell robbery count given the jury's rejection of the defense on the Eggett robbery count. We agree the defense was unavailable in light of the evidence at trial.
"[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that appellant acted with a subjective belief he or she had a lawful claim on the property." (People v. Romo (1990) 220 Cal.App.3d 514, 519, 269 Cal.Rptr. 440.) Whether or not the evidence provides the necessary support for drawing that particular inference is a question of law. (Ibid.) Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses,[69] the court need not give the requested instruction where the supporting evidence is minimal and insubstantial. Doubts as to the sufficiency of the evidence should be resolved in the accused's favor. (Ibid.; People v. Alvarado (1982) 133 Cal.App.3d 1003, 1021, 184 Cal.Rptr. 483; see also People v. Flannel (1979) 25 Cal.3d 668, 684-685, 160 Cal.Rptr. 84, 603 P.2d 1 [elucidating the same principles in context of a refused instruction regarding diminished capacity].)
Applying the foregoing rules, we conclude there was no substantial evidence supporting the inference that defendant acted with the requisite bona fide belief. While defendant certainly accused Eggett of stealing gold from him during the previous year, his testimony offered no basis for concluding that he actually believed he was taking gold and money belonging to Eggett in satisfaction of a lawful claim to those items. According to defendant, he was up at the top of a hill when he demanded at gunpoint that all the victims place their belongings on the hood of the Jeep. Although he saw "everybody going over there and putting stuff on the hood," their "backs were to [defendant]" and he did not see "who put what in which particular place." In his own words, he "just seen everything put in a pile on the hood of the Jeep." Thus defendant's testimony, even if believed, showed that he simply seized whatever items of value were placed on the Jeep's hood without any regard to whether such items came from Eggett, who supposedly owed him a debt, or from one of the others, who indisputably did not. (See People v. Alvarado, supra, 133 Cal.App.3d at p. 1022, 184 Cal.Rptr. 483 [instruction properly refused where evidence disclosed that defendants indiscriminately took items of value never specifically related to any claim of right].) Moreover, defendant's self-serving statement that he "did not know the money was going to turn out to be Billy Cantwell's," even if credited, was insufficient to establish a bona fide belief that the money had come from Eggett, as opposed to either *187 Cantwell or Hampton whom he concededly saw relinquishing possessions.
Furthermore, unlike the situation in Butler, supra, 65 Cal.2d 569, 55 Cal.Rptr. 511, 421 P.2d 703, where there was evidence that the victim had acknowledged the debt, the debt claimed here was, by all accounts, uncertain and open to dispute. In the present case, Cantwell and Kersting both testified that Eggett denied having taken any gold from defendant and that Eggett and defendant argued over which of them had in fact stolen gold from the other. At trial, defendant did not dispute that these arguments took place. In addition, his own testimony revealed the uncertain nature of the claim. According to defendant, he and Eggett agreed that defendant would receive one-third of all the gold they dredged together. Prior to the termination of their relationship in the summer of 1985, defendant and Eggett had, in defendant's words, found a "Glory Hole" that they dredged for eight days. In those eight days, defendant asserted they had mined approximately twelve pounds of gold. Although defendant "felt [his] share of everything would have been in the neighborhood [of] a little over four pounds," he conceded the gold had not been weighed prior to the time he supposedly left the gold with Eggett. And while he suggested the gold was worth more than $300 per ounce, he acknowledged its value would have depended upon its quality. From this testimony it is clear that defendant's claim of right amounted to no more than a rough estimate of a disputed debt. As such, it bore no resemblance to the claim at issue in Butler.
As mentioned above, we have not been asked to revisit Butler's, increasingly anachronistic authorization of the claim-of-right defense in the context of armed robbery. However, given the obvious public policy reasons for strictly circumscribing the circumstances under which persons should be permitted to enforce their debt demands at gunpoint (see Butler, supra, 65 Cal.2d at p. 577, 55 Cal.Rptr. 511, 421 P.2d 703 (dis. opn. of Mosk, J.); State v. Mejia, supra, 662 A.2d at p. 319; People v. Hodges, supra, 496 N.Y.S.2d at p. 774; State v. Winston, supra, 295 S.E.2d at p. 51; State v. Martin, supra, 516 P.2d at p. 756), we conclude the defense is not available where the claimed debt is uncertain and subject to dispute.
Accordingly, when taken as a whole and viewed most favorably toward defendant, the evidence supporting a claim-of-right defense in this case was "minimal and insubstantial." (People v. Romo, supra, 220 Cal.App.3d at p. 519, 269 Cal.Rptr. 440; People v. Alvarado, supra, 133 Cal.App.3d at p. 1021, 184 Cal. Rptr. 483.) Inasmuch as the court should not have instructed on the defense at all, defendant's claims of prejudicial error, ineffectiveness and misconduct are rejected.[70]

12. Defense of Necessity
At the defense's request, the trial court instructed on the defense of necessity as follows: "[¶] Kidnapping is justifiable and not unlawful when committed by a person who, in the reasonable belief that his actions are necessary, acts to prevent harm to himself or a third party. [¶] The reasonable belief of harm to himself or a third party does not require actual danger, but it does require the person be confronted by the appearance of peril that arouses in his mind an honest and reasonable fear, such that a reasonable man in the same situation would be justified in having the same fear. [¶] The kidnapping must be done under the influence of such fear alone and there must exist no alternative means to alleviate the threatened harm."
As defendant points out, the foregoing instruction essentially advised the jurors that his belief in the threatened harm must have been reasonable for the defense to apply. *188 Relying upon People v. Scott (1983) 146 Cal. App.3d 823, 194 Cal.Rptr. 633, defendant contends the trial court should have specifically instructed sua sponte that evidence of his involuntary intoxication with methamphetamine could be taken into account in determining the reasonableness of his beliefs. As we shall explain, even were we to disregard the defense's role in contributing to the perceived errors, we see no basis for reversal.
In People v. Scott, supra, 146 Cal.App.3d 823, 194 Cal.Rptr. 633, the defendant became involuntarily intoxicated and began experiencing delusions after unknowingly ingesting a hallucinogen. Believing he was a Central Intelligence Agency agent assigned to protect the President, the defendant attempted to commandeer several vehicles without the consent of their owners. The Court of Appeal reversed the defendant's two convictions for unlawfully taking a vehicle without the consent of its owner (Veh.Code, § 10851) and directed the trial court to enter a judgment of not guilty. Relying on section 26, subdivision Three, the court concluded the defendant had been operating under a reasonable mistake of fact: "If in fact defendant were a government agent and either his life or the life of the President were in danger and defendant attempted to commandeer the vehicles for the purpose of saving his own life or that of the President, his actions would have been legally justified under the doctrine of necessity.... [¶].... Although defendant's mistake of fact was undoubtedly irrational, it was also undoubtedly reasonable under the circumstances, because the circumstances include that the mistake emanated from a delusion caused by defendant's involuntary intoxication resulting from unknowingly ingesting some unspecified hallucinogenic substance." (146 Cal.App.3d at pp. 831-832,194 Cal.Rptr. 633, fn. omitted.)
Although here defendant does not specifically identify the mistaken set of facts under which he was supposedly operating at the time of the kidnapping, he appears to claim the accidental ingestion of methamphetamine made him perceive the confrontation with Eggett's group as being far more threatening than it actually was. Even assuming this was the case, the law makes clear that the defense is unavailable where the means chosen by the defendant to resolve the delusional difficulties were not reasonably necessary. As one court explained: "[E]ven if the circumstances which confronted defendant entitled him under the doctrine of necessity to resort to some criminal act for his own protection, not just any criminal act which might eventually bring about his safety would qualify as an appropriate means to that end." (People v. Raszler (1985) 169 Cal.App.3d 1160, 1165, 215 Cal.Rptr. 770.) Thus, even a delusional defendant is "obligated to utilize the least costly alternative."[71] (Ibid, [defense unavailable to a defendant who disregarded available nonviolent methods of avoiding his imagined stalkers]; see also People v. Geddes (1991) 1 Cal.App.4th 448, 456, 1 Cal.Rptr.2d 886 [defendant's arson was not reasonably necessary to save his family members, whom he delusionally believed were being held hostage].)
In this case, the alternative chosen by defendant was kidnapping, an extremely dangerous offense accomplished by threats of harm or injury. (See People v. Pearch (1991) 229 Cal.App.3d 1282, 1298, 280 Cal.Rptr. 584.) "In order to compel the victim to comply, the kidnapper must make a serious threat of real harm, i.e., death or significant injury, and make the victim believe the threat is real, e.g., by displaying or alluding to a gun or a knife or other similar weapon. Idle threats of harm which are not reasonably believable under the circumstances are not sufficient. Threats of serious harm or death made with a show of willingness to *189 carry through on those threats present an inherently dangerous situation." (Ibid.)
Defendant, however, did not have to resort to the dangerous and life-threatening crime of kidnapping in order to secure the safety of himself and his group. The evidence showed that defendant had disarmed Eggett's group shortly after the unexpected confrontation. As defendant's own testimony indicates, Billy was not considered dangerous and Richard Eggett was, in effect, removed as a threat after defendant shot him in the feet. Moreover, Eggett, Hampton and Cantwell had their hands and feet bound by the time of the kidnapping. Rather than forcefully moving Eggett and the others against their will with Burgess's help, defendant could have detained them at the campsite while someone from his own group notified the authorities. Alternatively, defendant and his companions could have just left Eggett and his group tied up at the campsite while they went to the authorities. While those alternatives might have required defendant to technically commit the less serious crime of false imprisonment, they would have avoided the significantly greater potential for serious harm inherent in the forcible asportation of four men under the threat of imminent injury by a deadly weapon. Since the kidnappings were not reasonably necessary to save defendant and his group, necessity was not available as a defense to those counts. (People v. Geddes, supra, 1 Cal.App.4th at p. 456, 1 Cal. Rptr.2d 886.) A fortiori, the trial court did not prejudicially err in failing to specifically instruct that the defense may take into account the claimed involuntary intoxication.
Defendant next argues the court should have instructed on the defense of necessity with respect to the assault count because the charge "included detaining the Eggett party at gunpoint after they came storming into the camp, displaying guns, and attempted to take a gun from Burgess." We are not convinced. Count IV of the information described the sole assault charge as involving his assault on Richard Eggett with a firearm. As made amply clear to the jurors by the prosecutor's arguments and by the instructions they received, that charge specifically pertained to the shooting of Eggett in the feet.[72] As for the shooting itself, defendant offers no view of the evidence that might have justified application of the necessity defense.
Defendant also argues the court should have instructed on the necessity defense with respect to the robbery counts and the underlying felony element of the special circumstance of murder during the commission of robbery because his "taking" of Cantwell's pistol was necessary to prevent harm to defendant and his group.[73] In response, the People assert the defense had no application because the charged robberies were not based on defendant's taking of weapons; rather, the robbery charged in count II was premised upon the taking of Eggett's gold and the robbery charged in count III referred to the taking of Cantwell's money.
Although the prosecutor certainly did not emphasize defendant's taking of weapons as part of the charged offenses, he did make a brief reference during closing argument to "[t]he robbery of the men, of the gold, money and guns." (Italics added.) Nonetheless, even assuming the necessity defense may have applied to the taking of Cantwell's pistol, it had absolutely no application to the taking of either the gold or the money. Plainly, then, the guilty verdict on count II (robbery of Eggett) and its finding on the robbery-murder special-circumstance allegation cannot be attributable to the claimed error. Moreover, the absence of an instruction could not have prejudiced defendant with respect to count III because it is inconceivable that the jurors would have found him guilty for the robbery of Cantwell's pistol while not finding him guilty for the taking of Cantwell's money. It was undisputed that both items had been forcibly taken from *190 Cantwell and that the pistol and approximately $800 were ultimately returned to him. If the jurors found a robbery as to the returned property, there was no basis for distinguishing between the money and the pistol, and the returned money would provide a sufficient basis for the guilty verdict. If the jurors also determined that defendant did not return all the cash that was initially taken from Cantwell (i.e., defendant retained between $50 and $300), then that unreturned property would also sustain the verdict regardless of a contrary conclusion as to the pistol. No basis for reversal appears.

13. The Right of Citizen's Arrest
Evidence was introduced at trial showing that Cantwell and Hampton entered the campsite in an aggressive manner, that they pointed loaded firearms at members of defendant's group, and that Eggett may have attempted to wrest Burgess's gun away from him. Defendant testified that after observing such behavior, he said "a bunch of things," one of which was "You are under arrest. Get up against the truck.'"
Given the above evidence, defendant contends the jury could have found he had attempted to effect a citizen's arrest. (See § 837.)[74] He therefore argues that counsel was ineffective for not requesting instructions on "citizen's arrest and its consequences" and that the trial court erroneously failed to instruct on the issue sua sponte. While not setting forth the particular instructions that should have been given, defendant contends that the jury, if properly instructed, could have found that he took the personal property of Cantwell and Eggett for the lawful purpose of "secur[ing] the property of the arrested persons," thus negating the charges of robbery or reducing them to theft. He also suggests his actions would not constitute kidnapping if the jury found he acted for the lawful purpose of restraining and transporting arrested persons.
On this record, there was no evidence from which a reasonable juror could infer that the alleged robberies were undertaken pursuant to the claimed arrest. Defendant testified that, after having once yelled "You are under arrest," he repeatedly told the men to put their weapons down and to leave the area but never again referred to an arrest. Once defendant succeeded in disarming Eggett's group, he took their personal belongings, including a vial of gold and cash, not for the purpose of securing the property, but rather, in his own words, because "I felt that it was owed to me at that time because Richard Eggett had ripped me off the year before."
Likewise, even assuming for purposes of argument that actions taken pursuant to section 837 may validly serve as a defense to kidnapping,[75] there was no evidence from which a reasonable juror could infer that the kidnappings here, which occurred hours after the claimed reference to an arrest, were undertaken for the purpose of aiding in the arrest or in notification of the authorities. Defendant's testimony indicated he wanted to avoid contact with the authorities and chose to forcibly move Eggett's group to a remote area so that he and his group could leave the camp. While this evidence, viewed in the light most favorable to defendant, showed defendant's concern for the safety of himself and his group, it did not support the inference that the men were being transported pursuant to an arrest.
Because a trial court has no obligation to instruct sua sponte on a defense supported by "minimal and insubstantial" evidence (People v. Flannel, supra, 25 Cal.3d at *191 pp. 684-685, 160 Cal.Rptr. 84, 603 P.2d 1), no error appears. Moreover, given the evidentiary weaknesses of the theory and the obvious contradictions it would raise with respect to defendant's claim-of-right defense to the one robbery count, counsel cannot be faulted for failing to demand instructions on it.[76]

14. Flight Instructions
Without objection, the jury was orally instructed on flight pursuant to an unmodified version of CALJIC No. 2.52.[77] Subsequently, defendant objected and requested that the court modify the second sentence of the standard instruction to state: "whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such circumstance are matters for your determination." Citing People v. Guzman (1975) 47 Cal.App.3d 380, 388, 121 Cal. Rptr. 69, defendant argued the foregoing modification should be given because there was evidence of reasons for flight other than consciousness of guilt. The court agreed to give the modified instruction, and indicated it would bring the jury back and orally instruct them accordingly. After the prosecutor objected that such a procedure would unnecessarily and unduly emphasize the subject, the court suggested it would simply change the language of the written instruction sent to the jury room, without an oral reinstruction. Both the prosecutor and defense counsel agreed to that procedure.
On appeal, defendant contends that the reading of the unmodified version of CALJIC No. 2.52 was an error that was not cured because the jury was not verbally informed of the modification and the record shows the packet of written instructions was not requested by the jury. We are not persuaded.
We recently found that a flight instruction substantially similar to the one orally conveyed here adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt. (People v. Bradford (1997) 14 Cal.4th 1005, 1054-1055, 60 Cal.Rptr.2d 225, 929 P.2d 544; see also People v. Lucas (1995) 12 Cal.4th 415, 471, 48 Cal.Rptr.2d 525, 907 P.2d 373 [CALJIC No. 2.52 properly allows jury to determine whether consciousness of guilt or some other inference is more reasonable]; People v. Guzman, supra, 47 Cal.App.3d at p. 388, 121 Cal.Rptr. 69 [acknowledging the propriety of CALJIC No. 2.52].) Accordingly, the jury received proper guidance and the written modification was unnecessary.
Defendant next contends the jury was incorrectly instructed pursuant to former CALJIC No. 9.15 that a robbery is still in progress while the perpetrator is in "hot flight" or is being immediately pursued.[78] According to defendant, this portion of the standard instruction, when considered in combination with CALJIC No. 2.52, allowed the jury to improperly infer that the robbery was still in progress even after defendant returned the money and guns to Cantwell and Hampton. Again, no error appears.
Defendant is wrong in suggesting the robbery could not still be in progress after the return of the money and guns. The *192 crime of robbery continues until the robber has reached a place of temporary safety. (People v. Fierro, supra, 1 Cal.4th at p. 226, 3 Cal.Rptr.2d 426, 821 P.2d 1302 [defining duration of robbery for purposes of firearm enhancement]; People v. Carroll (1970) 1 Cal.3d 581, 585, 83 Cal.Rptr. 176, 463 P.2d 400 [same for bodily injury enhancement].) Evidence may support the conclusion that no place of temporary safety has been reached while the robber is still encumbered with the victim, "who at first opportunity might call the police." (People v. Fields (1983) 35 Cal.3d 329, 364, 197 Cal.Rptr. 803, 673 P.2d 680; see People v. Stankeuritz (1990) 51 Cal.3d 72, 101, 270 Cal.Rptr. 817, 793 P.2d 23.) In this case, the jury could reasonably conclude defendant had not reached a place of temporary safety while still in the campsite area with his victims.
Even if there was no evidence of hot flight or immediate pursuit, the unnecessary references to those concepts were harmless. The jury was specifically instructed to "disregard any instruction which applies to a state of fact which you determine does not exist" and to "not conclude from the fact that an instruction has been given that the Court is expressing any opinion as to the facts." (See CALJIC No. 17.31.) We also fail to see how that instruction, when considered in combination with CALJIC No. 2.52, could have misled the jury as defendant suggests.[79] Accordingly, the instruction on the hot flight and immediate pursuit concepts could not possibly have prejudiced defendant.

15. Felony-murder Instruction
CALJIC No. 8.10 was read to the jury as follows: "[¶] Defendant is charged in Count 1 of the information with the commission of the crime of murder, violation of Section 187 of the Penal Code. The crime of murder is the unlawful killing of a human being with malice aforethought or unlawful killing of a human being which occurs during the commission or attempted commission of a felony inherently dangerous to human life. [¶] In order to prove the commission of the crime of murder, each of the following elements must be proved. One, that a human being was killed. Two, that the killing was unlawful; and three, that the killing was done with malice aforethought." (Italics added.)
Defendant contends the italicized portion of the instruction above should not have been read to the jury. While conceding he was not prosecuted on a felony-murder theory, defendant nonetheless posits that the instruction as read impermissibly and prejudicially allowed the jury to convict him of first degree murder on the basis of felonies not enumerated in section 189, such as theft, furnishing of methamphetamine, conspiracy to manufacture methamphetamine, and false imprisonment, or on the basis of impermissible felonies, such as assault, assault with a deadly weapon, and assault with intent to inflict great bodily injury on Eggett.
This contention is without merit. Although the reading of CALJIC No. 8.10 inadvertently referred to felony murder, the other instructions clearly informed the jurors there could be no conviction of first degree murder unless they found deliberation and premeditation.[80] In addition, it was unmistakably clear from the outset of the prosecutor's opening statement to the close of his final argument that the instant case was being tried upon the theory of deliberate and premeditated murder. The prosecutor gave no indication at any time that a conviction *193 was being sought on a felony-murder theory. Nor did the defense proceed as if such theory had been presented. On this record, no reasonable juror could possibly have understood that guilt could be predicated upon a felony-murder theory.

16. Failure to Instruct on Involuntary Manslaughter
Defendant testified that, in the morning before the confrontation at the campsite, he ingested two capsules of methamphetamine he believed were vitamins left at the camp by former occupants. Also, in the later afternoon or early evening, after leaving Eggett tied to a tree, defendant shared some methamphetamine with Cantwell and Hampton.
In light of the evidence of defendant's morning ingestion of the two capsules, the court gave modified involuntary intoxication instructions based upon CALJIC No. 4.23 (1981 rev.). In light of the evidence of the afternoon or evening taking of methamphetamine, the court gave an instruction on voluntary intoxication pursuant to CALJIC No. 4.22 (1981 rev.). In addition, the court instructed on first degree murder, second degree murder and voluntary manslaughter. (E.g., CALJIC Nos. 4.21 (1981 rev., as mod.) [intoxication as relevant to mental state], 8.30 [second degree murder], 8.70 [degree of murder], 8.71 (1979 rev.) [doubt whether first or second degree murder], 17.10 (1984 rev.) [conviction of lesser included offense of voluntary manslaughter], 8.40 (1979 rev., as mod.) [voluntary manslaughter], 8.50 (1987 rev., as mod.) [murder and manslaughter distinguished], 8.72 [doubt whether murder or manslaughter], 8.74 (1976 rev.) [unanimous agreement as to first or second degree murder or manslaughter].) With defense counsel's agreement, however, no instructions on involuntary manslaughter were given.
Defendant contends the trial court should have instructed sua sponte regarding the lesser included offense of involuntary manslaughter. The failure to do so, he contends, was reversible error and violated his due process rights.
"Because a trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual question adversely to the defendant under other instructions (People v. Turner (1990) 50 Cal.3d 668, 690-691 [268 Cal.Rptr. 706, 789 P.2d 887]; People v. Sedeno (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]), we need not decide whether in this case the evidence required the giving of instructions on [involuntary] manslaughter." (People v. Mincey (1992) 2 Cal.4th 408, 438, 6 Cal.Rptr.2d 822, 827 P.2d 388; see also People v. Prettyman (1996) 14 Cal.4th 248, 276, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) By finding defendant guilty of first degree murder in the face of exhaustive instructions pertaining to the lesser included offenses of second degree murder and voluntary manslaughter, the jury reached the factual conclusion that defendant acted with malice aforethought, deliberation, and premeditation, and necessarily rejected the argument that defendant's claimed voluntary and involuntary taking of methamphetamine interfered with his ability to form these requisite mental states. Thus, to the extent the failure to give the involuntary manslaughter instruction was error, it was harmless.[81]

17. Reasonable Doubt Instruction
The jury was instructed in the language of then CALJIC No. 2.90 (1979 rev.), the standard reasonable doubt instruction, which contained references to the terms "moral evidence" and "moral certainty."[82]
*194 As defendant acknowledges, both the United States Supreme Court and our court have upheld the efficacy of this instruction despite some reservations. (Victor v. Nebraska (1994) 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583, affg. People v. Sandoval (1992) 4 Cal.4th 155, 185-186, 14 Cal.Rptr.2d 342, 841 P.2d 862; People v. Bradford supra, 14 Cal.4th at pp. 1053-1054, 60 Cal.Rptr.2d 225, 929 P.2d 544; People v. Rodrigues, supra, 8 Cal.4th at p. 1145, 36 Cal.Rptr.2d 235, 885 P.2d 1.) Nonetheless, he contends his state and federal constitutional rights to jury trial and due process of law were violated in light of the prosecutor's closing argument telling the jury: "If you have that feeling, that conviction, that gut feeling that says yes, this man is guilty, he's guilty of these crimes and guilty of the robbery and guilty of the special circumstances, that's beyond a reasonable doubt." According to defendant, the "moral certainty" language of former CALJIC No. 2.90, when considered in conjunction with the prosecutor's argument that guilt could be based on a "gut feeling," made it reasonably likely that the jury would have misunderstood the instruction as allowing for a finding of guilt on a standard lower than proof beyond a reasonable doubt.
This claim has not been preserved for review because the defense failed to object or to request an admonition on the point. In any event, the claim is without merit. When considered as a whole, the prosecutor's argument could not have misled the jury regarding the appropriate standard of proof. The prosecutor was not purporting to define "moral certainty" as having a "gut feeling"; rather, he was directing the jurors to trust their gut feelings in assessing the credibility of witnesses and resolving the conflicts in the testimony. Shortly after making the "gut feeling" reference, the prosecutor clarified that jurors should "look beyond the mere words that have been testified to," "examine closely the various witnesses, their demeanor, their attitude," and "apply sometimes a certain intuitive reasoning to who has reasons to lie, who has not. And who to believe."
Our conclusion that the prosecutor's comments did not cause a misunderstanding of the reasonable doubt instruction is reinforced by the fact that the trial court had repeatedly admonished the jurors, both at the outset of trial and after closing arguments, that they were required to follow the law and base their decision solely on the law and instructions as given to them by the court. Those admonishments were sufficient to dispel any potential confusion raised by the prosecutor's argument. No basis for reversal appears.
Defendant also suggests the instruction prejudicially implied that his "immoral" activity (stealing and use of illegal drugs) could not constitute "moral evidence" sufficient to justify a reasonable doubt. Not so. No reasonable juror would infer such a meaning from the term; nor did the prosecutor suggest such an interpretation. Moreover, the jurors here were specifically instructed they could consider whether defendant's claimed intoxication from methamphetamine use affected his ability to form the requisite mental states for the alleged crimes.

18. Kidnap-murder Special Circumstance
Defendant argues the kidnap-murder special circumstance is invalid because there was no substantial evidence showing that Eggett's murder was committed to advance any of the alleged kidnappings, to facilitate defendant's escape therefrom, or to avoid detection. Defendant reasons as follows. If, on the one hand, the kidnapping was committed to facilitate the murder, then it was "merely incidental" to the murder and lacked an independent wrongful purpose. (People v. Green (1980) 27 Cal.3d 1, 61-62, 164 Cal. Rptr. 1, 609 P.2d 468 [finding the felony-murder special circumstances inapplicable if the defendant intended to commit murder and only incidentally committed one of the specified felonies while doing so].) If, on the other hand, the kidnapping was committed to punish Eggett and/or to facilitate defendant's escape from the scene, and the killing was a later idea, then the two were independent. In defendant's view, it is illogical to conclude that Eggett was killed to avoid detection because there were six other adult witnesses (Haynes, Kersting, Burgess, Cantwell, Hampton and Billy) who were allowed *195 to leave the camp unhindered.[83] Consequently, defendant argues, even if he were guilty of kidnapping and murder, there is no plausible scenario under which the murder was committed to facilitate the kidnapping.
Even though defendant was tried upon the theory of deliberate and premeditated murder, concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance. (People v. Raley, supra, 2 Cal.4th at p. 903, 8 Cal.Rptr.2d 678, 830 P.2d 712.) We first address the question whether the underlying felony was merely incidental to a murder within the meaning of People v. Green, supra, 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468. (People v. Raley, supra, 2 Cal.4th at p. 903, 8 Cal.Rptr.2d 678, 830 P.2d 712.) Examining the evidence here in the light most favorable to the People, we find a rational trier of fact could find beyond a reasonable doubt that defendant had a purpose for the kidnapping apart from murder and that, therefore, the kidnapping was not merely incidental to the murder. (Id. at p. 902, 8 Cal.Rptr.2d 678, 830 P.2d 712.) That the jurors here were instructed in the terms of People v. Green, supra, 27 Cal.3d at pages 61-62, 164 Cal.Rptr. 1, 609 P.2d 468, reinforces our conclusion.
Although the jurors heard evidence that defendant had threatened to kill Eggett even before the two confronted each other on the day of the murder, they were not bound to find that defendant's sole intent from the beginning of the confrontation was to kill him. There was evidence that defendant had considered letting Eggett and his group leave the camp at various points before the time they were tied up and driven away from campsite. There was also evidence that defendant may not have killed Eggett when he was first separated from the others in the Jeep but that defendant may have wanted Eggett to be left wounded and exposed to the elements for a couple of days before being rescued by Hampton and Cantwell. From such evidence a reasonable juror could infer that defendant had not finally decided Eggett's fate at the time of the asportation, so that the kidnapping could not be said to be "merely incidental" to the murder. (See People v. Raley, supra, 2 Cal.4th at p. 902, 8 Cal.Rptr.2d 678, 830 P.2d 712.)
We next consider whether the evidence was sufficient to support a finding that the murder was committed to facilitate the kidnapping. It was. A rational trier of fact could find beyond a reasonable doubt that, even though defendant allowed six witnesses to the kidnapping to leave the camp, he killed Eggett in the belief that Eggett was the only person who would go to the authorities about the kidnapping and other crimes. Significantly, the evidence showed defendant was already aware (and angry) that Eggett had previously "snitched" on him in connection with the Racowski assault and the vandalism of Eggett's Jeep. It could reasonably be inferred that defendant wanted to ensure there would be no snitching this time, especially since the instant crimes were far more serious in nature. Although defendant initially may have been concerned that Cantwell and Hampton would contact the police, the two assured him they would not do so and even expressed agreement with defendant's decision to let Eggett suffer a little more. Moreover, after everyone but Eggett returned to the camp, defendant called everybody together to "witness" that all differences between Eggett and him had been "settled" and that Eggett had "agreed" to give defendant his dredge and the pawn tickets for the gold supposedly stolen by Eggett. Defendant made sure that everyone saw him return the other items, including all the weapons and at least part of the money taken from Cantwell and Hampton at gunpoint. He also offered to share methamphetamine with everyone, though only Cantwell and Hampton joined him. Based upon what had transpired, defendant may have thought he had successfully convinced everybody except Eggett that it was unnecessary to involve the authorities because defendant took only what was owed to him and Eggett simply got what he deserved.
*196 In sum, a rational juror could conclude from the foregoing evidence that defendant viewed the murder victim as the only person with a reason and a willingness to report the kidnapping and other crimes. Since the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety (People v. Stankewitz, supra, 51 Cal.3d at p. 101, 270 Cal.Rptr. 817, 793 P.2d 23),[84] there was substantial evidence to support the jury's determination that defendant murdered Eggett to advance the kidnappings, to facilitate his escape, or to avoid detection. That defendant may have had concurrent intent, that is, consisting of both an intent to kill and an intent to commit an independent felony, does not invalidate the felony-murder special circumstance. (People v. Raley, supra, 2 Cal.4th at p. 903, 8 Cal.Rptr.2d 678, 830 P.2d 712.)
Finally, defendant argues there was insufficient evidence to support the jury's determination that Eggett's brother, Billy, was kidnapped. This argument is predicated on the fact that the jury was instructed pursuant to People v. Oliver (1961) 55 Cal.2d 761, 12 Cal.Rptr. 865, 361 P.2d 593, which held that if the person moved is incapable of consenting to the movement by reason of immaturity or mental condition, then it must be proved that the movement was done for an illegal purpose or with an illegal intent.[85] Defendant argues there was no such proof here because he had taken Billy along with the others so that Billy could release them and thereby terminate the kidnapping. This claim is devoid of merit. Based upon the evidence, a reasonable juror could conclude beyond a reasonable doubt that defendant intended to use Billy to facilitate his escape from the kidnappings by making sure the others were not released until defendant had safely left the area.[86]

19. Robbery-murder Special Circumstance
Defendant utilizes reasoning similar to that in the previous discussion to argue there was no evidence showing that Eggett's murder was committed to advance defendant's commission of a robbery, to facilitate his escape therefrom, or to avoid detection. That reasoning is equally unavailing here. Suffice it to say, a rational juror could reasonably infer from the same evidence that defendant perceived the murder victim as the only person who would report the robbery. Since the crime of robbery does not terminate until such time as the perpetrator releases or otherwise disposes of the victim and reaches a place of temporary safety (People v. Stankewitz, supra, 51 Cal.3d at p. 101, 270 Cal.Rptr. 817, 793 P.2d 23), there was substantial evidence to support the jury's determination that defendant murdered Eggett to advance a robbery, to facilitate his escape, or to avoid detection. Again, that defendant may have harbored a concurrent intent to kill does not invalidate the felony-murder special circumstance. (People v. Raley, supra, 2 Cal.4th at p. 903, 8 Cal.Rptr.2d 678, 830 P.2d 712.)

20. Torture-murder Special-circumstance Instruction
Although not asked to consider torture as a basis for a first degree murder conviction, the jury was instructed pursuant to CALJIC No. 8.81.18 (1986 rev.), the standard instructions on the torture-murder special circumstance.[87]
*197 Defendant claims, in effect, that the foregoing instructions were insufficient to define the special circumstance of torture murder and that the statutory special circumstance (§ 190.2, subd. (a)(18)) is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because they fail to require any relationship between the torture and the murder, such as a causal relationship, proximity in space or time, identity or similarity of motive, or identity of victims. In defendant's words, "[t]he requirements of the instructions are met if the defendant, somewhere and sometime, tortured a living human being, and at some other place or time, for some other reason, murdered somebody."
In assessing whether the jury was adequately guided under the Eighth or Fourteenth Amendment, we ask "whether there is a reasonable likelihood the jury understood the charge as defendant asserts. [Citations.] We determine how it is reasonably likely the jury understood the instruction, and whether the instruction, so understood, accurately reflects applicable law. [Citations.]" (People v. Raley, supra, 2 Cal.4th at p. 899, 8 Cal. Rptr.2d 678, 830 P.2d 712 [concluding that term "sadistic purpose" in CALJIC No. 8.81.18 is not unconstitutionally vague or overbroad].)
As a preliminary matter, we reject the contention that CALJIC No. 8.81.18 improperly fails to require a causal relationship between the torture and the victim's death. As we have held before, section 190.2, subdivision (a)(18) encompasses within the torture-murder special circumstance acts of torture that would not have caused death. (People v. Crittenden (1994) 9 Cal.4th 83, 141-142, 36 Cal.Rptr.2d 474, 885 P.2d 887.)
Furthermore, it is not reasonably likely that the jurors understood the instructions to permit a true finding on the torture-murder special circumstance based on acts of torture that had no connection to the murder. Of note, the instructions were specific in stating that the special circumstance at issue was "murder involving infliction of torture."
We are unswayed by defendant's assertion that the instructional reference to "murder involving the infliction of torture" is problematic because the word "involving" is too vague and does not necessarily imply that the person tortured be the person killed or that there be some proximity in time or space between the murder and torture. While these points might have merit under a different set of facts, they do not aid defendant's position in this case.
First, the evidence here did not show a conflict in identity between the person tortured and the person murderedthe evidence all pointed to the same victim, Richard Eggett. That the jurors clearly understood this to be the case is reflected in their special circumstance finding, which stated: "We, the jury in the above-entitled matter, having found the defendant, LEE MAX BARNETT, guilty of Murder in the First Degree, do further find the allegation that the murder of Richard Eggett involved the infliction of torture by the defendant to be: True."
Second, neither defendant nor the People have cited any helpful authority addressing the issue of a requisite "connection" or "nexus" between the alleged acts of torture and murder in the context of section 190.2, subdivision (a)(18). Nonetheless, we find that, whatever the outer limits of time or space proximity might be, they were not exceeded under any theory of the case here.
To the extent the jurors concluded that defendant inflicted all the nonfatal and fatal nick and stab wounds either when defendant first separated Eggett from the others in the Jeep or when defendant later returned to Eggett once everyone started to leave the camp, there would be a clear connection between the torture and murder.[88]
*198 Alternatively, the connection would still be sufficient if the jurors found that defendant torturously nicked and stabbed Eggett after leading him away from the Jeep and then killed Eggett later when he returned. Significantly, the evidence established that defendant never freed or relinquished control over Eggett from the time of the torture to the time of the murder. That Eggett was left alone naked and tethered to a tree to suffer from his injuries until defendant returned to fatally stab him was not sufficient to separate the torture from the murder.
As we have recognized in the past, torture murder is "particularly reprehensible because the defendant intends to cause cruel suffering." (People v. Raley, 2 Cal.4th at p. 900, 8 Cal.Rptr.2d 678, 830 P.2d 712.) The special circumstance of intentional murder involving the infliction of torture sufficiently channels and limits the jury's sentencing discretion consistent with Eighth Amendment principles (see People v. Raley, 2 Cal.4th at p. 898, 8 Cal.Rptr.2d 678, 830 P.2d 712), and meaningfully narrows the group of persons subject to the death penalty (see People v. Davenport (1985) 41 Cal.3d 247, 221 Cal. Rptr. 794, 710 P.2d 861 [rejecting a contention to the contrary]; see also People v. Raley, 2 Cal.4th at p. 900, 8 Cal.Rptr.2d 678, 830 P.2d 712). For the reasons set forth above, defendant fails to show any constitutional violation here.

21. Closing Argument
Defendant contends defense attorney Kenkel was ineffective during closing argument because, after repudiating the defense of innocence to which defendant had testified, he submitted no viable alternative defense. In particular, he faults counsel for proposing a scenario in which defendant killed Eggett out of anger, even though it was inconsistent with defendant's testimony and lacked any evidentiary basis in the record.[89] Moreover, defendant complains, to the extent counsel suggested defenses based upon lack of intent to kill, lack of premeditation, and diminished capacity or "diminished actuality" based on the use of methamphetamine, he was vague and failed to properly explain the defenses to the jurors. The underlying theme of these claims is that if counsel had only supported defendant's claim of innocence, "it is reasonably probable that the jurors Would not have concluded defendant was guilty beyond a reasonable doubt."
"The decision of how to argue to the jury after the presentation of evidence is inherently tactical...." (People v. Freeman (1994) 8 Cal.4th 450, 498, 34 Cal.Rptr.2d 558, 882 P.2d 249.) To prevail on a claim that *199 counsel's approach in such a matter was ineffective, "defendant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial." (Ibid.; accord, Strickland v. Washington (1984) 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674.) As we shall explain, that presumption cannot be overcome on the instant record.
During the trial, the prosecution put on five witnesses who gave generally consistent testimony regarding defendant's actions on the day of the crimes. All five witnessed at least some portion of the robberies and kidnappings, and the continuous physical abuse of Eggett. With respect to the robberies, three witnesses (including Kersting from defendant's group) testified defendant knew from the outset he was taking Cantwell's money from the hood of the Jeep, and three (including Burgess from defendant's group) confirmed he did not return it all. Only defendant maintained otherwise. All five witnesses heard defendant threaten to kill Eggett and to cause him pain; at least three heard defendant angrily confront Eggett about "snitching" on him for events that happened the previous year. According to the five witnesses, defendant was the last person to be seen with Eggett's Jeep and was last observed driving in the direction where Eggett had been left tied. Burgess and Kersting testified to the similarities between the tied logs found on the wheels of Eggett's abandoned Jeep (in which Eggett was found stabbed to death) and the tied logs they had seen defendant fashion and use the night before the confrontation with Eggett's group. The morning after the confrontation, Burgess saw that defendant had changed his appearance and that he had blood smeared on his thighs.
Over counsel's strenuous objection, defendant took the stand and testified to his innocence for three days. His testimony, which appeared to cast guilt upon Bill Cantwell as Eggett's murderer, was hardly convincing. Defendant claimed he had stolen methamphetamine oil worth millions of dollars from Cantwell's van, though Cantwell and others testified that the van contained no such oil, and no oil had ever been found at any of the hiding places described by defendant. Defendant also claimed to have heard Eggett say that Cantwell was going to hold Eggett responsible for the theft, yet Cantwell and Eggett had come to the camp together to dredge for gold and Hampton did not mention observing any tension between the two. Despite defendant's insistence that Cantwell held a grudge for the multimillion-dollar theft and that he assaulted and shot defendant twice in the previous year and sent others to threaten defendant and beat him up, defendant had never spoken Of such topics before July 6, 1986, and apparently felt safe enough to release Cantwell and give him back a loaded weapon after having held him hostage for several hours. Defendant also untied Hampton and returned his knife and loaded shotgun, even though Hampton supposedly stabbed him twice in the leg, resulting in an infected wound that healed so quickly it went unnoticed by jail and medical personnel 11 days later when defendant was examined after his arrest.
Defendant's testimony on other details also strained belief. Despite the consistent testimony of others that defendant wanted Eggett to suffer as "mosquito bait," defendant claimed he secretly rubbed mosquito repellent all over Eggett's naked body for his protection. His assertion that someone slashed the tires of his truck after the confrontation was contradicted by Kersting, who said defendant left the camp after Cantwell and Hampton. In addition, his claim that in 1985 he and Eggett dredged up twelve pounds of gold in only eight days was not only uncorroborated, it was rebutted by Dave McGee's testimony that Eggett never showed him more than three ounces of gold even though Eggett was very proud of the gold he dredged and would show it off.
In an attempt to bolster defendant's claim of innocence, the defense presented two inmate witnesses to testify regarding Cantwell's supposed admissions after the stabbing murder. However, Jyll Bond, for whom defendant had given legal aid in jail, claimed Cantwell had shown her the "rifle" that killed Eggett, thereby negating the value of her testimony and probably casting doubt upon that of the second witness as well.
*200 Given the strength of the prosecution's case, and the uncorroborated and inherently incredible nature of defendant's testimony, defense counsel chose not to dwell on the defense of total innocence but strove to undermine the first degree murder charge and, alternatively, the special circumstance allegations, based upon a reasonable view of all the evidence before the jury. Counsel emphasized the fact that it was Kersting who originally planned the dredging trip, not defendant, so there was no preexisting plan to kill Eggett. After explaining that premeditation and deliberation were mental states that required clarity of thought, counsel argued that defendant lacked the clarity of thought to premeditate or deliberate due to his accidental ingestion of methamphetamine in the morning. For support, counsel drew upon Kersting's observations of defendant's morning nervousness and noted that defendant's immediate reaction to the arrival of Eggett's Jeep corresponded to the "fight or flight" reaction typical of methamphetamine intoxication. Counsel also reminded the jurors that defendant displayed other typical symptoms such as hypervigilence, paranoia, grandiosity and agitation and that such reactions were consistent with testimony by Hampton and Cantwell regarding the strong effects they experienced from the methamphetamine taken in the afternoon. In addition, counsel made a strong case for rejecting the prosecution's theory that Eggett was killed when first separated from the others at the top of the hill, noting that Burgess heard Eggett yelling after defendant returned to the Jeep and that defendant's conduct in releasing the others was not consistent with "having just killed somebody."
It was after the foregoing arguments that counsel offered an alternative explanation for Eggett's death which, although inconsistent with, total innocence, suggested a plausible scenario in which Eggett was killed without premeditation or deliberation if the jury were to believe Kersting's testimony that defendant said he was going to take the Jeep up to where Eggett was and tell him to keep his mouth shut. Counsel asked the jury to consider the evidence that defendant, along with Cantwell and Hampton, took some potent methamphetamine just before he left camp in the Jeep to warn Eggett not to go to the police. Counsel then argued that if defendant returned to Eggett as Kersting's testimony suggested, then given the effects of the methamphetamine, defendant's apparent anger toward Eggett because of the stolen gold, and the defense expert's testimony that Eggett's "clean" stab wounds were not torture-type wounds, it was possible Eggett was killed in a fit of anger without premeditation or deliberation. Later, at one point, counsel argued: "The fact is when Mr. Barnett left that camp, he was on his way back up to dump that Jeep off and say what Greg Kersting said he was going to say. The use of methamphetamine is a horrible persistive [sic ] problem in our society. The fact that it's involved in this case is not one that you should hold ill will towards any of the witnesses or Mr. Barnett," (Italics added.)
It is contended on appeal that counsel's reliance on Kersting's testimony and his reference to its implication as "fact" contradicted defendant's claim that he left the Jeep parked more than a mile from where Eggett was tied, walked back to camp and drove out in his truck, and inevitably led to the conclusion that defendant killed Eggett. Both Kersting and Burgess, however, had testified to the similarities between the tied logs found on the wheels of the abandoned Jeep containing Eggett's body and those they had seen fashioned by defendant the night before the confrontation. Burgess, moreover, had admitted having claimed at one point that he saw blood on defendant's thighs the morning following the confrontation. In view of such testimony, counsel was faced with a difficult decision whether to emphasize defendant's version of the facts and thereby risk his own credibility with the jurors. Because counsel could reasonably believe it unlikely that the jurors would disregard Kersting's and Burgess's testimony, counsel could reasonably decide to use Kersting's statements to the defense's advantage on the issues of premeditation and deliberation. Given the weight of incriminating evidence in this record, we cannot say counsel made an incompetent tactical choice to avoid a sweeping declaration of defendant's innocence and to instead offer a viable basis for the jurors to find something *201 less than first degree murder. (See People v. McPeters (1992) 2 Cal.4th 1148, 1186-1187, 9 Cal.Rptr.2d 834, 832 P.2d 146.)
In any event, defendant has not shown that prejudice resulted from the perceived incompetence. In light of the strong evidence of defendant's motive and opportunity to commit the murder, the evidence of his handiwork on the wheels of the abandoned Jeep containing Eggett's body, the evidence of blood smears on defendant's legs the morning after the murder, and the evidence of defendant's change of appearance and flight after the murder, we cannot conclude it reasonably probable that the outcome would have been different had counsel relied solely on defendant's fantastic and uncorroborated version of events and strenuously pressed the defense of total innocence. (Strickland v. Washington, supra, 466 U.S. at p. 694, 104 S.Ct. at p. 2068; People v. McPeters, supra, 2 Cal.4th at p. 1187, 9 Cal.Rptr.2d 834, 832 P.2d 146.)
Defendant next faults counsel for arguing, in the context of the kidnap-murder special circumstance, that the kidnapping terminated once defendant left Eggett and returned to camp. Noting that such argument was contrary to the jury instructions, defendant contends counsel instead could have successfully argued that the evidence did not show the commission of a murder "to facilitate" a kidnapping. We disagree.
The kidnap-murder special circumstance was nearly impossible to defend against because the kidnapping was witnessed by six people and defendant admittedly told everyone that Eggett was still tied up when he left him. Even had counsel attempted to argue that the murder could not have facilitated defendant's escape from the kidnapping, it is not reasonably probable that such argument would have resulted in a different outcome given the evidence in the record and the legal principle that a kidnapping does not terminate until the victim is released or otherwise disposed of and the kidnapper reaches a place of temporary safety. (People v. Stankewitz, supra, 51 Cal.3d at p. 101, 270 Cal. Rptr. 817, 793 P.2d 23.) In short, counsel's performance was neither ineffective nor prejudicial.[90]

22. Cumulative Effect of Errors
Defendant argues there were numerous serious and prejudicial errors that, even if deemed harmless separately, in combination resulted in an unfair trial, a denial of due process of law, and a denial of effective assistance of counsel in violation of the California Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. We disagree. Whether considered separately or in combination, the few errors that may have occurred during defendant's trial, as discussed earlier, were harmless.

D. Penalty Phase Issues

1. Effect of Guilt Phase Errors
Defendant contends that, even if the errors occurring at the guilt phase were harmless as to the guilt determination, they were prejudicial as to the penalty phase. Without offering any meaningful analysis of the perceived errors which form the basis for this particular claim, defendant simply refers us to his previous briefing on fifteen claimed guilt phase errors[91] and makes a two-sentence *202 argument on three of those errors relating to the evidence of his nonviolent escape from a county hospital. Noting that evidence of a nonviolent escape is inadmissible in the penalty phase of a trial (§ 190.3; People v. Boyd (1985) 38 Cal.3d 762, 776-777, 215 Cal.Rptr. 1, 700 P.2d 782), defendant contends the admission of such evidence at the guilt phase was highly prejudicial because the jurors were instructed to consider, in determining the appropriate penalty, "all of the evidence which has been received during any part of the trial of this case." Defendant argues the penalty must be reversed because it is reasonably possible that the jurors relied on the inadmissible evidence to conclude that a death sentence would help to insure against a future escape. We are not persuaded.
As we discussed earlier, the evidence of defendant's nonviolent escape was relevant to material issues at the guilt phase. Assuming the evidence was not admissible during the penalty phase, defendant should have sought a limiting instruction directing the jury to disregard such evidence during the penalty phase. (See People v. Quartermain (1997) 16 Cal.4th 600, 630, 66 Cal.Rptr.2d 609, 941 P.2d 788; People v. Jones (1997) 15 Cal.4th 119, 167, 61 Cal.Rptr.2d 386, 931 P.2d 960.)
In any event, we rejected a substantially similar claim of prejudice in People v. Jackson (1996) 13 Cal.4th 1164, 56 Cal.Rptr.2d 49, 920 P.2d 1254 for reasons that are equally applicable here. "Although defendant's argument may be plausible in the abstract, it is ultimately unpersuasive under the facts of this case." (Id. at p. 1233, 56 Cal. Rptr.2d 49, 920 P.2d 1254.) That is, when the evidence of defendant's nonviolent escape is considered in light of the record as a whole, it cannot be deemed to be prejudicial. First of all, the prosecutor specifically warned the jurors they could not consider the evidence of defendant's escape from the county hospital as a circumstance in aggravation because "the evidence had indicated that was kind of a walk away without force or violence." In addition, because there was already admissible evidence that defendant had one felony conviction for attempted prisoner escape in New York, the evidence of the nonviolent escape was merely cumulative. It is highly unlikely defendant would have appeared as a significantly greater escape risk merely because, in addition to the New York escape attempt, he was able to simply walk away from a nonsecure county hospital where he went to the bathroom unsupervised before the police returned to pick him up. "It is not reasonably possible, in other words, that the [nonviolent] escape would have added appreciably to the jurors' estimation of defendant's future dangerousness." (Ibid.)
In sum, there is no reason to reverse the penalty based upon the admission of the nonviolent escape evidence at the guilt phase. Nor do any of the other claims of guilt phase error, whether considered singly or in combination, warrant reversal.[92]

2. Cross-examination of Bertha Walther
During the cross-examination of defendant's mother, Bertha Walther, the prosecutor elicited testimony that she recalled defendant may have once stolen ice cream in the seventh grade, that he had been accused of setting fires although he did not and could not have actually set the fires, and that apparently there was an incident in elementary school where defendant may have been untruthful. When the prosecutor asked if defendant had gone to the school grounds in the ninth grade with his horse and a gun, Walther said she had heard he had gone there with his horse but had heard nothing about a gun. The prosecutor also asked if Walther recalled whether defendant had gotten into trouble while in the service. Walther *203 responded affirmatively, and explained that defendant had stabbed an assistant minister in fending off his homosexual advances. She later indicated that he was dishonorably discharged from the Army after he was misled into signing up for duty in Vietnam and he refused to go.
In People v. Ramirez (1990) 50 Cal.3d 1158, 270 Cal.Rptr. 286, 791 P.2d 965, we held that the prosecutor should not have been permitted to cross-examine the mother of the defendant about his misconduct throughout his teenage years because her direct examination testimony only described adverse circumstances in the defendant's early childhood. (50 Cal.3d at pp. 1191-1194, 270 Cal.Rptr. 286, 791 P.2d 965.) Relying primarily on that decision, defendant argues the prosecutor committed misconduct by cross-examining his mother about these incidents of misconduct when they had not been mentioned during the direct examination and were inadmissible as aggravating evidence.
Because defendant failed to make timely and specific objections and failed to request admonitions on the above matters at trial, he is barred from complaining about them on appeal. (People v. Bradford, supra, 15 Cal.4th at p. 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259.) In any event, the claim of misconduct is unfounded.
On direct examination, Walther testified that defendant had worked for local farmers to earn money and diligently saved to pay his own way to Bible camp and to buy himself a horse. She described how defendant helped tend the family's one-acre garden and won ribbons at the fair for the vegetables and goats he had raised himself. She also testified that, even though defendant and his older brother fought a lot, defendant never hurt his brother and would always "protect his brother" at school and "fight his battles" for him. Defendant had helped take care of his infant brother and had been very good and respectful to Walther over the years. Walther, however, acknowledged that defendant "started getting into trouble" in approximately 1963, and described an incident involving the theft of some turkeys. She and defendant's father decided that defendant should go into the service because it "might straighten him out." Although Walther spoke of defendant's one theft of turkeys and his fights with "over-teasing" children in school, she said he had never been in reform school, juvenile hall, "[o]r anything like that." This testimony essentially portrayed defendant as a hardworking youth who possessed good character attributes and avoided serious trouble until he was approximately 18 years old.
When a defense witness gives character testimony, the prosecutor may inquire of the witness whether he or she has heard of acts or conduct by the defendant inconsistent with that testimony, so long as the prosecutor has a good faith belief that such acts or conduct actually took place. (People v. Ramos, supra, 15 Cal.4th at p. 1173, 64 Cal.Rptr.2d 892, 938 P.2d 950.) Thus, to counter Walther's portrayal of defendant as a youth who stayed mostly out of trouble, the prosecutor here could properly question Walther whether, in addition to stealing some turkeys, defendant also stole ice cream, started fires, and took a gun to school. The fact that the prosecutor made no effort to prove some of the incidents by direct evidence, standing alone, does not show that the prosecutor had no basis for them or that he asked the questions in bad faith. Moreover, in light of Walther's direct testimony that defendant enrolled in the service to straighten himself out, questions pertaining to her recall of his record while in the Army and the circumstances of his discharge were well within the scope of proper cross-examination. Hence there is no basis for analogizing the cross-examination in this case to that found objectionable in People v. Ramirez, supra, 50 Cal.3d 1158, 270 Cal.Rptr. 286, 791 P.2d 965.[93]
Defendant additionally points out that the prosecutor asked Walther about other incidents of misconduct that occurred while defendant was an adult.[94] Such questioning *204 was inappropriate, he argues, because they clearly exceeded the scope of direct examination and Walther's knowledge, if any, was based on hearsay. Again, defendant's failure to make timely and specific objections at trial bars his complaints on appeal. (People v. Bradford, supra, 15 Cal.4th at p. 1333, 65 Cal.Rptr,2d 145, 939 P.2d 259.) In any event, even assuming that the questions should not have been allowed and that a competent attorney would have objected, defendant cannot establish prejudice. Because direct evidence on most of the identified incidents had been introduced as part of the prosecution's case in aggravation, the questioning of Walther on those topics was merely cumulative. Though it appears the prosecution did not introduce direct evidence of a bail-jumping incident or a stint in a Virginia jail, there is no reasonable possibility that the prosecutor's brief cross-examination on those two matters could have influenced the jury, given the properly admitted evidence of defendant's prior convictions and his numerous robberies and unprovoked assaults against peace officers and civilians. (See, e.g., People v. Ramirez, supra, 50 Cal.3d at p. 1194, 270 Cal.Rptr. 286, 791 P.2d 965.)

3. Testimony of Helen T. and Police Documents
Helen T. testified she was raped in New York in 1982 by a man called Eric, but could not identify defendant in court as the rapist. Over the defense's objection, the prosecutor was permitted to show Helen T. two photographs from the files of the New York State Police. When asked if she recognized the photographs, Helen T. replied: "No, cause when I knew him, he was thinner." After the conclusion of Helen T.'s testimony, the prosecutor sought to have the New York police documents, consisting of the two photographs of defendant and a card with defendant's fingerprints, admitted into evidence. Even though defense counsel had earlier stipulated that the fingerprints on the card matched defendant's, counsel objected to admission of the card because the words "first degree rape" were written on it. At that point, the prosecutor clarified that the fingerprint card was not being introduced to prove that defendant was the person that raped Helen. T., but rather, to prove that "[t]his is the person that was identified by [Helen T.] in 1982 as the person that raped her during the New York [grand jury] proceeding." Once the trial court agreed to have the words "rape in the first degree" whited out from the card, counsel apparently withdrew his objection.[95]
Defendant claims there was insufficient evidence from which a jury could find him guilty beyond a reasonable doubt of the rape of Helen T. because she could not identify him in court as her rapist and was unable to identify the New York police photographs shown to her. Noting the absence of any evidence in the record that Helen T. had identified defendant as her rapist in 1982, defendant asserts the death judgment must be reversed.
*205 In response, the People appear to claim that any deficiency in the record resulted from prosecutorial oversight coupled with defense counsel's failure to make the specific objection urged on appeal. It is the People's position, however, that the jury's consideration of the evidence did not prejudice defendant.
In viewing the record, we find that the prosecution did not offer evidence showing that defendant was in fact the person identified by Helen T. as her rapist in 1982. Nonetheless, we conclude that reversal of the death judgment is not warranted. Significantly, the jury was expressly instructed that it could not consider such evidence unless the offense was proved beyond a reasonable doubt. In light of such instruction, it is not reasonably possible that a rational jury would have permitted inconclusive evidence connecting defendant with the alleged rape to cause it to impose the death penalty, when the evidence failed to show his identity as the rapist. (See People v. Bloom (1989) 48 Cal.3d 1194, 1230-1231, 259 Cal.Rptr. 669, 774 P.2d 698.)
Moreover, while testimony alleging rape can be inflammatory, we are convinced that the evidence in this case clearly did not prejudice defendant. As properly admitted evidence in aggravation the jury had before it the circumstances of the instant crime showing that defendant committed murder while engaged in the crimes of robbery and kidnapping and that the killing was intentional and involved the infliction of torture with a large knife. The jury also heard evidence of other violent sexual crimes by defendant, to wit, evidence that in 1977 defendant raped and sodomized 17-year-old Mae G. and forced her at knife point to orally copulate him. Also offered was evidence of defendant's various felony convictions and his assaults upon police officers and other individuals, as follows. In 1965, defendant was convicted of second degree assault on a state trooper, transportation of a stolen vehicle across state lines and felony attempted prisoner escape. In 1969, defendant robbed the clerk of a liquor store twice. In 1970, he was convicted of five counts of armed robbery; at the time of his arrest he had raised a loaded handgun but was stopped from using it by an officer. In 1971, defendant attempted to rob a restaurant owner at gunpoint. As he fled in his car he hit a police officer in the leg and sideswiped a police car; he was then shot in the leg after he pointed a gun at an officer. In 1972, defendant robbed a gas station attendant at gunpoint. In 1973, he resisted being transported back to jail from a medical facility and had to be Maced. In 1979, defendant was convicted of the assault and beating of David Sinopoli. In 1987, he slashed a fellow jail inmate with a razor blade. In 1987, he caused a disturbance in the jail yard by refusing to wear his jumpsuit; he also attempted to punch an officer in the head. In 1988, defendant spit at three correctional officers and kicked the window out of a transportation van. Also in 1988, defendant tried to kick out the windows of another patrol car and he spit in another officer's face. On appeal, defendant does not challenge the sufficiency of the evidence with regard to these other incidents in aggravation.
On this record, given the properly admitted evidence of defendant's substantial criminal history and the circumstances of the instant offenses, it was not reasonably possible that the jury would have rendered a different verdict had it not heard the evidence of Helen T.'s rape. Accordingly, the claim fails for want of prejudice. (See People v. Bloom, supra, 48 Cal.3d at pp. 1230-1231, 259 Cal.Rptr. 669, 774 P.2d 698; People v. Brown, supra, 46 Cal.3d at p. 449, 250 Cal. Rptr. 604, 758 P.2d 1135.)[96]

*206 4. Evidence of Unadjudicated Criminal Activity

As part of its penalty phase case, the prosecution was permitted to introduce evidence of unadjudicated criminal offenses for which the applicable statutes of limitations had expired. Such evidence included the rape of Mae G. in California in 1977, the robbery of Wilhelm Turoski in Arizona in 1972, the robbery of Catheryne Matthews in Florida in 1971, and the robbery of Michael Gilhooly in New York in 1969. Noting that the applicable statutes of limitations were of seven years or less, defendant urges us to find that admission of such evidence should have been barred in light of the stale and unreliable nature of the evidence. He also argues that the admission of such remote and unreliable evidence violated his federal constitutional rights.
We have held on numerous occasions that California law imposes no time limitation upon the introduction of evidence of violent crimes at the penalty phase, and that the jury may consider such acts occurring at any stage of a defendant's life. (People v. Williams (1997) 16 Cal.4th 153, 233, 66 Cal.Rptr.2d 123, 940 P.2d 710; People v. Bradford, supra, 15 Cal.4th at p. 1376, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Johnson (1993) 6 Cal.4th 1, 51-52, 23 Cal. Rptr.2d 593, 859 P.2d 673.) As defendant makes no attempt to show any specific prejudice from admission of the allegedly stale evidence in this case, we shall adhere to the foregoing authorities here.
In addition, we previously have rejected the claim that a defendant's constitutional rights are Violated by the consideration, as a factor in aggravation of penalty, of evidence of unadjudicated criminal activity for which prosecution would be time-barred. (People v. Williams, supra, 16 Cal.4th at p. 233, 66 Cal.Rptr.2d 123, 940 P.2d 710 [declining to reconsider holding that the Eighth Amendment's aim of assuring the reliability of penalty determinations is furthered, not frustrated, by the admission of prior violent criminal activity]; People v. Bradford, supra, 15 Cal.4th at pp. 1376-1377, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Johnson (1992) 3 Cal.4th 1183, 1244, 14 Cal. Rptr.2d 702, 842 P.2d 1; People v. Douglas, supra, 50 Cal.3d at pp. 529-530, 268 Cal. Rptr. 126, 788 P.2d 640.) Defendant provides no basis for reconsidering that position here.

5. Elements of Unadjudicated Criminal Activity
Defendant argues the trial court erred in failing to instruct the jury sua sponte on the elements of the alleged other crimes falling within section 190.3, factor (b) (hereafter factor (b)). The failure to so instruct, he asserts, violated his federal constitutional rights to equal protection, to trial by jury, and to a reliable penalty determination. We disagree.
There is no obligation under state law or federal or state constitutional law to instruct the jury sua sponte on the elements of the crimes presented under factor (b). (People v. Osband (1996) 13 Cal.4th 622, 704, 55 Cal.Rptr.2d 26, 919 P.2d 640; People v. Johnson, supra, 6 Cal.4th at p. 49, 23 Cal. Rptr.2d 593, 859 P.2d 673; see also People v. Cain (1995) 10 Cal.4th 1, 72, 40 Cal.Rptr.2d 481, 892 P.2d 1224.) As we have explained, there may be tactical reasons for not requesting such instructions; for example, the defense may fear that a series of lengthy instructions "`could lead the jury to place undue emphasis on the crimes rather than on the central question of whether [the defendant] should live or die.'" (People v. Cain, supra, 10 Cal.4th at p. 72, 40 Cal.Rptr.2d 481,892 P.2d 1224.)
Defendant also contends that the decision to forgo instructions on the elements *207 of other crimes requires a defendant's personal waiver. We have rejected this contention before (e.g., People v. Johnson, supra, 6 Cal.4th at p. 49, 23 Cal.Rptr.2d 593, 859 P.2d 673), and again do so here.

6. Failure to Define "Aggravating" and "Mitigating"
Defendant argues his constitutional right to a reliable verdict was abridged by the trial court's failure to instruct the jury on the meaning of the terms "aggravating" and "mitigating." Our decisions have consistently held to the contrary (e.g., People v. Cain, supra, 10 Cal.4th at p. 80, 40 Cal.Rptr.2d 481, 892 P.2d 1224; People v. Clark (1993) 5 Cal.4th 950, 1031, 22 Cal.Rptr.2d 689, 857 P.2d 1099; People v. Malone, supra, 47 Cal.3d at p. 55, 252 Cal.Rptr. 525, 762 P.2d 1249), and defendant offers no persuasive reason for reexamination of our position.

7. Instruction on Sentencing Discretion
The jurors were instructed pursuant to the 1986 version of CALJIC No. 8.84.2, as follows: "[¶] After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assigning of weight to any one. Any one factor may outweigh all the others. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and which penalty is appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances, [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole."
Defendant notes that the instructions, as given, did not contain the sentence from section 190.3 stating: "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole." He suggests, relying on People v. Heishman (1988) 45 Cal.3d 147, 246 Cal. Rptr. 673, 753 P.2d 629, that instruction with the statutory language is "mandatory" and that where, as here, the court fails to give a requested instruction containing such language, error is committed. Defendant further contends that the instructions, as given, resulted in a denial of federal due process.
We conclude there was no misinstruction and no denial of due process. First of all, it is incorrect to view People v. Heishman, supra, 45 Cal.3d 147, 246 Cal.Rptr. 673, 753 P.2d 629, as imposing a mandatory obligation to instruct with the language of section 190.3 when requested.[97] As relevant here, that decision simply recognizes that a trial court must instruct on the sentencing principles embodied in section 190.3. (45 Cal.3d at pp. 184-185, 246 Cal.Rptr. 673, 753 P.2d 629.) Our later decisions have made clear that the 1986 version of CALJIC No. 8.84.2 adequately conveys those principles and that, consequently, additional instruction in the precise language of the statute is unnecessary. (People v. Duncan (1991) 53 Cal.3d 955, 978, 281 Cal.Rptr. 273, 810 P.2d 131; see also People v. Tuilaepa (1992) 4 Cal.4th 569, 593, 15 Cal.Rptr.2d 382, 842 P.2d 1142, affd. sub nom. Tuilaepa v. California (1994) 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750.) We have also squarely held that the CALJIC instructions are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards. (E.g., People v. Rodrigues, supra, 8 Cal.4th at p. 1192, 36 Cal.Rptr.2d 235, 885 P.2d 1; People v. Tuilaepa, supra, 4 *208 Cal.4th at p. 593, 15 Cal.Rptr.2d 382, 842 P.2d 1142; People v. Raley, supra, 2 Cal.4th at pp. 919-920, 8 Cal.Rptr.2d 678, 830 P.2d 712.) Defendant provides no persuasive reason for reconsideration of those decisions.

8. Alleged Prosecutorial Misconduct
During closing argument, the prosecutor cautioned the jurors to not consider as aggravating factors three incidents that had been discussed by various witnesses for other purposes during the trial: (1) the references by defendant's mother to an escape by defendant that had not been shown to involve force or violence; (2) defendant's nonviolent "walkaway" from the Chico hospital; and (3) defendant's sabotage of Eggett's Jeep. The defense did not object to those portions of the prosecutor's arguments.
On appeal, defendant views the prosecutor's actions as a clever, but improper, ruse to call the jurors' attention to harmful matters that would influence them against defendant, notwithstanding the accompanying warnings. Defendant contends that such misconduct was prejudicial and that counsel's failure to object constituted ineffective assistance. As a result, defendant complains, he has been deprived of his constitutional rights to due process and a fair and reliable penalty determination. We see no basis for a reversal.
As defendant recognizes, the defense's failure to object to the alleged misconduct or to request any admonition therefor bars assertion of the claim of misconduct on appeal. (People v. Bradford, supra, 15 Cal.4th at p. 1378, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Pinholster, supra, 1 Cal.4th at p. 963, 4 Cal.Rptr.2d 765,824 P.2d 571.)
Even assuming, however, that the prosecutor's arguments were at least objectionable and would have been halted had counsel made a timely objection, it is not reasonably probable that a determination more favorable to defendant would have resulted. (Strickland v. Washington, supra, 466 U.S. at p. 694, 104 S.Ct. at p. 2068; People v. Ledesma, supra, 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) The prosecutor spent the vast majority of his closing argument properly discussing defendant's prior felony convictions, his long history of violent and assaultive conduct, and the circumstances of the instant crimes, which involved defendant's brutal torture and killing of Richard Eggett. It is inconceivable that the jurors, having heard about such matters, would have been swayed to reject the death penalty had the prosecutor not reminded them of defendant's two nonviolent escapes or his sabotage of a vehicle.[98]

9. Capital Sentencing Scheme
Defendant argues that the sentencing scheme under California's 1978 death penalty law is constitutionally flawed for a number of reasons. We have consistently rejected identical claims, as follows.
The capital sentencing scheme is not unconstitutional insofar as it does not require the jury to make findings on the aggravating factors supporting its death verdict. (People v. Bradford supra, 14 Cal.4th at p. 1059, 60 Cal.Rptr.2d 225, 929 P.2d 544; People v. Wash, supra, 6 Cal.4th at pp. 271-272, 24 Cal.Rptr.2d 421, 861 P.2d 1107.) There is no constitutional requirement that all aggravating factors must be proved beyond a reasonable doubt, that aggravating factors must outweigh the mitigating factors beyond a reasonable doubt, or that death must be found to be the appropriate penalty beyond a reasonable doubt. (People v. Bradford supra, 14 Cal.4th at p. 1059, 60 Cal. Rptr.2d 225, 929 P.2d 544; People v. Crittenden, supra, 9 Cal.4th at pp. 152-153, 36 Cal.Rptr.2d 474, 885 P.2d 887; People v. Webb (1993) 6 Cal.4th 494, 536, 24 Cal. Rptr.2d 779, 862 P.2d 779.) Introduction of evidence of unadjudicated criminal activity under factor (b) does not offend the federal Constitution (People v. Samayoa (1997) 15 Cal.4th 795, 863, 64 Cal.Rptr.2d 400, 938 P.2d 2; People v. Hawthorne (1992) 4 Cal.4th 43, 76, 14 Cal.Rptr.2d 133, 841 P.2d 118; People v. Bacigalupo (1993) 6 Cal.4th 457, 478, 24 *209 Cal.Rptr.2d 808, 862 P.2d 808) and federal constitutional law does not require instruction on the elements of the crimes presented under factor (b) (People v. Osband, supra, 13 Cal.4th at p. 704, 55 Cal.Rptr.2d 26, 919 P.2d 640; People v. Johnson, supra, 6 Cal.4th at p. 49, 23 Cal.Rptr.2d 593, 859 P.2d 673). The capital sentencing scheme is not unconstitutional insofar as it permits a jury that has convicted a defendant of capital murder to determine, on the issue of penalty, whether the defendant committed alleged prior criminal acts to be considered in aggravation. (People v. Rodrigues, supra, 8 Cal.4th at p. 1194, 36 Cal.Rptr.2d 235, 885 P.2d 1; People v. Pride (1992) 3 Cal.4th 195, 252-253, 10 Cal.Rptr.2d 636, 833 P.2d 643.) There is no categorical constitutional prohibition on the introduction of facts and evidence underlying a defendant's prior felony convictions. (People v. Stanley, supra, 10 Cal.4th at pp. 819-820, 42 Cal.Rptr.2d 543, 897 P.2d 481 [rejecting argument that Taylor v. United States (1990) 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 requires a contrary conclusion]; People v. Wader (1993) 5 Cal.4th 610, 656 & fn. 8,20 Cal.Rptr.2d 788, 854 P.2d 80 [same].) Use of the words "extreme" and "substantial" in section 190.3, factors (d) and (g), does not impermissibly limit consideration of mitigating factors in violation of the federal Constitution. (People v. Williams, supra, 16 Cal.4th at p. 276, 66 Cal.Rptr.2d 123, 940 P.2d 710; People v. Scott (1997) 15 Cal.4th 1188, 1227-1228, 65 Cal.Rptr.2d 240, 939 P.2d 354.)
California's capital sentencing scheme does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. (People v. Samayoa, supra, 15 Cal.4th at p. 863, 64 Cal.Rptr.2d 400, 938 P.2d 2; People v. Anas (1996) 13 Cal.4th 92, 187, 51 Cal.Rptr.2d 770, 913 P.2d 980; People v. Crittenden, supra, 9 Cal.4th at pp. 154-156, 36 Cal.Rptr.2d 474, 885 P.2d 887; People v. Wader, supra, 5 Cal.4th at p. 669, 20 Cal. Rptr.2d 788, 854 P.2d 80.) Nor have the statutory categories been construed in an unduly expansive manner. (People v. Arias, supra, 13 Cal.4th at p. 187, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Finally, prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (People v. Scott, supra, 15 Cal.4th at p. 1228, 65 Cal. Rptr.2d 240, 939 P.2d 354; People v. Ray (1996) 13 Cal.4th 313, 359, 52 Cal.Rptr.2d 296, 914 P.2d 846; People v. Crittenden, supra, 9 Cal.4th at p. 152, 36 Cal.Rptr.2d 474, 885 P.2d 887.)
Defendant's arguments fail to convince us to reconsider any of these issues. Moreover, the combination of the alleged deficiencies does not establish collectively a basis for rejecting the death penalty law. (See People v. Crittenden, supra, 9 Cal.4th at p. 153, 36 Cal.Rptr.2d 474, 885 P.2d 887.)

10. Multiple Counting of Factors
Defendant asserts there is "substantial overlap" both within and among factors (a) (circumstances of the crime), (b) (prior criminal activity involving force or violence) and (c) (prior felony convictions) under section 190.3. He appears to contend, for example, that because of such overlap, the jury may have "double-counted" (or "multi-counted") the violent conduct that led to the kidnapping, robbery and murder convictions and the special circumstance findings at the guilt phase of trial under all three factors and more than once under factor (a) alone. Relying primarily upon U.S. v. McCullah (10th Cir.1996) 76 F.3d 1087 (McCullah), defendant argues that the instructions given below permitted the double counting of aggravating factors in violation of due process and that prejudice must be presumed. This claim is without merit.
Viewing the instant record, we conclude there is no possibility the jurors would have understood that the guilt phase crimes and special circumstances could be counted more than once as aggravating factors. Here, in addition to receiving instructions in the language of section 190.3, the jurors were properly advised that factors (b) and (c) did not include the crimes for which defendant was found guilty in the first phase of trial. (See People v. Miranda (1987) 44 Cal.3d 57, 106, fn. 28, 241 Cal.Rptr. 594, 744 P.2d 1127.) They also were specifically instructed that they could not consider the three special circumstances individually as separate aggravating *210 circumstances and that, to the extent they chose to assign weight to the special circumstances as evidence in aggravation, they must consider the murder and the three special circumstances as a single aggravating factor. Such concepts were reinforced in the jurors' minds by the prosecutor during his closing argument.[99]
Although the jurors did not receive a further instruction clarifying that individual criminal acts falling within the parameters of both factors (b) and (c) of section 190.3 could not be counted twice for the same purpose (see People v. Melton (1988) 44 Cal.3d 713, 764-765, 244 Cal.Rptr. 867, 750 P.2d 741), we have already concluded that the standard instructions do not inherently encourage the double counting of aggravating factors. (E.g., People v. Sanchez (1995) 12 Cal.4th 1, 78-79, 47 Cal.Rptr.2d 843, 906 P.2d 1129; People v. Montiel, (1993) 5 Cal.4th 877, 938-939, 21 Cal.Rptr.2d 705, 855 P.2d 1277.) We have also recognized repeatedly that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor. (E.g., People v. Mincey, supra, 2 Cal.4th at p. 474, 6 Cal.Rptr.2d 822, 827 P.2d 388; People v. Visciotti (1992) 2 Cal.4th 1, 76, 5 Cal.Rptr.2d 495, 825 P.2d 388; see also People v. Montiel, supra, 5 Cal.4th at pp. 939-940, 21 Cal.Rptr.2d 705, 855 P.2d 1277.) In the instant appeal, defendant does not point to any improper argument. Nor did the defense object to the prosecutor's discussion of the aggravating factors at trial. On this record, we find no basis for reversing the death judgment.
McCullah, supra, 76 F.3d 1087, which involved a death sentence imposed under the Anti-Drug Abuse Act of 1988, 21 United States Code section 848(e), does not require otherwise. As described by McCullah, the federal act contains various so-called "(n)(1) factors" that are not merely death-eligibility factors but are aggravating factors to be weighed against mitigating factors in the selection phase of the sentencing process. (McCullah, supra, 76 F.3d at pp. 1108-1109.) In McCullah, the jury returned a death verdict after being asked to consider both the "(n)(1)(C) factor" (requiring that defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim) and the "(n)(1)(D) factor" (requiring that defendant intentionally engaged in conduct which he knew created a grave risk of death and such death resulted). In reversing the death judgment, the Tenth Circuit Court of Appeals observed that the two factors substantially overlap and are duplicative. Accordingly, the Tenth Circuit concluded, the district court's submission of both factors to the jury "creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors," even if the factors are not identical. (McCullah, supra, 76 F.3d at p. 1112.)
It is unclear whether the "narrowing" and "selection" aspects of the federal capital sentencing scheme are comparable to those in California's capital sentencing scheme (see generally, People v. Bacigalupo, supra, 6 Cal.4th 457, 24 Cal.Rptr.2d 808, 862 P.2d 808), and defendant offers no analysis on that point. In any event, it is clear that the type of "substantial overlap" found objectionable in McCullah is not present here. Notably, factor (n)(1)(C) and factor (n)(1)(D) of the federal scheme both focus on the issue of the defendant's intent in committing the underlying offenses. As the court in McCullah explained, because "[a]ny intentional conduct aimed at producing death is by definition conduct done with knowledge of grave risk of death," the (n)(1)(C) factor "necessarily subsumes" the (n)(1)(D) factor. (McCullah, supra, 76 F.3d at p. 1111.) By contrast, factors *211 (b) and (c) of section 190.3 implicate two distinct issues that are properly considered in the penalty determination: defendant's propensity for violence on the one hand, and his felony recidivism on the other. (People v. Melton, supra, 44 Cal.3d at pp. 764-765, 244 Cal.Rptr. 867, 750 P.2d 741.) While both issues may present themselves in a single incident, it cannot be said that such issues substantially overlap or that one necessarily subsumes the other. Accordingly, there is no unconstitutional skewing of the weighing process in the California scheme.

11. Restitution Fine
At the time of defendant's present crimes (1986) and his trial (1988), Government Code section 13967, subdivision (a) provided in pertinent part that "if the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000)." (Stats.1986, ch. 1438, § 1, p. 5140; Stats.1984, ch. 1340, § 1, p. 4722.) Here the trial court imposed a restitution fine in the amount of $5,000. Defendant did not object.
On appeal, defendant claims that a 1992 amendment to the foregoing statute applies retroactively to bar the imposition of any fine against him "in view of his evident inability to pay and the lack of evidence showing ability to pay" while on death row.[100] He fails, however, to support that claim with adequate argument We therefore reject it as not properly raised. (See People v. Gordon, supra, 50 Cal.3d at p. 1244, fn. 3, 270 Cal.Rptr. 451, 792 P.2d 251; People v. Bonin, supra, 47 Cal.3d at p. 857, fn. 6, 254 Cal. Rptr. 298, 765 P.2d 460.)

12. Proportionality Review
Contrary to defendant's assertions, the federal Constitution does not require intercase proportionality review (Pulley v. Harris (1984) 465 U.S. 37, 50-51, 104 S.Ct. 871, 879-880, 79 L.Ed.2d 29; People v. Bradford, supra, 15 Cal.4th at pp. 1383-1384, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Crittenden, supra, 9 Cal.4th at p. 156, 36 Cal.Rptr.2d 474, 885 P.2d 887.) Nor does our state Constitution require such review in order to ensure due process of law and equal protection of the laws, or to avoid the infliction of cruel or unusual punishment. (People v. Bradford, supra, 15 Cal.4th at p. 1384, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Crittenden, supra, 9 Cal.4th at pp. 156-157, 36 Cal.Rptr.2d 474, 885 P.2d 887.) In any event, "`even were such a procedure mandated in this state, it is inconceivable that this defendant would benefit from it.'" (People v. Carpenter (1997) 15 Cal.4th 312, 421, 63 Cal.Rptr.2d 1, 935 P.2d 708.)

13. Cumulative Error
Defendant argues that the cumulative effect of the errors committed at the penalty phase requires reversal of the penalty conviction. We disagree. Whether considered separately or in combination, the few errors that may have occurred during the penalty phase, as discussed earlier, were harmless.

14. Lackey v. Texas
In Lackey v. Texas (1995) 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304, Lackey petitioned the high court for a writ of certiorari, arguing that his execution after 17 years on death row would amount to cruel and unusual punishment. On denial of certiorari, Justice Stevens, joined by Justice Breyer, filed a memorandum expressing the view that Lackey's claim, though novel, was "not without foundation." (514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304.)
Justice Stevens, however, indicated there were questions concerning what portion of the 17-year delay should be considered in the analysis and whether some of the *212 delay should be attributable to Lackey's abuse of the system. (514 U.S. at p. 1047, 115 S.Ct. at p. 1422.) In closing, Justice Stevens remarked that the denial of certiorari was not a ruling on the merits and characterized Lackey's claim as an ideal issue for further study by the state and federal courts. (Ibid.)
Relying on Justice Stevens's comments, defendant claims he has been subjected to cruel and unusual punishment by being confined over 10 years without a final adjudication of his case. As part of his claim, he asserts that only five years of the delay is fairly attributable to defense requests for extensions or continuances on appeal and that any retrial will face problems of stale evidence, dissipating memory, and death of key witnesses.
As we have emphasized in the past, our review on a direct appeal is limited to the appellate record. (People v. Sanchez, supra, 12 Cal.4th at p. 59, 47 Cal.Rptr.2d 843, 906 P.2d 1129; People v. Szeto (1981) 29 Cal.3d 20, 35, 171 Cal.Rptr. 652, 623 P.2d 213.) Because defendant's claim is dependent upon evidence and matters not reflected in the record on appeal, we decline to consider it at this juncture. (Accord, Janecka v. State (Tex.Crim.App.1996) 937 S.W.2d 456, 476.)

III. DISPOSITION
For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.[101]
GEORGE, C.J., and MOSK, KENNARD, WERDEGAR, CHIN and BROWN, JJ., concur.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] The trial court apparently also sentenced defendant to a total term of 17 years, 4 months for the robbery, assault with a firearm, and kidnapping counts and the firearm enhancements, and imposed a restitution fine of $5,000. Defendant has raised no issues with regard to the determinate sentencing.
[3] Defendant's girlfriend, Cheryl Lake, was also at the camp.
[4] It was McGee's understanding that Eggett had hired defendant to help him dredge for gold.
[5] Defendant drove his truck, with Haynes and two of the children as passengers. Burgess drove Kersting's truck, with Kersting and the third child as passengers.
[6] The camp was in the middle of the road. A creek apparently blocked the road just beyond the camp.
[7] Cantwell rode his street motorcycle until the road got too rough and steep for it. He then left the motorcycle and joined the others in the Jeep. The motorcycle that had been parked at the camp when defendant and his group arrived belonged to Hampton.
[8] Cantwell had met defendant as "Lee Barrett" in 1985 through Eggett. Cantwell sold defendant a van and had socialized with him at least once in 1985. He had also seen defendant at the campsite before.
[9] Although Cantwell testified he believed he had emptied his pistol, Kersting testified that defendant had emptied the weapons, throwing the shells into the bushes.
[10] During this time Kersting did not know if Eggett and his friends were "real bad guys or what," so he tried to stay out of their sight. Although Burgess told Kersting that the men were rapists and "ripped people off," they never threatened Kersting in any way.
[11] Billy, who was very meek, was not tied up.
[12] Hampton testified that defendant had been wearing a long knife at his side while at the camp. Burgess also saw that defendant had a knife at the camp.
[13] Everyone agreed that the mosquitoes were exceptionally bad up at the camp area.
[14] When Cantwell asked about the other $300 of his money, defendant told him to consider it a loan. Cantwell was too frightened to argue about it.
[15] Hampton and Cantwell did not go back for Billy. Billy, who had walked back to the campsite, was picked up by law enforcement officers the next day.
[16] Defendant claimed he had stolen the oil, which had been stored in five 5-gallon containers, from Cantwell's van shortly before he purchased it. Defendant took the containers of oil to Butte Creek Canyon and buried them in four different spots without leaving any markings. Defendant said he had been told that the stolen oil was worth between $2 million and $4 million.

Defendant claimed the following past encounters with Cantwell at various times during his testimony. They included defendant's version of certain events discussed by prosecution witnesses, such as the 1985 incident at Dave McGee's apartment. Another time in 1985, Cantwell was in his Blazer and chased defendant across a field, shooting him in the hand and in the calf area. In January of 1986 in San Diego, Cantwell's friends accused defendant of stealing the oil from Cantwell and severely beat him. Then, after defendant left San Diego in March of 1986, some people tried to kill him in Chico by running into him with their car.
[17] Defendant also described various motions he had prepared, including a motion to dismiss the information, indictment or complaint, a suppression motion and a motion for new discovery. The court told defendant it would not accept any filings of any motions by defendant as long as he had a lawyer.
[18] Citing Hawkins v. Superior Court (1978) 22 Cal.3d 584, 150 Cal.Rptr. 435, 586 P.2d 916, defendant suggests on appeal that the magistrate's decision denied him adequate representation at the preliminary hearing because Schroder failed to realize the propriety of using the hearing to impeach witnesses and compel the cooperation of hostile witnesses. We are not persuaded. Not only is the claim vague regarding the particular evidence that should have been developed, but as the People point out, there are good reasons for not allowing the preliminary hearing to serve as a discovery tool for the prosecutor and for not "nailing down" negative testimony of witnesses who may later become unavailable for trial.
[19] Defendant contends this case is distinguishable from People v. Crandell, supra, 46 Cal.3d 833, 251 Cal.Rptr. 227, 760 P.2d 423, because here the conflict was primarily attributable to Schroder. We disagree. Here, as in People v. Crandell, defendant and counsel disagreed sharply over matters of strategy and preparation for the impending preliminary hearing. Moreover, the instant conflict was exacerbated by defendant's unfounded belief that Schroder was related to a Melvin Schroeder who supposedly knew the murder victim.
[20] Because we conclude defendant did not make an unequivocal assertion of his right of self-representation, we find inapposite defendant's authorities holding or suggesting there is no obligation to reassert an unequivocal request for self-representation in order to preserve the issue. (E.g., People v. Poplawski (1994) 25 Cal.App.4th 881, 30 Cal.Rptr.2d 760; In re Justin L. (1987) 188 Cal.App.3d 1068, 233 Cal.Rptr. 632; U.S. v. Arlt (9th Cir.1994) 41 F.3d 516, 519-520 [defendant persisted in seeking the right to represent himself even though court-appointed counsel, counsel's partner and the court all attempted to dissuade him].)
[21] By this time Steven Stapleton had been appointed to assist Kenkel in the defense.
[22] Kenkel further testified he had spent considerable time on psychiatric issues since defendant's records indicated admissions into various state hospitals on six or seven occasions over the years. Kenkel was trying to get those records and had arranged for a psychologist to meet with defendant for information and testing.
[23] In addition, defendant complained Kenkel was ineffective in presenting the two dismissal motions because he failed to show that Schroder's representation at the preliminary hearing resulted in prejudice. To avoid any conflict, Rick Ortner was appointed to represent defendant on the claims of Kenkel's ineffectiveness.
[24] Defendant's contentions, which took over an hour to relate, included the following: (1) complaints that counsel should have filed a motion to suppress (§ 1538.5) relating to allegations that his truck and its contents were illegally seized, allegations that an inmate agent of the prosecutor gave the sheriff's office letters containing defense strategy, allegations that conversations at the jail had been illegally tape-recorded, and allegations that his confidential legal papers had been read and copied by jail personnel; (2) counsel's failure to make a motion pursuant to People v. Hitch (1974) 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 concerning the alleged mishandling of Eggett's autopsy such as the improper washing of Eggett's body, the failure to test brown fluid in Eggett's stomach, and the failure to check whether Eggett had pellets in just one leg or both legs and whether all the pellets were the same; (3) counsel's failure to seek discovery pursuant to Pitchess v. Superior Court (1974) 11 Cal.3d 531, 113 Cal.Rptr. 897, 522 P.2d 305 of all records in the case pertaining to acts of violence committed by Sergeant Tom Handy against arrested persons; (4) counsel's failure to seek dismissal based on the "[a]bsolute perjured testimony" at the preliminary hearing; (5) counsel's failure to request an order allowing the jury to view the crime scene; (6) counsel's failure to seek a gag order to stop the prosecutor from giving details to the press regarding potential aggravating evidence at the penalty phase; (7) counsel's failure to make motions regarding the prosecutor's alleged failure to timely disclose discovery, the willful suppression of evidence and the striking of special circumstances; and (8) counsel's failure to have defendant's back examined to verify that he could not have lifted Eggett's body into the Jeep.
[25] Section 987.9 mandates that a judge other than the trial judge should rule on confidential applications for funds for the investigation of capital cases.
[26] A few minutes after returning to open court, defendant moved to be allowed to represent himself, saying he felt like he was about to have a nervous breakdown as a result of the way his defense had been handled. Based upon information related by Kenkel, the court continued the matter and ordered two psychiatrists to examine defendant to determine his capacity to knowingly and intelligently waive counsel. On May 11, 1988, defendant withdrew the request to represent himself, contending that the prosecutor's addition of more than 100 names to the jury questionnaire made it impossible for defendant to contact them all without the assistance of his defense team.
[27] Kenkel had been practicing primarily criminal law since he graduated from law school in 1973. He initially worked at the San Joaquin Public Defender's office from 1974 to 1977, where he first handled misdemeanor trials and then felony trials involving rapes, homicides, robberies and assaults. In 1977, Kenkel entered private practice in partnership with Dennis Latimer in Chico, where he continued to do mostly criminal defense work. Prior to the instant case, he handled three other death penalty cases and had obtained a life without possibility of parole verdict in one of them. He spent approximately 20 hours a year in continuing legal education in criminal law, and had spoken and debated on the death penalty to numerous groups. Kenkel also was serving on the Board of Governors and Executive Committee of the California Attorneys for Criminal Justice.
[28] We note defendant had given the court at least two oral descriptions of what the transcripts and police reports would have shown. Those descriptions did not demonstrate any entitlement to a dismissal of the charges.
[29] In defendant's view, Kenkel's representation that he was ready to proceed to trial was "incredible" because the previous week Kenkel had unsuccessfully sought a continuance. As the record discloses, however, Kenkel's request for a continuance was denied on the basis that defense investigators would have at least 30 days to the start of trial to continue their work while the jury was selected. Given such circumstances, we see no reason to reject Kenkel's assurances as inherently unbelievable.
[30] For instance, at the March 7, 1988, hearing, the court had asked counsel to "briefly state in broad terms what you've done in your representation of [defendant] thus far." Counsel indicated he was pursuing possible defense theories relating to whether Eggett's homicide qualified as a felony murder, whether the allegedly stolen property was either recovered or loaned, and whether there were psychiatric issues. Counsel also informed the court at the March 11, 1988, hearing that he and defendant had had other discussions regarding the defense that he believed should not be aired in court.
[31] Defendant had been told by the court that, in light of its denials of the two previous Faretta motions, the court would not stop the trial again for a Faretta hearing unless defendant first submitted a written motion setting forth reasons that warranted a hearing.
[32] In his declaration defendant contended that Sam and John witnessed the entire confrontation between defendant's group and Eggett's group and would corroborate defendant's version of the events. In particular, defendant claimed Sam and John would testify as follows: They witnessed the Eggett group invade the campsite; they saw that the shot fired at Eggett's foot was accidental; they had followed the Jeep when defendant had taken Eggett up the hill and tied him; they saw that defendant did not stab or otherwise injure Eggett at the top of the hill; they were told by the victims that the victims were going to kill defendant for having stolen a large amount of methamphetamine in 1985; they heard Cantwell speak about having defendant return the drugs to Cantwell and Cantwell's plan to return to the campsite to have the drugs finished off; they spoke with defendant while he waited for everyone else to leave the camp; they saw the flat tire on defendant's truck; and they saw defendant leave Eggett's Jeep parked near Cantwell's motorcycle. Because such testimony would exculpate him, defendant objected to the defense resting without searching for these witnesses and renewed his request to be released for the purpose of assisting counsel in such a search. No one else from Eggett's group or defendant's group ever reported seeing anyone meeting the description of Sam or John at any time during the events in question.
[33] A subsequent chemical analysis did not confirm counsel's claim that methamphetamine oil had been found.
[34] Subsequent testing did not show that the bottle ever contained methamphetamine oil.
[35] Although defendant filed a document reflecting a Marsden motion, he had earlier stated he intended to file Faretta objections.
[36] According to Walther, defendant had given $100 to Jeff and Karen Pierce when their house burned down. Another time, while at a creek with his girlfriend Cindy, defendant had saved a little boy from drowning even though defendant was not a good swimmer. On another occasion, defendant took firewood to a woman named Daisy and her young child so they could have heat for the house. Walther also stated she informed counsel that a man named Paul Wilhelm had offered to testify on defendant's behalf. Additionally, Walther gave the defense team photocopies of defendant's diplomas from Bible courses and records for defendant's logging business back east.
[37] Defendant also contends the trial court erred in failing to consider whether defense counsel had, "in the guise of his control over trial strategy, usurped the client's right to make the fundamental decision whether to deny or admit commission of a homicide." As this contention is perfunctorily asserted without any analysis or argument in support, we reject it as not properly raised. (See People v. Marshall (1990) 50 Cal.3d 907, 945, fn. 9, 269 Cal.Rptr. 269, 790 P.2d 676.)

Finally, to the extent defendant argues the trial court was obligated to grant the Marsden motion based upon the alleged inadequacies described by defendant, we disagree. As the alleged inadequacies concerned matters of trial tactics, they did not compel counsel's removal. (People v. Williams, supra, 2 Cal.3d at p. 905, 88 Cal.Rptr. 208, 471 P.2d 1008.)
[38] Defendant makes a related contention that the trial court erred in failing to appoint independent counsel to represent him on this particular Marsden request. Not so. "Appointment of independent counsel to assist a defendant in making a Marsden motion is likely to cause unnecessary delay, and may damage the attorney-client relationship in those cases in which the trial court ultimately concludes that the motion should be denied. We see no need for trial courts to appoint independent counsel to assist defendants making such motions. [Citations.]" (People v. Hines, supra, 15 Cal.4th at p. 1025, 64 Cal. Rptr.2d 594, 938 P.2d 388.)
[39] In addition, we reject the contention that the Marsden motion should have been granted based upon the alleged inadequacies of counsel. Our review of the record discloses no abuse of the discretion by the trial court.
[40] To the extent defendant contends the court erred in failing to conduct a proper inquiry into the alleged conflicts of interest, we observe that reversal for any such an error requires a showing that an actual conflict of interest existed and that the conflict adversely affected counsel's performance. (People v. Bonin (1989) 47 Cal.3d 808, 837-838, 254 Cal.Rptr. 298, 765 P.2d 460.) Since defendant has made no effort to make such showings on appeal (he specifically reserves the matter for presentation in a petition for writ of habeas corpus), we shall not address the issue here.
[41] On August 17, 1988, defendant informed the court that, as part of his ongoing Faretta objections, he planned to file a further description of counsel's alleged inadequacies. On August 22, 1988, defendant filed, in propria persona, a document entitled "Motion for Marsden motion." Despite his earlier reference to Faretta, defendant did not ask to represent himself, either in the filed motion or at the hearing thereon.
[42] The record indicates that defense investigators had spent approximately 1,700 hours on the case. This figure is based upon counsel's estimate under oath that the defense had expended approximately $60,000 in investigative funds at $35 per hour.
[43] Although defendant indicated that Cindy Burger would testify as to his heroism and that Kathy Mills likewise would testify positively, counsel pointed out that both individuals would be subject to cross-examination regarding physical violence by defendant. And while Dr. Hitchko, a psychologist who extensively tested defendant, would be able to explain defendant's antisocial personality in the context of his unfortunate family background, he would be subject to cross-examination concerning defendant's test responses, which indicated strong manipulation, dangerousness, and patterns of violence. Although counsel had considered calling Robin Stingley to testify regarding her reaction of surprise to hearing defendant's suspected involvement in Eggett's murder, he declined to do so given her adverse testimony in the guilt phase and his assessment that she would not have been a particularly good witness. As for defendant's claim that inmate Greg Woodcox would have provided positive testimony regarding the alleged assault attempt on Officer Cheatham, counsel decided against calling Woodcox after interviewing him and concluding that his testimony would not help the case.
[44] This opinion does not attempt to discuss every single allegation of counsel's ineffectiveness that formed the basis for the Marsden motion. We have, however, reviewed them all and conclude that none of the allegations, whether considered singly or in combination, compel a different result.

Defendant further contends that counsel's lack of effort precluded him from utilizing available mitigating evidence in violation of his constitutional rights to effective assistance of counsel, to represent himself, to a fair trial with due process of law and to have a reliable death penalty determination. As these contentions are perfunctorily asserted without any analysis or argument in support, we reject them as not properly raised. (People v. Marshall, supra, 50 Cal.3d at p. 945, fn. 9, 269 Cal.Rptr. 269, 790 P.2d 676.) We also find the contentions to be without merit in light of our determination that defendant had not demonstrated ineffectiveness of counsel.
[45] We note defendant had initially requested appointment of separate counsel to assist on a new trial motion prior to conclusion of the penalty phase. The court denied the request without prejudice, finding it was premature until such time as the trial was completed. Although defendant asserts on appeal that appointing separate counsel in advance of a verdict would avoid later delay in the presentation of new trial motions based upon assertions of counsel's ineffectiveness, he cites no authority validating such a practice. We decline to be the first.
[46] Defendant also contends the trial court erroneously denied his 130-page motion in propria persona for a new trial. This contention is not supported by its own analysis, but incorporates by reference other arguments made in the opening brief. We therefore reject the contention based upon our analyses of those other arguments.
[47] The defense exercised two of its peremptory challenges against Wilson and Caven. Allison and Costa were never seated and therefore were never subject to peremptory challenge.
[48] Although the parties stipulated to 26 peremptory challenges each, the court later said each side was entitled to 30. The defense exercised 20 of its challenges and the prosecution exercised 21.
[49] After explaining the circumstances under which a defendant would be eligible for the death penalty, the trial court asked Hill: "And then after hearing evidence in the penalty phase you found that other factors plus the homicide, substantially outweighed whatever mitigating factors were put forward on behalf of that person, do you think there would be any circumstances under which you could vote for a death penalty?" To this Hill responded: "I would have to hear it all, I mean you know before I could say whether I could or not. I mean it would have to be presented in frontright now, sitting here, no I couldn't." Then during defense questioning, Hill stated she didn't know whether she would be able to impose a death penalty if she believed the truth of the charges to a moral certainty. Finally, the prosecutor asked: "[D]o you feel just given your own internal make up, that away from the theory and well, you know, it's nice to think about it in the abstract, just really back there in a jury room, do you think that you could say `yes I could vote for death?'" Hill answered no.
[50] Throughout her voir dire, Thatcher repeatedly said she did not know whether she could vote for the death penalty if she were to conclude that death was the appropriate punishment in the case. When the prosecutor pressed Thatcher to state whether she could "in good conscience say that you would vote to put another human to death," Thatcher responded "I don't think so. I don't think I could."
[51] For example, although the court dismissed Thatcher primarily because of her answers, it also considered the fact that she almost broke down in tears over some of the questions.
[52] Field acknowledged that at times he had to stop acquaintances or friends from starting to say something about the trial to him, and that he had to leave abruptly when reports would come "on the radio or something."
[53] When Racowski concluded her testimony regarding the assault, the trial court offered to instruct the jury that the evidence had been admitted for the limited purpose of showing motive. Consistent with defense counsel's wishes, at the end of the guilt phase the jury was instructed: "[¶] Evidence has been introduced for the purpose of showing that the Defendant committed crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show a motive for the commission of the crime charged and/or impeachment of the Defendant. [¶] For the limited purpose for which you may consider such evidence you must weigh it in the same manner as you do all other evidence in this case. You are not permitted to consider such evidence for any other purpose."
[54] Defendant also claims that admission of Racowski's testimony violated his federal constitutional rights to due process and to a reliable guilt determination in a capital case. We reject these claims. The defense did not make timely objections on those bases at trial. (People v. Rodrigues, supra, 8 Cal.4th at p. 1116, fn. 20, 36 Cal.Rptr.2d 235, 885 P.2d 1; People v. Ashmus (1991) 54 Cal.3d 932, 972-973, fn. 10, 2 Cal. Rptr.2d 112, 820 P.2d 214.) In any event, the admission of the testimony did not implicate any of the cited federal protections.
[55] Defendant makes related claims that errors of the court, misconduct of the prosecutor and incompetence of defense counsel, in relation to the Jeep sabotage matter, prejudicially undermined his rights to due process and to a reliable guilt determination in a capital case. These claims are rejected. The defense made no such objections at trial. (People v. Rodrigues, supra, 8 Cal.4th at p. 1116, fn. 20, 36 Cal.Rptr.2d 235, 885 P.2d 1; People v. Ashmus, supra, 54 Cal.3d at pp. 972-973, fn. 10, 2 Cal.Rptr.2d 112, 820 P.2d 214.) In any event, the admission of the evidence did not implicate any of the cited federal protections.
[56] According to defendant, "[w]hen a vehicle such as a motorcycle is driven under its own power on a road surface covered with loose objects such as pine needles, the full power of the engine is directed to the small area where the drive wheel touches the road surface, and the resistance of the vehicle must be moved by the force applied at that point. Pushing the motorcycle, on the other hand, will be unlikely to disturb the surface unless the weight of the cycle itself is sufficient to depress the surface, as when it is pushed through sand or mud."
[57] Defendant suggests that the fact that counsel subsequently objected to the admission of Eastham's testimony establishes he had no tactical purpose in previously allowing defendant to testify as he did. We disagree. The subsequent efforts by counsel to minimize further exploration of the issue appeared reasonable in light of defendant's negative characterization of Eastham's abilities. Such efforts do not affirmatively demonstrate the unreasonableness of counsel's earlier actions.

Defendant also contends that counsel's ineffectiveness and the trial court's error infringed upon his Fifth Amendment privilege against self-incrimination. As this contention is perfunctorily asserted without any meaningful analysis or argument in support, we reject it as not properly raised. (People v. Marshall, supra, 50 Cal.3d at p. 945, fn. 9, 269 Cal.Rptr. 269, 790 P.2d 676.) In any event, we perceive no Fifth Amendment violation on the instant facts.
[58] Although the prosecutor seemed to question whether defendant could be adequately secured from escaping if transported to areas of his own choosing, he professed more concern about people in the search area over whom authorities would have no control.
[59] According to defendant, Muretto's threat was the reason Bond had sought to escape from the jail.
[60] As part of the ineffective assistance claim, defendant asserts counsel could have avoided any hearsay problem by calling Muretto as a hostile witness. Since, among other things, the record does not show Muretto's availability, this portion of the claim is not properly raised on appeal.
[61] The United States Supreme Court described the 1970 version of section 647, subdivision (e) as a criminal statute that required persons who loitered or wandered on the streets to provide a "credible and reliable" identification and to account for their presence when requested by a peace officer under circumstances that would justify a stop under the standards of Terry v. Ohio (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. (Kolender v. Lawson, supra, 461 U.S. at p. 353, 103 S.Ct. at p. 1856.)
[62] Defendant contends the evidence was prejudicial by suggesting he was guilty of a crime of moral turpitude (failure to return to custody) for which he had not been charged or convicted, and, combined with other evidentiary errors, undermined his rights to a fair trial and due process. We are not persuaded. The trial court specifically instructed the jury that evidence of prior crimes committed by defendant could not be considered as proof that he was a person of bad character or had a disposition to commit crimes, and that any such evidence may be considered "only for the limited purpose of determining it tends to show a motive for the commission of the crime charged and/or impeachment of the defendant" (See ante, fn. 54.) Accordingly, any possible prejudice was minimized.
[63] The mistrial motion was also based upon the prosecutor's question whether defendant had been wanted on "other warrants" in September of 1985. The court determined that no mistrial was warranted on that basis since the court had sustained the defense's objection and had admonished the jury to disregard the matter.
[64] In light of our conclusion that the prosecutor's actions were not prejudicial, we reject defendant's related contentions pertaining to the trial court's failure to grant his motion for mistrial due to the perceived misconduct and to defense counsel's omissions with respect to the line of questioning.
[65] As mentioned previously, the defense indicated prior to closing argument that it had no objection to the prosecutor's display of the knife, so long as there was no "high drama." The defense's failure to object to the actual display of and reference to the knife during closing argument reasonably supports the inference that no high drama in fact occurred.
[66] Vasquez also questioned the effect his testimony might have on the immunity that had been granted Burgess. Both the trial court and the prosecutor agreed that Burgess could no longer be prosecuted for the charged offenses.
[67] The relevant questions and answers were as follows: "[¶] Q. [defense counsel] Had you been pressured by anybody at that point in time, or up to that point in time? [¶] A. [Burgess] Yes. [¶] Q. By whom? [¶] A. My attorney. [¶] Q. And why did you say that it possibly could have been blood? [¶] A. I felt that at that point it was so ludicrous it wasn't going to make any difference anyway, [¶] Q. What do you mean by that? [U] A. I was given the answer to questions and then asked the question, [¶] Q. Who gave you the answer to what question? [¶] A. My attorney. [¶] Q. Gave you answer to what question? [¶] A. That Lee [defendant] had returned to the site the following day. [¶] Q. What site? [¶] A. The campsite. And had stopped and told somebody that he had done it. My attorney even gave me a name but I forgot what it was, and finally David said `well I told him' then he refused to give the name of the person that was supposed to have told him as attorney/client privilege information."
[68] According to the reporter's transcript, the prosecutor read half of the instructions to the jury and defense counsel read the other half. The claim-of-right instruction, which had been submitted by the defense, read as follows: "It is a defense to the crime of robbery that a person harbors a good faith and honest belief he has a right to the property, even though said belief is mistaken. If the evidence raises a reasonable doubt that the defendant may have had an honest, although mistaken belief, that he had a right to the gold taken from Richard Eggett, you must find the defendant not guilty of the crime of robbery, as charged in Count II."
[69] At least three eyewitnessesCantwell, Burgess and Kerstingtestified they heard defendant acknowledge at the time of the taking that the money did not belong to Eggett. Because defendant flatly denied at trial ever having made such acknowledgments, we do not consider such evidence in assessing the instructional error claim.
[70] Defendant makes the additional claim that if one credited his trial testimony that he took Cantwell's money initially under a claim of right, then the evidence would support a conviction of theft, as a lesser included offense of robbery, with respect to the portion of money that he allegedly retained and never returned. (See People v. Ramkeesoon (1985) 39 Cal.3d 346, 351, 216 Cal.Rptr. 455, 702 P.2d 613.) In light of our conclusion that the claim-of-right defense was unavailable given the evidence in the case, we reject defendant's contention that the trial court violated state law and federal due process by failing to instruct sua sponte on the lesser included offense of theft.
[71] Defendant claims the instruction in this case was misleading on the issue of alternatives because its broad statement that "there must exist no alternative means" could have led the jurors to incorrectly reject the defense if they determined there existed more drastic means than kidnapping, such as killing Eggett's group or disabling them by wounds, to alleviate the threatened harm. This is an absurd interpretation which, in addition to defying common sense, disregards the additional requirement that defendant's actions be "necessary" to prevent harm to himself or a third party. No reasonable juror would ascribe such a tortuous meaning to the instruction.
[72] The mistake of fact instruction told the jurors:

"Thus, the defendant is not guilty of the crime of assault with a firearm if he committed the act under an honest and reasonable belief in the existence of certain facts, that is, that the gun was not loaded."
[73] Although defendant frames this claim as extending to the taking of guns from both Cantwell and Eggett, he fails to point to any evidence in the record showing that Eggett brought a gun to the camp or that defendant took any gun belonging to Eggett.
[74] Section 837 provides: "A private person may arrest another: [¶] 1. For a public offense committed or attempted in his presence. [¶] 2. When the person arrested has committed a felony, although not in his presence. [¶] 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it." In this case,; defendant asserts the "aggressive display of weapons by Cantwell and Hampton" violated section 417 and "the attempted robbery by Eggett of Burgess" violated section 211. While disputing other aspects of the instant claim, the People do not contest these particular assertions.
[75] We note that subdivision (a) of section 207 specifies that "[e]very person who forcibly ... arrests any person in this state, and carries the person ... into another part of the same county, is guilty of kidnapping." (Italics added.) Neither defendant nor the People have commented on the significance of this statutory language.
[76] It was not error to not instruct on the concept of citizen's arrest with regard to the assault charge because the jury could not possibly have understood the assault charge to be based on the act of disarming Cantwell or Hampton. (See ante, at pt. II.C.12.)
[77] The oral instruction provided: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt but it is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."
[78] The jury was instructed: "[¶] The commission of the crime of robbery is not confined to a fixed place or a limited period of time. [¶] A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in hot flight, that is, while in possession of the stolen property he is fleeing in an attempt to escape. Likewise it is still in progress so long as he is still being immediately pursued in an attempt to capture him or regain the stolen property. [¶] A robbery is complete when the perpetrator has eluded his pursuers, if any; has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property."
[79] Defendant suggests the instruction permitted the jury to improperly infer that the robbery was still in progress even after defendant returned the money and guns to Cantwell on the theory that defendant was engaged in "flight" and that this somehow affected the special circumstance finding, "because under one prosecution theory Eggett was killed after the property was returned to Cantwell." It is unclear how this argument benefits defendant. According to the prosecution's case, defendant never did return all of Cantwell's property. In addition, defendant never claimed to have returned any of Eggett's property at any time.
[80] The reading of CALJIC No. 8.10 was directly followed by a reading of CALJIC Nos. 8.11 (defining malice aforethought) and 8.20 (defining deliberate and premeditated murder), and by a modified version of CALJIC No. 4.21 (pertaining to evidence of intoxication in determining whether defendant had the requisite mental state of express malice, premeditation and deliberation).
[81] Defendant argues the verdict does not necessarily signify an intentional killing with malice aforethought because the jury could have found first degree murder under the incomplete felony-murder instruction given by the court. As the claim of felony-murder instructional error is clearly without merit (see ante, pt. II.C.15.), we reject its assertion here.
[82] The jury was advised: "[¶] Reasonable doubt is defined as follows. It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. [¶] It is that state of the case which after the entire comparison and consideration of all the evidence leaves the mind of the jurors in that condition that that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."
[83] Although Eggett's mentally slow adult brother, Billy, offered some testimony in this case, it was very limited.
[84] Defendant asserts that a victim who has been bound by a kidnapper no longer presents an obstacle to the kidnapper's escape. We cannot agree with this categorical statement. Prior to reaching a place of temporary safety, the kidnapper could be thwarted in his escape if the bound victim frees himself or is freed by another.
[85] The jury was instructed: "If the person moved away is incapable of consenting thereto by reason of immaturity or mental condition, then the person moving him away is guilty of kidnapping only if the act of moving was done for the purpose of illegally facilitating the kidnapping of others."
[86] In light of this conclusion, we need not address whether substantial evidence supported the alternative theory that Billy did not accompany defendant voluntarily and was in fact transported by force.
[87] The jury was instructed: "[¶] To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. That the defendant intended to kill or intended to aid in killing of a human being, [¶] 2. That the defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose, and [¶] 3. That the defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." (CALJIC No. 8.81.18 (1986 rev.).)
[88] Contrary to defendant's suggestions otherwise, the jurors were not asked to find that defendant committed torture by beating and kicking Eggett or forcing Eggett to stand and walk after he was shot in the feet. Nor were they asked to find that defendant's piercing of Eggett's back with a fishing lure constituted torture. Although the prosecutor referred to the statements made by defendant when he committed such abuse as further evidence of his intent to inflict "severe, cruel, physical pain" upon Eggett, it was repeatedly emphasized by both the prosecution and the defense that the torture at issue concerned the multiple knife wounds found on Eggett's body.
[89] Counsel's argument proceeded as follows: "Greg Kersting ... recalls one of the last things Lee Barnett saying, was that he Was going to take that Jeep, go up to where Richard Eggett was; tell him to keep his mouth shut or he would never see the Jeep again.... [¶] ... [I]f Mr. Barnett went back up, took that Jeep, to tell Mr. Eggett that when he gets loose, that he better keep his mouth shut, and if Rich Eggett who is not a small man, not a man who was afraid, [you] heard evidence about his fate the year before with Mr. Barnett  said something like go to hell what would have been the result.... [¶] Think about what would happen if somebody in anger striking out maybe intending to kill, maybe not, in anger at being challenged again by someone you thought stole from you, or screwed you out of a pound of gold, attacked somebody, would stab wounds be consistent with what you've seen in this case. There's no evidence as to what order they occurred. Just evidence that they're there.... [¶] The fact is when Mr. Barnett left that camp, he was on his way back up to dump that Jeep off and say what Greg Kersting said he was going to say. The use of methamphetamine is a horrible persistive [sic] problem in our society. The fact that it's involved in this case is not one that you should hold ill will towards any of the witnesses or Mr. Barnett. [¶] You should carefully and open-mindedly examine all of the evidence in this case. Including methamphetamine. What it does to people. [¶] Even if you conclude, if you come to a collective decision that first degree murder is warranted in this case, even if you make that decision, your inquiry, your job in this case is far from over."
[90] Counsel also made the following argument:

"[¶] This has not been a comfortable case. Lee Barnett is not your boy next door. He's a person who has lived outside on the edges of what we consider normal society. He's a drug abuser. No family, no friends have come to observe his trial; support him. [¶] The measure of our society is not how we treat the best of us, but how we treat the worst of us. For me personally it's been a tough case." Defendant complains counsel should not have gratuitously criticized him or tried to distance himself from the client. We see no incompetence. As his immediately following argument made clear, counsel was simply telling the jurors, in effect, that even though they might not feel sympathy for defendant, this was precisely the type of case that required "courageous people" such as themselves to reach a courageous result.
[91] The claimed errors involve: the dismissal of potential jurors Carol Thatcher and Collette Hill; the failure to inquire adequately into possible misconduct by Juror Larry Field; admission of testimony regarding the alleged assault on Christine Racowski; admission of testimony relating to the sabotage of Eggett's Jeep; admission of the prosecution's "experiment" with the motorcycle tire tracks; admission of evidence relating to defendant's nonviolent escape from the county hospital; admission of evidence relating to the location of the supposedly stolen methamphetamine oil; impeachment of Kenny Clumpus by proof of a nonviolent escape; and prosecutorial misconduct relating to defendant's use of aliases and display of the fishing lure and knife.
[92] Defendant points to no authority indicating that the perceived errors rise to the level of a federal constitutional violation. (See People v. Brown (1988) 46 Cal.3d 432, 449, 250 Cal.Rptr. 604, 758 P.2d 1135.) In any event, defendant's federal claims fail because application of the "reasonable doubt" standard of Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, would also yield a finding of no harm.
[93] In light of our conclusion that the prosecutor's questioning was proper, we reject defendant's related claim that counsel was ineffective for failing to halt it.
[94] Such questioning included: whether Walther remembered if defendant had been arrested for rape; whether he had got into trouble while in prison in New York; whether he had been arrested for armed robbery in Albany; whether he had escaped from the Albany jail; whether he had been in jail in Virginia; whether he had been convicted of an assault in Massachusetts; and whether he had jumped bail.
[95] The colloquy at trial was as follows. "[¶] Mr. Ramsey [the prosecutor]: We would ask that that evidence be admitted into evidence at this time. [¶] Mr. Kenkel [defense counsel]: Your Honor, I would have objection to particularly the fingerprint card, as it does haven't [sic ] any particular relevance. It is Mr. Barnett's fingerprints. My problem with it, it has written on it `first degree rape'. [¶] I would, subject to my previous motion with regard to that witness, we would have no objection to the photograph, it's going in without the fingerprint card. [¶] Mr. Ramsey: Well, it ties in. Your Honor, that this[¶] If counsel is willing to stipulate this is the man that was arrested and was identified by the witness during the New York proceedings, [¶] Mr. Kenkel: Well, if we can obliterate, whiteout the `first degree rape' section; that's my only problem with the fingerprint card, is it's got the `first degree rape' written on it. [¶] I assume the District Attorney is not introducing the fingerprint card to prove he's the person that raped her, but to prove[¶] Mr. Ramsey: This is the person that was identified by this witness in 1982 as the person that raped her during the New York proceeding, [¶] The Court: I will admit it. I'll have the clerk whiteout `rape in the first degree' from the card. [¶] Mr. Kenkel: That's fine."
[96] Defendant's related contention that counsel rendered ineffective assistance of counsel by failing to properly object to the evidence or to have it stricken also fails for lack of prejudice. (People v. Stanley (1995) 10 Cal.4th 764, 825, 42 Cal. Rptr.2d 543, 897 P.2d 481; People v. Zapien, supra, 4 Cal.4th at pp. 980-981, 17 Cal.Rptr.2d 122, 846 P.2d 704.) More fundamentally, however, defendant has not established that counsel's omissions at trial constituted ineffective assistance. As we have repeatedly recognized, "a mere failure to object to evidence seldom establishes counsel's incompetence." (People v. Malone (1988) 47 Cal.3d 1, 33, 252 Cal.Rptr. 525, 762 P.2d 1249 [applying rule in context of an objection made on different grounds]; see People v. Ghent (1987) 43 Cal.3d 739, 772, 239 Cal.Rptr. 82, 739 P.2d 1250.) On this record we cannot conclude counsel was necessarily incompetent for limiting his objections and failing to press the points now asserted on appeal. It is possible that, had counsel injected such objections or moved to strike, the prosecution very easily could have introduced evidence showing that Helen T. had identified defendant as her rapist in the 1982 proceedings. Significantly, the record contains no indication that such evidence was unavailable. Since counsel may have been aware of the relative case with which the prosecution could have obtained and introduced such evidence, we shall not assume the nonexistence of a legitimate tactical basis for counsel's omissions.
[97] The People dispute the characterization that the defense requested the language at issue here. We assume, for purposes of argument, that the defense's characterization is supported by the record.
[98] Defendant also contends the prosecutor committed misconduct by referring to his dishonorable discharge from the Army and by continuing to use and display the Marine Corps K-bar knife. These contentions are devoid of merit.
[99] The prosecutor argued: "[¶] Now we come and go back to the crime, the crime that we heard of at the very beginning. That was our first phase of the trial. The crime that itself involving the robbery, the kidnap, the torture, can be considered as a single circumstance in aggravation should not be broken out. Should not be broken out and say well we've got a murder, we have got a robbery, we've got a kidnapping and we have got torture. [¶] So shouldn't that be four special circumstances. No, it's considered as one aggravating circumstance and it's  when I said special circumstances I meant aggravating circumstance. Don't consider as a separate four; you consider it as one."
[100] In 1992, Government Code section 13967, subdivision (a) was amended in relevant part to provide: "[I]f the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than two hundred dollars ($200), subject to the defendant's ability to pay, and not more than ten thousand dollars ($10,000)." (Stats.1992, ch. 682, § 4, p. 2922, italics added.) That amendment was repealed in 1994. (Stats. 1994, ch. 1106, §§ 2, 3; see now Pen.Code, § 1202.4 [deleting requirement that imposition of restitution fine be subject to the defendant's ability to pay but allowing such factor to be considered in setting the amount of the fine in excess of the $200 minimum].)
[101] During the pendency of this appeal, defendant filed various briefs and exhibits in propria persona purporting to relate to his representation on appeal. To the extent defendant wishes us to consider such filings as supplemental briefing on the automatic appeal, we decline to do so. (People v. Clark, supra, 3 Cal.4th at p. 173, 10 Cal.Rptr.2d 554, 833 P.2d 561.)